**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

<table>
<tr><td>

In re:

AMSTERDAM HOUSE CONTINUING CARE
RETIREMENT COMMUNITY, INC.,[1]

Debtor.
</td><td>

Chapter 11

Case No. 21-_____ (___)
</td></tr>
</table>

## DECLARATION OF JAMES DAVIS IN SUPPORT OF THE
## DEBTOR'S CHAPTER 11 PETITION AND FIRST DAY PLEADINGS

I, James Davis, hereby declare under penalty of perjury:

1.  I am the President and Chief Executive Officer ("CEO") of Amsterdam Continuing Care Health System, Inc. ("ACCHS" or the "Member") and Amsterdam House Continuing Care Retirement Community, Inc. ("AHCCRC" or the "Debtor"). ACCHS is the sole member of the Debtor. The Debtor, d/b/a The Amsterdam at Harborside ("The Harborside"), operates Nassau County's first and only continuing care retirement community ("CCRC") licensed under Article 46 of the New York Public Health Law ("PHL"), which provides residents ("Residents") with independent living units, enriched housing and memory support services, comprehensive licensed skilled nursing care, and related health, social, and quality of life programs and services.

2.  The Debtor's Board of Directors (the "Board") oversees the organization's management and I report directly to the Board.

3.  I have forty-eight (48) years of experience in long-term care, having served in several administrative capacities at Goldwater Memorial Hospital, as the Executive Director of the Ruth Taylor Geriatric and Rehabilitation Institute at the Westchester Medical Center, and for thirty-

---

[1] The last four digits of the Debtor's federal tax identification number are 1764. The Debtor's mailing address is 300 East Overlook, Port Washington, New York 11050.

three (33) years as the President and CEO of ACCHS, the Debtor, and other affiliates of ACCHS, including Amsterdam Nursing Home Corporation (1992) in Manhattan. Over the years, I have contributed frequently to the body of academic work on elder care and my work has been published in The New York Medical Quarterly and Long-Term Care Forum, among other publications. I have also spent considerable time and effort advancing the interests of not-for-profit providers statewide, most particularly through LeadingAge New York (previously the New York Association of Homes and Services for the Aging). I have served on many LeadingAge New York committees and task forces as both a member and chair. I served as Chair of LeadingAge New York Services for nine years, was a member of the LeadingAge House of Delegates for over five years, and in 2012 was awarded LeadingAge New York's Lawrence E. Larson Award of Honor for contributions to the field of aging services. I served as Vice Chair and as a member of the Board of Directors of the Continuing Care Leadership Coalition (a/k/a CCLC), a trade association representing long-term care facilities in the New York metropolitan area. I am a member of New York State's Continuing Care Retirement Communities Council appointed by the Governor. I have a bachelor's degree in economics and finance from the City College of New York, a master's degree in hospital administration from George Washington University, and am a licensed New York State Nursing Home Administrator.

4. On the date hereof (the "Petition Date"), in order to consummate a comprehensive restructuring and bond financing, the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101, et seq. (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Eastern District of New York, Central Islip Division (the "Court").

5.      The Debtor remains in possession of its assets and manages its business as a debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

6.      In my capacity as President and CEO, I am familiar with the Debtor's day-to-day operations, financial condition, business affairs, and books and records.  I submit this declaration (the "Declaration") to assist the Court and other parties in interest in understanding the circumstances that compelled the commencement of this chapter 11 case (the "Chapter 11 Case"), and in support of (a) the Debtor's petition for relief under chapter 11 the Bankruptcy Code, and (b) the following motions filed by the Debtor contemporaneously herewith or shortly thereafter (collectively, the "First Day Pleadings"):

> a.      *Debtor's Emergency Application for Appointment of Kurtzman Carson Consultants LLC as Claims and Noticing Agent for the Debtor Effective as of the Petition Date* (the "KCC Retention Application");
>
> b.      *Debtor's Emergency Motion for Entry of Interim and Final Orders (I) Prohibiting Utilities from Altering, Refusing, or Discontinuing Service, (II) Deeming the Utility Providers Adequately Assured of Future Performance, and (III) Establishing Procedures for Determining Requests for Additional Adequate Assurance* (the "Utilities Motion");
>
> c.      *Debtor's Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to (a) Pay Prepetition Wages, Salaries, Commissions, Employee Benefits, Prepetition Payroll Taxes, and Other Obligations, (b) Maintain Compensation and Benefits Programs, and Pay Related Administrative Obligations, and (c) Make Payroll Deductions, (II) Authorizing Applicable Banks and Other Financial Institutions to Honor and Process Related Checks and Transfers, and (III) Granting Related Relief* (the "Employee Wages Motion");
>
> d.      *Debtor's Emergency Motion for Entry of an Interim and Final Order (I) Authorizing the Debtor to Pay Certain Prepetition Taxes and Fees, (II) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers, and (III) Granting Related Relief* (the "Taxes Motion");
>
> e.      *Debtor's Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to (a) Maintain Existing Insurance Policies and Pay All Insurance Obligations Arising Thereunder and (b) Renew, Revise, Extend, Supplement, Change or Enter into New Insurance Policies, and (II) Granting Certain Related Relief* (the "Insurance Motion");

3

f.    *Debtor's Emergency Motion for Entry of an Order Authorizing the Implementation of Procedures to Maintain and Protect Confidential Resident Information* (the "<u>Resident Confidentiality Motion</u>");

g.    *Debtor's Emergency Motion for Entry of an Order Authorizing Debtor to Continue Escrowing and Refunding Entrance Fees in the Ordinary Course of Business* (the "<u>Escrow Motion</u>");

h.    *Emergency Motion for Entry of Interim and Final Orders Authorizing (I) Continued Use of the Debtor's Existing Cash Management System, (II) Maintenance of Its Existing Bank Accounts, (III) Continued Use of Its Existing Business Forms, and (IV) a Waiver of Certain Deposit and Investment Requirements in 11 U.S.C. § 345(b) and the UST Guidelines* (the "<u>Cash Management Motion</u>");

i.    *Debtor's Emergency Motion for Interim and Final Orders (I) Authorizing the Debtor to Use the Cash Collateral of UMB Bank, N.A., as 2014 Bond Trustee; (II) Providing UMB Bank, N.A., as 2014 Bond Trustee, Adequate Protection; and (III) Modifying the Automatic Stay* (the "<u>Cash Collateral Motion</u>");

j.    *Debtor's Emergency Motion for Entry of an Order Pursuant to Section 333(a) of Bankruptcy Code and Bankruptcy Rule 2007.2 (I) Waiving the Appointment of Patient Care Ombudsman and (II) Allowing Debtor to Self-Report* (the "<u>Ombudsman Motion</u>"); and

k.    *Debtor's Emergency Motion for Entry of an Order Authorizing the Debtor to Assume the Plan Support Agreement* (the "<u>Plan Support Agreement Motion</u>");

l.    *Debtor's Emergency Motion for Entry of an Order Establishing Certain Notice, Case Management and Administration Procedures and Omnibus Hearing Dates* (the "<u>Case Management Motion</u>");

m.    *Debtor's Emergency Application for an Order (a) Establishing Bar Dates Pursuant to Bankruptcy Rule 3003(c) and (b) Approving Form and Manner of Notice Thereof* (the "<u>Claims Bar Date Application</u>").

7.    I am generally familiar with the contents of each First Day Pleading and believe that the relief sought therein allows the Debtor to, among other things, fulfil its duties as debtor-in-possession and minimize the disruption to the Debtor's business operations that may be caused by the commencement of this Chapter 11 Case.  Additionally, I believe that the relief requested in the First Day Pleadings is important to ensure that the Debtor can continue to deliver necessary care and services to its residents as further described herein.

8.      Capitalized terms used but not defined in this Declaration shall have the meanings set forth in the relevant First Day Pleading.  Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, my opinion based upon my experience and knowledge of the Debtor's operations and financial condition, and information provided to me by management, advisors or other representatives of the Debtor.  If called as a witness, I would testify consistently with the facts set forth in this Declaration.

9.      To familiarize the Court with the Debtor and the relief the Debtor seeks early in this Chapter 11 Case, this Declaration is organized into two sections.  Section I provides an overview of the Debtor's operations and capital structure.  Section II sets forth the relevant facts in support of each of the First Day Pleadings filed in connection with this Chapter 11 Case, which the Debtor believes are critical to administering this Chapter 11 Case and preserving and maximizing the value of the Debtor's estate.

10.     The purpose of this chapter 11 case is to implement a comprehensive balance sheet restructuring and bond financing through a pre-negotiated chapter 11 plan (the "Plan") that has been negotiated at arm's length between the Debtor, its sole member, the trustee to the Debtor's outstanding revenue bonds (including any successors, the "2014 Bond Trustee") issued by the Nassau County Industrial Development Agency (the "2014 Issuer"), and the holders of approximately 73% of the principal amount outstanding of Series 2014 Bonds (as defined below) (excluding accreted principal under the Series C Bonds) (as defined below) (the "Consenting Holders").  Critically, the Debtor intends to assume all Residency Agreements (as defined below) and Admissions Agreements (as defined below) for existing residents.  The Plan as proposed allows the Debtor to honor its existing Entrance Fee refund obligations to former residents and provides it the ability to meet the future obligations to current and prospective residents.  Entrance Fees paid

5

by Residents and Prospective Residents which signed their Residency Agreements or paid their waitlist deposits on or after October 25, 2020, will be maintained in an escrow pending entry of an order confirming the Plan, for the benefit of the Resident paying such Entrance Fees.

11.     Accordingly, the Debtor intends for this Chapter 11 Case to be consensual and that the Debtor will make a smooth transition into and out of chapter 11 as expeditiously as possible, while minimizing any business disruption and impact on the Debtor's daily operation of The Harborside or on its Residents, general unsecured creditors, and vendors, among others.

12.     I respectfully request this Court's assistance in providing a swift exit from chapter 11 protection.

## PRELIMINARY STATEMENT[2]

13.     Incorporated in 2004, the Debtor is a New York not-for-profit corporation that has built and operates The Harborside, a best-in-class senior living community which is situated on approximately 8.9 acres in Port Washington, New York and is dedicated to giving its residents an enriching lifestyle.  The Harborside is Nassau County's first and only continuing care retirement community ("CCRC") licensed under Article 46 of the PHL, and offers its senior residents a continuum of care in a campus-style setting, providing living accommodations and related health care and support services to a target market of seniors aged sixty-two (62) and older.  The Debtor's sole corporate member is Amsterdam Continuing Care Health System, Inc. ("ACCHS" or the "Member"), which is also a New York not-for-profit corporation.

14.     Upon entering The Harborside, residents are provided spacious apartments and a broad range of social and recreational activities creating an unmatched quality of life.  As Residents require additional assistance with everyday activities or health care services, they have access to

---

[2] All capitalized terms contained in this Preliminary Statement and not otherwise defined therein shall have the meanings ascribed to them below.

assisted living, memory support, skilled nursing facilities and rehabilitation located on the same campus.  As their new home, the Residents of The Harborside have entrusted their health, safety, and well-being to AHCCRC for the duration of their lives.

15.     For many seniors, moving into a CCRC is an attractive option for them and their families because it minimizes the burdens and costs associated with the aging process and ensures that they can remain in place if their medical needs change.  These seniors will often sell their homes, liquidate significant assets and/or invest a significant portion of their life savings to become a part of a CCRC like The Harborside.

16.     CCRCs, however, are operationally and financially complex.  CCRCs require the maintenance of a broad range of services for the benefit of their Residents in varying stages of the aging process.  Additionally, building and maintaining the necessary infrastructure requires considerable upfront and working capital investments.  Furthermore, CCRCs require a steady flow of new residents to generate the revenue necessary to maintain day-to-day operations and to remain current on financial obligations, including obligations to current and former residents.

17.     The Harborside has faced historic financial challenges, the effect of which threatens the Debtor's ability to honor its long-term debt obligations and maintain its operational stability.

18.     The Debtor relies on revenue generated by existing and new Residents to, among other things, maintain its day-to-day operations, service its debt obligations and honor its Resident refund obligations.  However, the inability to attract new residents and the burden of statutory requirements regarding the repayment of refunds caused a severe liquidity crisis for the Debtor even before the impact of the COVID-19 pandemic.  The pandemic exacerbated these problems. To preserve liquidity during the COVID-19 pandemic, the Debtor ceased making payments on the 2014 Bond Obligations and ceased making payments of Resident Entrance Fee refunds.  The failure

7

to make refund payments caused the Debtor to fall out of compliance with the terms of its Residency Agreements and PHL Section 4609, both of which require payment of entrance fee refunds no later than thirty days after the formerly-occupied unit has been resold and in no event later than one year after the formerly-occupied unit has been vacated.

19.     In order to address its financial condition, the Debtor engaged in extensive, arm's-length negotiation with the Member, the 2014 Bond Trustee, and the Consenting Holders, as applicable, resulting in the execution of a Plan Support Agreement, attached hereto as **Exhibit M**, documenting the terms of a refinancing of the Debtor's 2014 Bond Obligations (each defined and described below) that collectively provide for the following (the "Refinancing Transaction"):

a.    The funding of an additional $40,710,000 in new money bond financing (the new Series 2021A Bonds) to provide for among other things: (i) the payment of all outstanding Entrance Fee refunds in full; (ii) partial funding of the Debtor's minimum liquid reserve requirements ("MLRR") under applicable New York State law; and (iii) a necessary debt service reserve fund;

b.    The contribution of $9 million from the Member to the Debtor to fund the balance of the MLRR;

c.    An exchange of the current Series A Bonds and Series B Bonds (as defined below) for a pro rata share of the new 2021B Bonds issued in the aggregate original principal amount of $127,327,200 (the "Bond Refinancing"); and

d.    The provision of post-bankruptcy credit support from the Member to the Debtor pursuant to a Liquidity Support Agreement ("LSA"), pursuant to which the Member's obligations will be fully funded from the closing of the sale of a not-for-profit nursing home operated by an affiliate of the Debtor and Member, to be dedicated to regulatory compliance, including the funding of future MLRR and Entrance Fee refund obligations.  The funds provided under the LSA shall be held in a segregated account at the Debtor and shall not be subject to the Trustee's liens.

20.     Pursuant to the Plan Support Agreement, the First Day Pleadings and this Chapter 11 Case, AHCCRC seeks to, among other things, implement the Refinancing Transaction through a chapter 11 plan.

## I.    OVERVIEW OF THE DEBTOR'S BUSINESS

### A.    Description of The Harborside's Continuing Care Retirement Community

#### 1)    The Harborside

21.    The Harborside offers approximately three hundred and twenty nine (329) units of varying sizes for independent, enriched, and skilled nursing care.  Notably, The Harborside has twenty-six (26) enriched housing units, eighteen (18) special needs assisted living residence units also licensed as enhanced assisted living residence units and fifty-six (56) skilled nursing beds in its Isaac H. Tuttle Health Center (the "Health Center") to provide short-term rehabilitation and long-term care to its Residents and to individuals living in the community who enter into an Admissions Agreement (as defined below) for the provision of services in the Health Center.  The Health Center is certified for Medicare and Medicaid by the Department of Health and Human Services' Center for Medicare & Medicaid Services ("CMS"), and is also licensed by the New York State Department of Health (the "DOH").  Approximately ten percent (10%) of Residents in the Health Center are covered by Medicaid.

22.    The Debtor is affiliated with certain New York entities, including:

- ACCHS, the Debtor's sole member, established in 1997, is a New York not-for-profit corporation that supports the overall mission of programs and services the Debtor and its affiliated corporations provide to senior citizens by obtaining contributions, grants, or holding fund raising events;

- Amsterdam Nursing Home Corporation (1992), established in 1995, is a New York not-for-profit corporation that succeeded an organization established in 1872.  It owns and operates a 409-bed skilled nursing facility and a 40-registrant adult day health care program in upper Manhattan, and maintains clinical and academic relationships with various hospitals;

- Amsterdam Services Corp., established in 1996, is a New York not-for-profit corporation that provides managerial and administrative support services to not-for-profit and county-sponsored organizations;

- Amsterdam Services Corporation (2001), established in 2001, is a New York business corporation that provides administrative services;

- Amsterdam Consulting, LLC ("ACLLC"), established in 2008, is a New York limited liability company that provides managerial and administrative support services to not-for-profit organizations.  As noted in paragraph 23 below, Amsterdam Consulting, LLC, provides such services for the Debtor; and

- Amsterdam 2012, Inc., established in 2012, is a New York not-for-profit corporation that was formed to develop retirement communities.

2)      Management of The Harborside

23.     The Debtor is a party to an Administrative Services Agreement with Amsterdam Services Corp. ("ASC"), a New York not-for-profit corporation, dated as of March 31, 2004 and amended as of November 15, 2007.  In July 2008, ASC assigned the Administrative Services Agreement to ACLLC.  The commencement date of the contract was March 1, 2010 for an initial term of five (5) years.  In October 2015, the Debtor and ACLLC entered into a second amendment to the agreement revising the terms to be automatically renewed for successive one-year terms, among other changes.

24.     The Administrative Services Agreement calls for ACLLC to provide administrative, supervisory and fiscal advisory and consulting services for the skilled nursing facility component of The Harborside.  Additionally, ACLLC provides financial services for the Debtor including the preparation of monthly operating statements.  For services performed under this agreement, the Debtor paid $163,894.92 in administrative services fees for fiscal year ending December 31, 2020.  The annual administrative services fee may increase annually by an amount not to exceed the increase in the Consumer Price Index for All Urban Consumers (medical care index).

25.     On October 23, 2014, the Debtor entered into a Financial Services Advisory Agreement (the "FSAA") with GMSC New York, LLC ("Greystone"), a Texas limited liability company and a wholly-owned subsidiary of GMSC, LLC, under which Greystone provides

financial advisory services for the Debtor.  The Debtor's contract with Greystone expires in October 2022.

26.    Per the terms of the FSAA, Greystone advises the Debtor in the financial management of The Harborside including assisting with the annual plan and operating budget, financial analysis and financial reporting.  The FSAA specifies that Greystone's fees are $17,500 per month.  On each anniversary of the effective date, Greystone's fee is adjusted for inflation by a percentage amount equivalent to the New York State trend factor.  There are no downward adjustments in the fee based on the calculation.  Greystone acts as an independent contractor in the performance of its obligations under the agreement.

27.    On March 31, 2004, the Debtor originally entered into a Marketing Advisory Services Agreement with GCD New York, LLC (also defined as "<u>Greystone</u>").  A second Marketing Advisory Services Agreement was executed (as amended, "<u>Marketing Agreement</u>") between the Debtor and Greystone upon the effective date of the 2014 Chapter 11 Case (as defined below) on November 13, 2014, under which Greystone provides marketing advisory services for the Debtor.  Per the terms of the Marketing Agreement, Greystone advises the Debtor in the marketing of The Harborside's independent living units, including providing a marketing plan with a projected budget of all the funds required to market, advertising and conducting public relations, recommending any modifications to the Debtor regarding move-in incentives, and recruiting and hiring Greystone employees in accordance with the Marketing Agreement.

28.    For its services, Greystone is paid a Services Fee, which varies based upon meeting certain performance metrics (the "<u>Services Fee</u>").  The Second Amendment to the Marketing Agreement, executed in December 2019, specifies that Greystone's Services Fee shall be $6,500.00 per move-in of the independent living units, as allocated in the Annual Operating Budget.  For each

move-in that exceeds the number of expected move-ins in the Annual Operating Budget, the Services Fee shall be $9,000.00. On each anniversary of the effective date, Greystone's fee is adjusted for inflation by a percentage amount equivalent to the New York State trend factor. There are no downward adjustments in the fee based on the calculation. Greystone acts as an independent contractor in the performance of its obligations under the agreement. The term of the Marketing Agreement has been extended to October 2022.

3)    Residency and Admission Agreements

29.    Before occupying The Harborside, each Resident is required to execute with the Debtor a residency agreement (each, a "Residency Agreement"). The Residency Agreement provides the terms and conditions that each independent living unit Resident must abide by while residing at The Harborside, and also outlines the Resident's obligations regarding the payment of entrance fees (the "Entrance Fees"), the Resident's rights to a refund of such Entrance Fees, and other monthly charges that may be due to the Debtor during the duration of the Resident's stay at The Harborside[3] (the "Monthly Service Fees"). For a limited period of time, the PHL permits the Debtor to admit certain individuals not residing in an independent living unit to the Health Center by entering into an admission agreement (each, an "Admission Agreement") with the Debtor. The Admission Agreement is a contract that provides the terms and conditions that such an individual must abide by while admitted to the Health Center, and outlines such an individual's obligation to pay fees or charges for healthcare services[4] rendered by the Debtor.[5]

---

[3] Under the terms of the Residency Agreement, independent living unit Residents are also eligible to receive treatment in the Health Center. Under this arrangement, such Residents continue paying Monthly Service Fees while receiving treatment in the Health Center.

[4] Individuals entering the Health Center under an Admission Agreement do not pay Entrance Fees. Furthermore, the Admission Agreement does not contemplate continuum of care.

[5] As of the Petition Date, the Debtor believes that approximately thirty-three (33) Residents are contracted under Admission Agreements.

12

30.     The Debtor currently offers prospective independent living Residents the choice of three residency plans, each evidenced by a different Residency Agreement.  The residency plans primarily differ with regard to the required Entrance Fee, the Monthly Service Fees, and the amount that potentially can be refunded thereunder.  Generally, the purpose of the Entrance Fee is to pay refunds to Residents upon termination of a Residency Agreement in accordance with its terms, pay certain project costs, retire debt, cover operating expenses, and generate investment income for the benefit of The Harborside and its Residents.  Prospective Residents typically pay ten percent (10%) of the Entrance Fee upon execution of a Residency Agreement, and the remaining balance prior to occupancy.  Depending on the form of Residency Agreement selected and unit size, the Entrance Fees in 2021 paid by Residents before they occupy a unit range from $527,249 to $2,229,194.  Under the Residency Agreements, prospective Residents are entitled to a full refund of any monies paid to the Debtor if they seek a refund prior to occupying a living unit at The Harborside.  Once a Resident has occupied a unit at The Harborside for more than ninety (90) days[6] and their Residency Agreement has subsequently terminated, a Resident is entitled to a refund of a portion of the Entrance Fees paid by such Resident on the earlier of (a) thirty (30) days after a new Resident executes a Residency Agreement and occupies the unit at The Harborside vacated by the Resident entitled to a refund, or (b) one (1) year after termination of the Residency Agreement.  The terms of any refund rights are outlined in the Residency Agreements.  Under the Plan, the Debtor seeks to assume all Residency Agreements and to fulfil all of its obligations thereunder.

31.     Moreover, in addition to the Entrance Fee, the Debtor also charges Residents a Monthly Service Fee.  For Residents under a Residency Agreement, the Monthly Service Fees range

---

[6] Under each form of Residency Agreement, a Resident is entitled to a full refund of the Entrance Fees, less any actual cost of services or charges incurred to customize the residence, if the Residency Agreement is terminated within ninety (90) days of initial occupancy.

from $2,593 to $8,089 per month, depending upon the Residency Agreement and unit selected. The Debtor reviews Monthly Service Fees periodically and adjusts them as necessary to meet The Harborside's financial requirements. Changes in the Monthly Service Fees must be approved by the New York State Department of Financial Services (the "DFS").

32.     The terms of each form of Residency Agreement that the Debtor currently offers are summarized as follows:

- 75% Refundable Plan: This plan offers Residents a 75% refundable contract (without interest). The Entrance Fees under this plan amortize[7] at 1% per month over a period of twenty-five months, until the allowable refund amount is reached.

- 50% Refundable Plan: This plan offers Residents a 50% refundable contract (without interest). The Entrance Fees under this plan amortize at 2% per month over a period of twenty-five months, until the allowable refund amount is reached. The Monthly Service Fees under this plan are 20% lower than the Monthly Service Fees for the 75% Refundable Plan.

- 0% Refundable Plan: This plan offers Residents a traditionally amortizing 0% refundable contract. The Entrance Fees under this plan amortize at 2% per month over a period of fifty months, until no refund is due. The Entrance Fees under this plan are 30% lower than the Entrance Fees for the 75% Refundable Plan.

The Debtor has historically offered other Residency Agreements, different from the above, with different amortization rates and refund amounts (the "Prior Residency Agreements"), but any such agreements are no longer offered to new residents. As of the Petition Date, approximately 156 Residents have Prior Residency Agreements.

33.     Historically, in certain circumstances, and in the ordinary course of business, the Debtor has provided prospective residents the option of deferring payment of up to fifty percent

---

[7] Under the Residency Agreements, and consistent with Article 46 of New York's Public Health Law, a certain percentage of the Entrance Fee, typically between 1%–2%, amortizes and becomes non-refundable each month on account of the Resident's occupancy at The Harborside, for the number of months specified under the Residency Agreement.

(50%) of their Entrance Fees for up to ninety (90) days to allow that resident to obtain the funds necessary to pay the Entrance Fees.  This optional deferral is offered in circumstances when Residents are unable to sell their existing home or have not yet sold and require funds from the sale of such home to pay the Entrance Fees to the Debtor.  Residents under the deferral program execute a promissory note requiring them to pay the Entrance Fees fourteen (14) days after the closing of the sale of their home, or within ninety (90) days after occupying The Harborside, whichever is earlier.  DFS currently has suspended blanket approval of all marketing initiatives and is considering such requests on a case-by-case basis.  The Debtor intends to continue offering the deferral program on a case-by-case basis, and in the ordinary course of business, during the pendency of the Chapter 11 Case, subject to DFS approval.  All of the incentive programs offered to Residents, such as the deferral program discussed above, have been in the past, and must continue to be, approved by the DOH and the DFS.

34.     The Debtor seeks to continue (a) depositing all Entrance Fees collected under Residency Agreements executed on or after October 25, 2020 (the "New Entrance Fees") collected under Residency Agreements executed on or after October 25, 2020 (the "New Residency Agreements") into a newly-created, non-interest-bearing escrow sub-account which sits underneath the Entrance Fee Escrow Account (the "New Escrow Account") pending entry of an order confirming the Plan, and (b) refunding New Entrance Fees in accordance with the respective New Residency Agreements and refunding entrance fees collected from Residents entering into Residency Agreements prior to October 25, 2020 (the "Old Residency Agreements" and any entrance fee thereof the "Old Entrance Fees") in accordance with the Old Residency Agreements.

4)     Regulatory Agencies

35.     The CCRC industry nationwide is regulated by various state and federal agencies. As a CCRC operating in the State of New York pursuant to Article 46 of the PHL and Regulation 140 of the New York Insurance Regulations, the Debtor is regulated by the DFS and the DOH.  In addition, as a participant in the Medicare and Medicaid Programs, the Debtor is subject to certification by CMS.

**B.     Prior Bankruptcy and Restructuring**

36.     This is the Debtor's second chapter 11 filing.  On July 21, 2014, the Debtor and holders of approximately seventy-five percent (75%) of the aggregate principal amount of the then-outstanding series 2007 bonds executed a plan support agreement whereby the parties agreed to restructure the series 2007 bonds.  This restructuring was implemented through a chapter case 11 (the "2014 Chapter 11 Case") that was commenced on July 22, 2014 in the Court under case number 14-73348 (AST).   On October 23, 2014, the Court entered an order confirming the plan of reorganization in the 2014 Chapter 11 Case (the "2014 Plan").  The 2014 Plan became effective on November 13, 2014 ("2014 Effective Date").  On the 2014 Effective Date, the series 2007 bonds (plus accrued and unpaid interest during the bankruptcy period) were exchanged for new Series 2014 Bonds (as defined below).

**C.     Capital Structure**

1)     Bond Debt

37.     In connection with the consummation of the 2014 Plan, the Nassau County Industrial Development Agency (the "2014 Issuer") issued its (i) $141,585,000 Nassau County Industrial Development Agency Continuing Care Retirement Community Fixed Rate Revenue Bonds (Amsterdam at Harborside Project) Series 2014A (the "Series A Bonds"), (ii) $23,842,500 Nassau County Industrial Development Agency Continuing Care Retirement Community Fixed

16

Rate Revenue Bonds (Amsterdam at Harborside Project) Series 2014B (the "Series B Bonds"), and (iii) $59,537,660 Nassau County Industrial Development Agency Continuing Care Retirement Community Excess Cash Flow Revenue Bonds (Amsterdam at Harborside Project) Series 2014C (the "Series C Bonds" and collectively with the Series A Bonds and the Series B Bonds, the "Series 2014 Bonds") pursuant to that certain Indenture of Trust (the "2014 Indenture") dated as of November 1, 2014, between the 2014 Issuer and the 2014 Bond Trustee.

38.    Proceeds from the sale of the Series 2014 Bonds were loaned to the Debtor pursuant to that certain Installment Sale Agreement, dated as of November 1, 2014 (the "Installment Sale Agreement"), between the 2014 Issuer and the Debtor, to fund the consummation of the restructuring transactions effectuated pursuant to the 2014 Plan.

39.    The 2014 Indenture established various funds to be held by the 2014 Bond Trustee, including a Debt Service Reserve Fund, Entrance Fee Fund, a Revenue Fund, an Operating Reserve Fund, and a Project Fund (as each term is defined in the 2014 Indenture) (the Bond Fund, the Project Fund and the Debt Service Reserve Fund are collectively referred to herein as the "Trustee-Held Funds").  As of the Petition Date, the Trustee-Held Funds totaled approximately $5,304,890.70. The Trustee-Held Funds are held in trust for the benefit of the bondholders, and the 2014 Bond Trustee is entitled to use the Trustee-Held Funds in accordance with the terms of the Bond Documents (as defined below).

40.    As of the Petition Date, the amounts due and owing by the Debtor with respect to the Series 2014 Bonds are as follows (collectively, the "Bond Claims"):

a.    Unpaid principal on the Series 2014 Bonds in the amount of $207,793,773;

b.    Accrued but unpaid interest on the Series 2014 Bonds in the amount of $6,517,450 as of June 14, 2021; and

c.      Unliquidated, accrued and unpaid fees and expenses of the 2014 Bond Trustee and its professionals incurred through the Petition Date.  Such amounts, when liquidated, shall be added to the aggregate amount of the Bond Claims.

41.      The Debtor has granted the 2014 Bond Trustee a mortgage and other liens on certain real and personal property pursuant to a Mortgage, Assignment of Leases and Rents and Security Agreement, dated as of November 1, 2014 (the "Mortgage" and, together with the 2014 Indenture, the Installment Sale Agreement, and any other document or agreement delivered as security for, or in respect to, the Series 2014 Bonds or the Debtor's obligations under any of such documents, collectively, the "Bond Documents" and obligations thereunder, the "2014 Bond Obligations").  The Debtor also executed a Guaranty, dated as of November 1, 2014, for the benefit of the 2014 Bond Trustee to guaranty the payment of amounts owing on the Series 2014 Bonds. Pursuant to these grants, and subject only to the lien on the Debtor's real property securing the Debtor's obligations under that certain Payment in Lieu of Taxes Agreement, dated as of December 1, 2007, between the Debtor and the 2014 Issuer, as amended pursuant to that certain First Amendment to Payment in Lieu of Taxes Agreement dated as of June 1, 2014 between the 2014 Issuer and the Debtor, and as ratified by the Debtor in connection with the issuance of the Series 2014 Bonds pursuant to that certain Ratification dated November 13, 2014, the 2014 Bond Trustee holds first priority liens and security interests in substantially all of the Debtor's real and personal property as security for its obligations associated with the Series 2014 Bonds including, but not limited to, revenues generated from the operations of The Harborside (the "Revenues" and together with the other collateral described in the Bond Documents, the "Prepetition Bond Collateral").

42.     As of the Petition Date, approximately $138,408,445 of the Series A Bonds, $1,508,685 of the Series B Bonds and $59,537,660 of the Series C Bonds (excluding accreted interest) remain outstanding.

2)     Unsecured Debt

43.     To help offset the financial impact of the COVID-19 pandemic and provide additional liquidity to The Harborside, on March 18, 2021, AHCCRC applied for funding pursuant to the Paycheck Protection Program ("PPP") through its bank, UMB Bank, N.A.  On March 31, 2021, AHCCRC received a loan for approximately $1.15 million pursuant to the PPP (the "PPP Loan").  AHCCRC has applied, or will apply, the proceeds of the PPP Loan towards payroll and operating expenses consistent with the PPP and anticipates that the PPP Loan will be forgiven in its entirety.

44.     In addition to the Bond Claims, the Debtor's primary creditor group consists of general unsecured creditors, who are owed approximately $179 million as of the Petition Date.  This group includes trade creditors and Residents who have requested refund of their Entrance Fees.  As of the Petition Date, the Debtor estimates that it owes approximately $20.3 million to Residents on account of Entrance Fee refund requests,[8] and approximately $568,000 to trade creditors, which is largely due to the timing of the filing of this Chapter 11 Case.  The Debtor generally remains current on trade debt in the ordinary course of business.

---

[8] The $20.3 million reflects amounts that are pending and payable on account of requested refunds as of the Petition Date.  The Debtor also has contingent liabilities to Residents in the amount of approximately $14.3 million, on account of Resident's refund rights that have not yet been exercised.

3)     Subvention Certificate

45.     On March 31, 2004, the ACCHS issued a $3,000,000 subvention to the Debtor. The Debtor proposes that the subvention survive the restructuring, subordinate to all the Series 2021 Bonds.

**D.     Events Leading to Bankruptcy**

46.     As discussed above, the Debtor relies on revenue generated by existing and new Residents to, among other things, maintain its day-to-day operations, service its debt obligations and honor its Resident refund obligations.  The Debtor's inability to attract new residents at the budgeted pace caused it to experience a shortfall in liquidity.  This situation worsened as the impact of the COVID-19 pandemic had a direct negative impact on the ability to attract new residents. Accordingly, to preserve liquidity during the COVID-19 pandemic, the Debtor ceased making payments on the 2014 Bond Obligations and ceased making payments of Resident Entrance Fee refunds.  The failure to make refund payments caused the Debtor to fall out of compliance with the terms of its Residency Agreements and PHL Section 4609, both of which require payment of entrance fee refunds no later than thirty days after the formerly-occupied unit has been resold and in no event later than one year after the formerly-occupied unit has been vacated.  The Debtor reported non-compliance to DOH and DOH issued a citation for non-payment of nine refunds at a total amount of $5.2 million, which DOH later updated with an addendum to a total of nineteen (19) Entrance Fee refunds totaling approximately $12 million.  Currently, thirty-three (33) refunds at a total of $20.3 million are unpaid.

47.     Required disclosures of the Debtor's financial condition further hampered sales and marketing, and the impact of COVID-19 and related restrictions imposed by the state of New York caused an almost complete shutdown of sales and marketing and ensuing events of default under

20

the 2014 Bond Obligations.  Thereafter, the Debtor and the 2014 Bond Trustee executed three Forbearance Agreements dated October 21, 2020, November 30, 2020 and January 31, 2021 and whereby the Trustee agreed to forbear from exercising remedies under the Bond Documents.

48.     Thereafter, the Debtor, the Consenting Holders, and the 2014 Bond Trustee negotiated a restructuring of the Debtor's bond debt obligations (the "Restructuring Transaction"), which is subject to approval by this Court, is described in paragraph 19 above and is embodied in the Plan.  Under the Restructuring Transaction, the Debtor will exchange the Series 2014 Bonds for new bonds.  Pursuant to that certain plan support agreement (the "Plan Support Agreement"), the Consenting Holders and the Member agreed to support the Debtor's Plan.

49.      The Debtor intends to use the chapter 11 process to quickly and appropriately address its liabilities and provide AHCCRC with the opportunity to achieve a sustainable capital structure while continuing to serve its Residents with the highest quality of care and lifestyle.  To that end, the Debtor has entered into the Plan Support Agreement and filed its Plan on the date hereof, and intends to emerge from chapter 11 in September 2021.

## II.    SUMMARY OF FIRST DAY PLEADINGS

50.     The Debtor has filed the First Day Pleadings concurrently with the filing of its chapter 11 petition and this Declaration.  The Debtor requests that each of the First Day Pleadings be granted to ensure the success of this Chapter 11 Case.

51.     For more detailed information regarding each First Day Pleading, the Debtor respectfully refers the Court to the respective First Day Pleading.  In the event that this Declaration and any provision of any First Day Pleading are inconsistent, the terms of the First Day Pleading shall control.

A.    **KCC Retention Application**

52.    Pursuant to the KCC Retention Application, the Debtor seeks authorization to retain KCC as its noticing and claims agent.  Upon information and belief, KCC is an experienced noticing and claims agent and is frequently used by debtors in chapter 11 cases of comparable size and complexity.  I believe that KCC is qualified to provide services, expertise, consultation, and assistance to the Debtor and serve as the noticing and claims agent in this Chapter 11 Case. Furthermore, I believe that using KCC will relieve this Court, its clerk, and the Debtor of administrative burdens and expenses.  I believe that employment of KCC will provide an efficient manner to manage claims and the notice process, and thereby allow the Debtor and its management to focus on the Debtor's restructuring efforts.  Therefore, I believe that using KCC will benefit the Debtor, its estate, its creditors, and all parties in interest, and respectfully ask this Court to grant the KCC Retention Application.

B.    **Utilities Motion**

53.    By the Utilities Motion, the Debtor seeks entry of interim and final orders (a) prohibiting utilities from altering, refusing, or discontinuing service to the Debtor, (b) approving the Debtor's proposed form of adequate assurance of payment, and (c) establishing procedures for resolving objections to the Debtor's proposed form of adequate assurance of payment.

54.    In the ordinary course of business, the Debtor obtains electricity, natural gas, water, telephone services, internet, garbage collection, sewerage, and other similar services (collectively, the "Utility Services") from a number of utility providers (the "Utility Providers").

55.    A list of the names and addresses of the Utility Providers, and the recent amounts owed per month over the previous calendar year is attached to the Utilities Motion as Exhibit C.

On average, the Debtor pays approximately $143,559 each month on Utility Services.  The Debtor has historically made full and timely payments for the Utility Services to Utility Providers.

56.     During the pendency of this case, the Debtor intends to pay all Utility Providers, subject to the granting of the Cash Collateral Motion, in a timely manner consistent with the Debtor's ordinary course of business and customary payment terms.

57.     Uninterrupted Utility Services are essential to the Debtor's continued business operations and successful reorganization, and are especially important in light of the healthcare services the Debtor provides to its elderly Residents.  If the Utility Providers are permitted to suspend or discontinue service to the Debtor, the Debtor would be unable to furnish the healthcare services necessary to ensure the safety and well-being of its elderly Residents.  Furthermore, discontinuation of the Utility Services would hamper the Debtor's ability to generate revenues, which would hinder the Debtor's ability to reorganize and also degrade the value of the Debtor's estate.  Therefore, I believe that it is critical that this Court grant the relief sought in the Utilities Motion.

58.     As adequate protection, the Debtor proposes depositing two (2) weeks' worth of Utility Service payments (an "Adequate Assurance Deposit") to each Utility Provider that requests such a deposit in writing.  I believe that the Adequate Assurance Deposit, in conjunction with the Debtor's ability to pay for future Utility Services and contingent on the granting of the Cash Collateral Motion, constitutes adequate protection under the Bankruptcy Code.

59.     Furthermore, the Debtor proposes certain procedures, discussed in detail in the Utilities Motion, which would allow a Utility Provider to request additional adequate protection if it believes that there are circumstances warranting greater protection.

60.     I believe that the Utilities Motion is in the best interest of the Debtor, its estate, its Residents, and all parties in interest.  Therefore, I respectfully ask this Court to grant the relief sought in the Utilities Motion.

### C.     Employee Wages Motion

61.     By the Employee Wages Motion, the Debtor seeks entry of interim and final orders (a) authorizing, but not requiring, the Debtor to pay prepetition claims for, among other things, ordinary and customary wages and salaries, federal and state withholding taxes, payroll taxes, and related administration obligations to third parties in connection therewith (collectively, the "Compensation Obligations"), which are paid by the Debtor in the ordinary course of business; (b) authorizing, but not requiring, the Debtor to continue its employee benefits programs and related administration obligations to third parties in connection therewith (the "Employee Benefit Obligations" and together with the Compensation Obligations the "Employee Obligations"); and (c) requiring banks and financial institutions to process, honor, and pay any checks presented by the Debtor's employees, and directing the banks and financial institutions to honor all related fund transfer requests made by the Debtor.

62.     The Debtor provides the following wages, employee benefits, and related obligations:

     a.     Wages, salaries, and other compensation;

     b.     An Employee Appreciation Program;

     c.     Employee benefits, including, but not limited to:

          i.     Medical, dental, and vision insurance;

          ii.    COBRA benefits;

          iii.   Life and long-term disability insurance;

    iv.  Short-term disability insurance;

    v.  A 403(b) voluntary retirement savings plan, and a 401(a) defined contribution retirement benefit plan; and

    vi.  Flexible spending programs;

  d.  Workers' compensation insurance;

  e.  Paid time off, severance, jury duty, and bereavement;

  f.  Payroll taxes and other deductions; and

  g.  Expense reimbursement.

63.  For the reasons described below and as further detailed in the Employee Wages Motion, I believe that the Employee Obligations are entitled to priority treatment in accordance with section 507 of the Bankruptcy Code.

64.  Currently, the Debtor directly employs approximately one hundred and seven (107) employees (the "Employees"), who perform a variety of functions ranging from providing nursing services, maintenance, dining services, and housekeeping to office administration. The Debtor's marketing staff are currently employed by GMSC, LLC and GDC New York, LLC as direct reimbursable expenses.

65.  The Debtor cannot operate without the Employees. Each of the Employees is critical to the uninterrupted operation of the Debtor's service oriented business. The Employees have familiarity with not only the Debtor's business operations, but also with each unique Resident's health and safety needs. Failure to maintain the Employee Obligations will result in the loss of key Employees, which will negatively impact the quality and scope of services provided to current Residents and, in turn, could jeopardize their health and well-being. Furthermore, loss of Employees and their vital services could result in a loss of confidence from current and prospective Residents, leading to increased Resident turnover. Minimizing Resident turnover by maintaining

Employees and the services they provide is essential to preserving the Debtor's estate. I also believe that the Debtor's ability to maintain Employees in the ordinary course of business is vital to the ongoing reorganization efforts.

66.    Furthermore, pursuant to state laws, the Debtor must maintain its workers' compensation obligations to ensure prompt and efficient payment and/or reimbursement of its Employees. If the Debtor fails to maintain such obligations, it will be prohibited by state law from operating in the state. As a result, I believe that payment of all amounts related to the Debtor's workers' compensation obligations is crucial to the continued operation of its business.

67.    Therefore, I respectfully ask this Court to grant the relief sought in the Employee Wages Motion.

### D.    Taxes Motion

68.    By the Taxes Motion, the Debtor seeks entry of interim and final orders authorizing, but not requiring, the Debtor to pay certain sales and use taxes, licensing and reporting fees, and various other governmental taxes, fees, and assessments (collectively, the "Taxes and Fees") levied by federal, state, and local authorities (the "Governmental Authorities") as such Taxes and Fees come due in the ordinary course of business. Furthermore, the Debtor requests that all banks or financial institutions be directed to receive, process, or pay all requests for payment related to the Taxes and Fees, whether submitted prior to or after the Petition Date. The Debtor also requests that all banks or financial institutions be authorized to rely upon the Debtor's representations or designation regarding whether a particular check or payment request is appropriate pursuant to the Taxes Motion.

69.    In the ordinary course of business, the Debtor is subject to certain Taxes and Fees payable to the Governmental Authorities. The Taxes and Fees have historically been approximately

$613,740.98 per year.  As of the Petition Date, I believe that the Debtor is current on all Taxes and Fees, and no amount is owed to the Governmental Authorities.  During the pendency of this Chapter 11 Case, I believe that approximately $256,039.00 in Taxes and Fees will become due and payable.

70.     I believe that failure to pay certain of the Taxes and Fees as they become due could expose the Debtor and its officers or management to substantial civil and/or criminal liability.  A lawsuit or criminal prosecution, and any potential liability, would distract the Debtor and its officers or managers from not only the Debtor's business operations, but also the ongoing administration of this Chapter 11 Case.  I believe that any such lawsuit, and its potential liabilities, would be a detriment to the Debtor's estate, its Residents, and all parties in interest.  Therefore, I respectfully ask this Court to grant the relief sought in the Taxes Motion.

### E.     Insurance Motion

71.     By the Insurance Motion, the Debtor seeks interim and final orders authorizing, but not requiring, the Debtor to (a) continue its prepetition existing insurance policies (the "Insurance Policies") maintained and administered by third-party insurance carriers (the "Insurance Carriers"); and (b) revise, extend, supplement or change its insurance coverage, by, among other things, entering into new insurance policies, renewing the current Insurance Policies, or purchasing new postpetition policies.  Furthermore, the Debtor requests that all banks or financial institutions be directed to receive, process, or pay all requests for payment related to the Insurance Policies, whether submitted prior to or after the Petition Date.  The Debtor also requests that all banks or financial institutions be authorized to rely upon the Debtor's representations or designation regarding whether a particular check or payment request is appropriate pursuant to the Insurance Motion.

72. The Debtor incurs approximately $956,241 in annual premiums relating to the Insurance Policies, which are prepaid on either a monthly, quarterly or annual basis. None of the Insurance Policies are financed. As of the Petition Date, the Debtor is current on its payment obligations on account of the Insurance Policies and the Debtor has historically made full and timely payments for the insurance premiums.

73. It is critical that the Debtor be authorized to maintain the prepetition Insurance Policies on an ongoing basis. Failure to maintain the Insurance Policies could result in Insurance Carriers cancelling the Insurance Policies, which would leave the Debtor exposed to substantial liability. I believe that being exposed to substantial liability is not in the best interest of the Debtor's estate, its Residents, or any party-in-interest. In addition, I understand that operating guidelines established by the U.S. Trustee for debtors in possession in order to supervise the administration of chapter 11 cases require the Debtor to maintain insurance coverage throughout this Chapter 11 Case. Therefore, I respectfully ask this Court to grant the relief sought in the Insurance Motion.

### F. Resident Confidentiality Motion

74. By the Resident Confidentiality Motion, the Debtor seeks entry of an order authorizing the implementation of procedures to protect confidential information of current and former Residents of the Debtor as may be required by HIPAA. In the ordinary course of providing care for its Residents, the Debtor is required to maintain the confidentiality of patient information pursuant to HIPAA. However, the Debtor recognizes that such requirements may conflict with the duty to disclose certain information under the Bankruptcy Code, including, without limitation, the duty to file a list of creditors under section 521(a)(1)(A) and, if necessary, a list of schedules of assets and liabilities under section 521(a)(1)(B)(i).

75.      In an effort to comply with both federal statutes, the Debtor proposes certain procedures to maintain Resident confidentiality during the pendency of this Chapter 11 Case (the "Resident Confidentiality Procedures").  The Resident Confidentiality Procedures provide that:

a.    The Debtor, with the assistance of its professionals, is authorized to prepare and maintain (i) a separate creditor matrix of the Residents (the "Resident Matrix"), and, if necessary, (ii) separate schedules of claims that may be asserted by and against the Residents (the "Resident Schedules");

b.    The Debtor is not required to file the Resident Matrix and the Resident Schedules, but is permitted to file a redacted version of the Resident Schedules that redacts the names and addresses of the Residents and assigns a unique identification number to each of the Residents, *provided however*, that the Residents Matrix and the Resident Schedules may be reviewed by (i) this Court, (ii) the Office of the United States Trustee of the Eastern District of New York, (iii) any applicable state regulatory agency (through the respective state attorney general), and (iv) any other party in interest that obtains, after notice and a hearing, an order directing the Debtor to disclose the Resident Matrix and Resident Schedules to such party;

c.    To the extent the Debtor is required to list Resident on any document filed with the Court, including, the list of the top 20 unsecured creditors, the Debtor is authorized to list such Residents by their assigned unique identification number on such document;

d.    If the Debtor's HIPAA certified noticing and claims agent, KCC, serves any document upon any person listed on the Resident Matrix, KCC is authorized to note in the certificate of service that the parties served include individuals listed on the Resident Matrix;

e.    KCC shall process Residents' Proofs of Claim ("Proofs of Claim") and, upon request, make available a summary of the total number and amount of all claims filed by Residents against the Debtor, which summary shall exclude any information subject to HIPAA, its associated regulations, and other privacy requirements;

f.    KCC shall make copies of any Proofs of Claim filed by Residents available to the Court for in camera review, and any such Proofs of Claim shall otherwise be maintained by KCC and the Debtor on a confidential basis and not subject to public dissemination or disclosure; and

g.    To the extent any Resident discloses his or her own PHI (as such term is defined in HIPAA) in any pleading, proof of claim, notice, or other publicly available document, the Debtor and its professionals shall be permitted, and to the extent required by the Bankruptcy Code, the Bankruptcy Rules, or

29

any other applicable law, rule, or court order, directed to include such PHI in any subsequent pleading, notice, document, list, or other public disclosure made in connection with this Chapter 11 Case, and such disclosure shall not be deemed to be a "wrongful disclosure" within the meaning of HIPAA or any regulation promulgated thereunder.

76.     I believe that the relief requested in the Resident Confidentiality Motion appropriately balances the need to maintain confidential patient information under HIPAA with the need for adequate disclosure under the Bankruptcy Code.  Therefore, I respectfully ask this Court to grant the relief sought in the Resident Confidentiality Motion.

### G.     Escrow Motion

77.     By the Escrow Motion, the Debtor seeks entry of interim and final orders authorizing the Debtor to (a) escrow entrance fees paid by Residents who move into the Debtor's facility after the Petition Date in the Debtor's prepetition escrow account during the pendency of this Chapter 11 Case and (b) refund such Entrance Fees under certain circumstances during this Chapter 11 Case.

78.     Specifically, the Debtor seeks to continue (a) depositing all New Entrance Fees collected under New Residency Agreements into the New Escrow Account pending entry of an order confirming the Plan, and (b) refunding New Entrance Fees in accordance with the respective New Residency Agreements and refunding entrance fees collected from Residents entering into Old Residency Agreements and any Old Entrance Fees in accordance with the Old Residency Agreements.

79.     As further set forth in the Escrow Motion, Residents shall be entitled to receive a full refund of any New Entrance Fees paid, less any fees or sums due and payable to the Debtor under and according to the terms of the respective New Residency Agreement, the New Escrow

Agreement, or applicable law. With respect to Old Entrance Fees, the Debtor will continue to pay such refunds in accordance with the respective Old Residency Agreements.

80.     I believe that a Resident's willingness to pay the Entrance Fee to the Debtor during the pendency of this Chapter 11 Case is dependent on the Resident's belief that the Entrance Fee is refundable as outlined in its Residency Agreement, without any risk arising as a result of the Debtor being in chapter 11. Escrowing the New Entrance Fees and permitting all Entrance Fees to be refunded in the ordinary course of business gives both current and prospective Residents confidence that this Chapter 11 Case will not negatively impact the deposits, and encourages prospective Residents to enter into New Residency Agreements during the pendency of this case. I believe that any doubt from Residents or prospective Residents regarding the Debtor's ability to honor its refund obligations with respect to Entrance Fees could seriously undermine the Debtor's ability to attract new Residents during the pendency of this pre-negotiated Chapter 11 Case. For example, I believe that prospective Residents would be reluctant to make the Entrance Fee deposits necessary to reside at The Harborside if they were not certain that their New Entrance Fees would be protected while the Debtor is in chapter 11. Furthermore, I believe that absent the relief sought in the Escrow Motion, current Residents may elect to prematurely terminate their Residency Agreements and demand refunds under the mistaken impression that Entrance Fees are at risk. Likewise, my own experience and discussions with existing Residents convinces me that their powerful promotion of The Harborside sales among their friend and family networks would be chilled if there was any question about the refund of Old Entrance Fees.

81.     I believe the Escrow Motion should be granted because Entrance Fees are critical to the Debtor's operations. The Entrance Fees, and the ability to generate New Entrance Fees, represent a significant amount of the Debtor's annual budget, and is critical to the Debtor's ability

to reorganize. Furthermore, I believe that because the Entrance Fees are significant amounts of money, the departing Residents would likely need the refunds of the Old Entrance Fees to secure alternative housing.

82.     I believe that the Escrow Motion is reasonable, necessary, and in the best interest of the Debtor, its estate, its Residents, and all parties in interest. Therefore, I respectfully ask this Court to grant the relief sought in the Escrow Motion.

### H.    Cash Management Motion

83.     By the Cash Management Motion, the Debtor seeks entry of interim and final orders (a) authorizing the Debtor to continue operating its centralized cash management system (the "Cash Management System") and bank accounts (the "Bank Accounts") located at various banks (the "Banks") or modify the Cash Management System and/or Bank Accounts if and when directed by the Banks, (b) granting the Debtor a waiver of 1) the requirements of section 345(b) of the Bankruptcy Code and 2) certain bank account and related requirements of the Office of the United States Trustee (the "U.S. Trustee"), and (c) authorizing the Debtor to continue its existing deposit practices under the Cash Management System (subject to any reasonable changes to the Cash Management System that the Debtor may implement).

84.     As part of the relief requested in the Cash Management Motion, and to ensure that its transition into and out of chapter 11 is as smooth as possible, the Debtor seeks entry of orders authorizing the Debtor to, among other things, (a) maintain and continue using the Bank Accounts in the same manner and with the same account numbers, styles, and document forms as are currently employed, (b) deposit funds in, and withdraw funds from, the Bank Accounts by all usual means, including checks, wire transfers, automatic clearing house transfers, drafts, electronic fund transfers, or other items presented, issued, or drawn on the Bank Accounts, (c) pay ordinary course

bank fees in connection with the Bank Accounts, (d) perform its obligations under the documents and agreements governing the Bank Accounts, and (e) treat the Bank Accounts for all purposes as accounts of the Debtor in its capacity as debtor in possession, and deeming the Bank Accounts to be "debtor-in-possession" accounts.

85.     To the extent that the Bank Accounts are not in compliance with section 345(b) of the Bankruptcy Code or certain bank account and related requirements of the U.S. Trustee, I believe that "cause" exists to waive the requirements of that section.  The Debtor is a sophisticated company with a cash management system that has the capacity to move funds as necessary to ensure the Debtor's fiscal safety.  I believe that strict compliance with section 345(b) of the Code will unduly burden the Debtor with administrative expenses and difficulties.

86.     The continued use of the Cash Management System and the Bank Accounts during the pendency of this Chapter 11 Case is essential to the Debtor's business operations.  The Debtor employs the Cash Management System and Bank Accounts to maximize efficiencies and the value of its business, and to collect, transfer, and disburse the funds generated by its operation.  Using the Cash Management System and Bank Accounts, the Debtor is able to collect and transfer cash efficiently to satisfy its financial obligations.  The Cash Management System and Bank Accounts facilitate the Debtor's cash forecasting and reporting, enable the Debtor to monitor the collection and disbursement of funds, and maintain control over the administration of its accounts at the Banks.  As a practical matter, it would be extremely burdensome and expensive to establish and maintain a different cash management system and different Bank Accounts.  Accordingly, the Debtor requests to continue the Cash Management System and the Bank Accounts without disruption.

87.     Without the relief requested, I believe the Debtor would be unable to effectively and efficiently maintain its financial operations.  This would cause significant harm to the Debtor's business and the value of its estate.  Accordingly, I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtor, its estate and creditors, and all parties in interest, and I respectfully ask this Court to grant the relief sought in the Cash Management Motion.

## I.     Cash Collateral Motion

88.     By the Cash Collateral Motion, the Debtor requests the entry of interim and final orders (together, the "Proposed Cash Collateral Orders") (a) authorizing the Debtor to use cash collateral; (b) granting adequate protection; (c) scheduling a final hearing; and (d) granting related relief.

89.     A description of the Debtor's capital structure is provided above in paragraphs 37 through 42.

90.     I believe that the "cash" or "cash equivalents" securing the obligations under the Mortgage constitute cash collateral of the 2014 Bond Trustee within the meaning of section 363 of the Bankruptcy Code (the "Cash Collateral").  Subject to this Court's approval and an approved budget, the Cash Collateral will be used to fund operating expenses and professional fees, as well as insurance, taxes, and the costs related to this Chapter 11 Case.

91.     Use of the Cash Collateral is critical to the Debtor's ability to fund its postpetition operations in a manner that will permit The Harborside to continue providing, among its other services, the excellent nursing care, enriched housing services, and skilled nursing services that our Residents deserve and our regulators demand.  Without immediate access to the Cash Collateral, the Debtor will be unable to provide for the safety or care of its Residents or obtain goods and services needed to carry on its operations during the Chapter 11 Case.

92.     After an arm's length negotiation with the Debtor, the 2014 Bond Trustee has consented to the Debtor's use of the Cash Collateral, subject to the terms and conditions described in the Cash Collateral Motion and Proposed Interim Order attached thereto.  I believe that the Proposed Interim Order is fair, reasonable, and consistent with the Bankruptcy Code.  Granting the Cash Collateral Motion will allow the Debtor to continue the operations necessary to maintain Residents' health and well-being, while also efficiently restructuring the Debtor's debt in this Chapter 11 Case.

93.     The Debtor will suffer immediate and irreparable injury if it is not granted access to the Cash Collateral.  Without Cash Collateral, the Debtor would be required to cease operations, which would jeopardize the health and safety of Residents, or seek alternate forms of funding, which would likely be more expensive due to interest and fees, and therefore not in the best interest of the Debtor's estate and all parties in interest.  Instead, the Debtor should have access to the Cash Collateral, as mutually agreed to by the Debtor and the 2014 Bond Trustee, subject to the Debtor's provision of the adequate protection set forth in the Proposed Cash Collateral Orders.

94.     Therefore, I respectfully ask this Court to grant the relief sought in the Cash Collateral Motion.

**J.     Ombudsman Motion**

95.     By the Ombudsman Motion, the Debtor seeks entry of an order (a) determining that appointment of a patient care ombudsman for the Debtor is not required at this time, and (b) allowing the Debtor to self-report information relating to the state of Resident care to this Court, the U.S. Trustee, the DOH, and any Residents or family members thereof who specifically request a copy of such information.  I believe that an ombudsman is unnecessary in this case because, among other reasons, (a) the Debtor has a history of providing excellent Resident healthcare

services and, subject to the Cash Collateral Motion being granted, will have the resources necessary to continue providing a high level of patient care during this Chapter 11 Case; (b) the Debtor has existing and stringent internal safeguards that adequately protect Residents; (c) the Debtor is already subject to regulatory oversight by numerous governmental authorities, such as CMS, the DFS, the DOH, and the New York State Attorney General and (d) the skilled nursing operations at the Debtor are only a part of the many services it provides to seniors, most of whom are in independent living and do not require health care services.

96.     As a licensed CCRC, the Debtor is required to comply with New York law governing CCRCs.  New York regulates both the marketing and selling of living units in CCRCs and CCRC operations pursuant to Article 46 of the PHL (the "CCRC Act"), Articles 28 and 36 of the PHL,[9] Article 7 of the New York Social Services Law (the "NYSS Law"), and regulations promulgated thereunder, including title 11 of the New York Codes, Rules and Regulations, part 350 (the "Regulations").  The CCRC Act, the NYPH Law, the NYSS Law, and the Regulations impose obligations on CCRC providers like The Harborside that serve to protect Residents and prospective Residents.

97.     Moreover, the DOH regulates the Debtor's operations, including the quality of patient care at The Harborside, and jointly regulates the financial and actuarial components of the CCRC with the DFS.  The DOH also conducts required, annual, and unannounced onsite inspections of The Harborside's Health Center.  The Regulations require the DFS' initial approval and ongoing review of the CCRC based on the actuarial validity and financial viability of the CCRC.  Furthermore, the Debtor is required under the CCRC Act to meet minimum reserve

---

[9] Certain portions of the Debtor's operation of The Harborside is also subject to Articles 28 and 36 of the PHL, which generally governs hospitals (including nursing homes), home care services, and related services.

requirements, and is subject to information requests by the DFS to demonstrate compliance with the Regulations.

98.     Separately, the skilled nursing portion of the Health Center is subject to survey and certification requirements imposed by the CMS to ensure that providers participating in government programs, including Medicare and Medicaid, meet the conditions for participation in such programs.

99.     The Debtor has informed the governmental regulatory authorities of this pending Chapter 11 Case and intends to continue notifying them of material updates of this case.  None of the governmental regulatory authorities have expressed concerns regarding the Debtor's ability to continue rendering healthcare services to Residents.

100.     I believe that the Debtor has a commendable history of patient care.  Historically, since 2014, the Debtor has received twenty-eight (28) complaints regarding patient care.  As of the Petition Date, the Debtor has no formal complaints with respect to patient care pending.  If and when a complaint is filed, the Debtor's staff investigate each complaint and implement procedures to any reoccurrence.  During the pendency of this Chapter 11 Case, and subject to the Cash Collateral Motion being granted, the Debtor will offer the same high level of Resident care that it offered prepetition.  As exemplified by the Debtor's exemplary record of Resident satisfaction and patient care, I can confirm that The Harborside and its staff are fully committed to the Residents and their well-being.

101.     The Debtor has numerous existing safeguards to protect Residents.  The Debtor has extensive internal policies and procedures to monitor the quality of Resident/patient care for the overall community.   This community-wide internal quality management program entails

monitoring by a committee (a "<u>Care Committee</u>"), which meets on a weekly basis to discuss and handle Resident needs as they arise and determine the appropriate level of care.

102.    Furthermore, the Debtor has policies and procedures in place to properly assign Residents to the level of care best suited to address their needs.  Prior to admission into The Harborside, each Resident is required to complete a confidential health profile and questionnaire and/or undergo an assessment.  Residents in the enriched housing portion of the Health Center are evaluated by a physician to determine the appropriate level of care, and The Harborside's staff develops a service plan based on the physician's evaluation and functional assessment.  Similarly, each Resident admitted into the skilled nursing units of the Health Center is assigned a team (a "<u>Care Team</u>") of registered nurses, physical therapists, social workers, medical doctors, and others responsible for initially assessing the medical condition of the Resident and then providing ongoing monitoring.  The Care Team is responsible for evaluating the health and condition of each admitted Resident and determining an appropriate level of patient care, and conducts ongoing weekly advanced planning to that end.   Any Resident who is dissatisfied with the care provided has access to a social worker on the Care Team to express any concerns or grievances, who convenes a comprehensive care planning meeting with all Care Team members involved in the care, the Resident, and his or her family members.  Any expressed concerns or issues are documented and the Debtor, in response, takes appropriate steps to address and resolve them immediately.

103.    In the enriched housing and memory support units in the Health Center (collectively, the "<u>Assisted Living Facility</u>"), within thirty (30) days after move-in, the Recreation Department will conduct a lifestyle survey such that The Harborside staff can better understand the Resident's activity and participation level to tailor the events to each Resident's individual needs. The Harborside staff conducts six-month evaluations, which include a service plan update to note

any changes in the Resident's health or functional status, medications, and skilled services being received since the last evaluation.

104.    Further, in the skilled nursing units, upon admission, the Resident is welcomed by each department, such as nursing, attending physicians and nurse practitioners, dietary, rehab, social work and recreation, which also conduct an assessment of the Resident.  Within 24 to 72 hours after admission for short-term residents, a Baseline Care Plan is completed to promote continuity of care and communication among nursing home staff, increase Resident safety, safeguard against adverse events that are most likely to occur right after admission, and to identify needs of supervision, behavioral interventions, and assistance with activities.  An interdisciplinary team consisting of the Health Center Administrator, the Minimum Data Set (MDS) Coordinator, Assistant Director of Social Worker, Director of Rehabilitation, Admissions Coordinator and Accounts Receivable Manager conducts morning reports on Monday through Friday, the purpose of which is to address concerns as they occur to ensure the Residents' individualized plans of care are followed.  The interdisciplinary team also holds weekly Performance Driven Payment Model/Utilization Review Meetings (PDPM/UR), in which the team discusses plans of care for Residents admitted for short-term rehabilitation to optimize quality of care and maximize reimbursement.

105.    Community-wide, the Quality Assurance/Performance Improvement ("QAPI") Committee meets quarterly to ensure and promote that quality assurance at the Health Center is maintained and exceeded, including if a grievance is filed, as discussed further below.  The QAPI is a federally-mandated committee by CMS that takes a systematic, comprehensive, and data-driven approach to maintaining and improving safety and quality in nursing homes.  *See* 42 C.F.R § 483.75 (2017).  Once a quality assurance issue is identified, the QAPI Committee uses measurements of

data from a variety of sources depending on the specific problem that has been identified to determine a solution.  The QAPI Committee's goal is met once 95 to 100% compliance of that solution is achieved.  All department heads meet with Residents and family members consistently, including when there is an issue with a quality measure.  The issue is then added as a QAPI and team members relevant to the identified problem are added to the plan. The Harborside has similar grievance processes in both the Assisted Living Facility and skilled nursing facility, in addition to a community-wide ombudsman with whom The Harborside staff works closely to identify and address any grievances as they arise immediately.[10]

106.    In the Assisted Living Facility, after a grievance is filed by the Resident or the Resident Representative, who is typically a family member or emergency contact, the Assisted Living Manager or the Resident's Case Worker will commence an investigation.  The Harborside's response and corrective action to the grievance is documented and discussed with the Care Team and the Resident's family.  All parties involved must sign off on a resolution to the grievance. Further, Residents are able to contact and discuss with the Nassau County Ombudsman Coordinator (as discussed below) if they would like to involve additional, external oversight in the grievance process.

107.    Similarly, in the skilled nursing units, The Harborside has a designated grievance officer who, in coordination with the Health Center Administrator and the Director of Nursing, investigates Resident grievances.  The process for filing a grievance starts with the Resident or the Resident Representative registering a complaint to the grievance officer.  Once the grievance is registered, the grievance officer will notify the involved department manager for investigation and

---

[10] Generally, official complaints are directed to the Debtor's Department Director of the area in which the complaint arises.  If the Director cannot address the complaint to the satisfaction of the Resident, the complaint is elevated to the Executive Director.  If the Executive Director cannot address the complaint, then then complaint is taken to the Chief Executive Officer.

follow up.  The Resident and/or Resident Representative will receive an outcome on the grievance within seven (7) business days.  At this time, grievances are in compliance and being completed in a timely manner.  The Health Center Administrator, the Director of Nursing, Assistant Director of Nursing and Director of Social Work continuously check with Residents in their rooms to ensure that they are satisfied with their care and any concerns are discussed for possible intervention as a QAPI if a problematic trend is consistently being observed.

108.    While The Harborside does not provide patient care in the independent living units, each Resident in these units has a Resident Ambassador to address any issues.  If an issue is raised and it is unresolved, it will be forwarded to the Department Director and then the Executive Director.  Residents can also discuss any concerns with the Resident Council to be discussed at the Residents Welfare Committee, which meets to discuss and address the needs of Residents in the independent living units.

109.    The Harborside's social work and administration departments work closely with The Harborside's internal ombudsman to address complaints as they arise, including sending the internal ombudsman weekly COVID-19 updates, and with the Ombudsman Coordinator for Nassau County designated by the New York State Office for the Aging Long Term Care Ombudsman Program (the "Ombudsman Coordinator").  The state Ombudsman Coordinator is responsible for advocating for residents who live in nursing homes, assisted living and other licensed adult care homes, including CCRCs, by investigating and resolving complaints made by or on behalf of Residents in relation to the Health Center.  The Ombudsman Coordinator regularly interacts with The Harborside through email, telephone, and meetings.

110.     As a result of the Debtor's high standards, CMS has classified the Health Center as a "five star" provider having a much above average overall rating, and the Health Center has also been named one of the "Best Nursing Homes" by the publication U.S. News and World Report.

111.     I believe that an ombudsman would not serve the best interests of the Debtor's Residents, the Debtor's estate, or any parties in interest in this case.  An ombudsman would provide services or supervision that would be duplicative of existing safeguards, and would therefore result in additional costs to the Debtor's estate with little additional value.  Given the anticipated short duration of this Chapter 11 Case, I believe that an ombudsman would only spend estate resources and valuable time familiarizing itself with the Debtor's business before being able to render services already provided by governmental regulatory authorities and internal quality management procedures.  Therefore, I respectfully ask this Court to decline appointing an ombudsman at this time.

112.     Finally, the Debtor is willing to self-report the information relating to the state of Resident care to this Court, the U.S. Trustee of the Eastern District of New York, the DOH, and any Residents or family members thereof who specifically request a copy of such information.  I believe that self-reporting will allow this Court and all parties in interest to assess the state of patient care at The Harborside, and goes beyond what is required of a patient care ombudsman, without incurring the added expense of a patient care ombudsman.

113.     Therefore, I respectfully ask this Court to grant the relief sought in the Ombudsman Motion.

**K.    Plan Support Agreement Motion**

114.     By the Plan Support Agreement Motion, the Debtor seeks entry of an order authorizing the Debtor to assume the Plan Support Agreement.  As set forth below, I believe that

the Plan Support Agreement is in the best interest of the Debtor and its estate so as to ensure that it continues having the affirmative vote of the Consenting Holders on the Plan. The Debtor also seeks this relief because, under the terms of the Plan Support Agreement, it is required to take all reasonably necessary steps in seeking to obtain from the Court an order authorizing the assumption of this Plan Support Agreement.

115.    The Debtor, the Consenting Holders and the Member entered into the Plan Support Agreement to effectuate the Plan. Pursuant to the Plan Support Agreement and as more particularly set forth therein, the Debtor agreed that it would (a) proceed forward with the consummation of the proposed restructuring in good faith in accordance with the timeline set forth in the Plan Support Agreement, and (b) provide the Plan, the Disclosure Statement, all of the First Day Pleadings and other principal documents associated with the Chapter 11 Case to the 2014 Bond Trustee for its review and consent. Additionally, the Debtor has agreed not to solicit a plan of restructuring that differs from the restructuring contemplated under the Plan without the consent of the Consenting Holders.

116.    Moreover, pursuant to and in accordance with the Plan Support Agreement, as more particularly set forth therein, the Consenting Holders, which hold approximately 73% of the principal amount outstanding of Series 2014 Bonds (excluding accreted principal under the Series C Bonds). have agreed to among other things: (a) take all steps necessary to support confirmation of the Plan, pursuant to the terms of the Plan Support Agreement; (b) take no action inconsistent with the terms of the Plan Support Agreement or the Plan; and (c) consent to the Debtor's use of the cash collateral of the 2014 Bond Trustee for the Series 2014 Bonds. Furthermore, the Consenting Holders have agreed not to sell, transfer, assign, or otherwise dispose of, directly or indirectly, any of the Series 2014 Bonds, or any right, claim, or interest relating to or arising from

the Series 2014 Bonds, held by its respective members, subject to the terms and conditions of the Plan Support Agreement.

117.    The Plan Support Agreement further provides that upon the occurrence of any of the following events, as more fully set forth in the Plan Support Agreement, it will be deemed terminated upon written notice from the non-breaching party to the breaching party (each, a "Termination Event"): (a) failure by the parties to agree to the form and substance of any Plan Support Documents (as defined in the Plan Support Agreement), (b) any Bankruptcy Documents (as defined in the Plan Support Agreement) are withdrawn, materially modified or amended, (c) failure to file the Bankruptcy Documents on the Petition Date, (d) failure to file the petition by the Outside Petition Date (as defined in the Plan Support Agreement), (e) any action by the Debtor that would prevent or affect the ability of the Debtor to consummate the Plan and the Restructuring Transaction, (f) entry of an order by the Court that would prevent or affect the ability of the parties to consummate the Plan and the Restructuring Transaction in this Chapter 11 Case, or would affect the rights and interests of any of the Consenting Holders or the 2014 Bond Trustee, as set forth in the Plan Support Agreement, (g) the Effective Date of the Plan has not occurred by the time set forth in the Plan Support Agreement, (h) an action by a court prevents consummation of the Plan, (i) a mutual written agreement to terminate the Plan Support Agreement by the Debtor and the Consenting Holders, and (j) failure by either party to comply with any of obligations set forth in the Plan Support Agreement.

118.    The Plan Support Agreement is integral to the Debtor's efforts to consummate the restructuring contemplated by the Plan. The Plan Support Agreement ensures that, in the absence of any unforeseen Termination Events thereunder, the Debtor will have the votes needed to confirm the Plan. Additionally, the relief requested herein will facilitate a smooth transition into and out of

chapter 11 as expeditiously and consensually as possible, while minimizing any business disruption and impact on the Debtor's daily operation of The Harborside or on its Residents and will otherwise minimize the costs and expenses associated with these proceedings.  Absent the benefit of the Plan Support Agreement, the Consenting Holders could withdraw support for the Plan and the related Plan process.  Such a course of action could jeopardize the Debtor's restructuring efforts and the continued operation of The Harborside and otherwise cause significant delays, costs, and expenses relating to the resolution of the Debtor's obligations owed to the holders of the Series 2014 Bonds and other third parties

119.    Notably, the restructuring contemplated by the Plan Support Agreement is substantially a restructuring of the Debtor's balance sheet which, while leaving large parts of the Debtor's business relatively unchanged, will nonetheless significantly strengthen the Debtor's financial status and better position the Debtor for future profitability and therefore benefit the holders of the Series 2014 Bonds.

120.    Accordingly, the Debtor submits that the Plan Support Agreement Motion is in the best interest of the Debtor, its estate, its Residents, and all parties in interest.  Therefore, I respectfully ask this Court to grant the relief sought in the Plan Support Agreement Motion.

### L.    Case Management Motion

121.    By the Case Management Motion, the Debtor seeks entry of an order establishing certain notice, case management, and administrative procedures, all subject to further order of the Court, including: (a) establishing notice procedures; (b) authorizing procedures for the service of pleadings, motions, or filings on the Residents; and (c) directing that matters be heard at monthly omnibus hearings (the "Omnibus Hearings") to be scheduled in advance and approving certain filing procedures related thereto, and establishing objection procedures.

122.    Additionally, and as discussed above, because as part of its overall operations The Harborside operates a nursing home that qualifies as a licensed healthcare provider, the Debtor is subject to the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and other privacy requirements, which prevents disclosure of individually identifiable health care information (the "Protected Health Information" or "PHI").    Accordingly, the Case Management Motion proposes certain procedures with respect to service of pleadings and other filings during the course of the Chapter 11 Case, to prevent disclosure of the Protected Health Information.  I believe that the proposed procedures would adequately protect the rights of Residents while preserving the spirit of notice and disclosure under the Bankruptcy Code.

123.    I believe the relief requested in the Case Management Motion would minimize the costs and burdens associated with running a chapter 11 process in the absence of procedures set forth in the Case Management Motion.  For instance, the possibility of numerous, fragmented hearings, as well as the costs associated with mass copying and mailing or otherwise serving all filings to parties without such procedures, would impose an administrative and economic burden on the Debtor's estate, this Court, and the parties in interest, and require the Debtor to otherwise re-allocate its limited resources to comply with administrative requirements.  Therefore, I respectfully ask this Court to grant the relief sought in the Case Management Motion.

**M.    Claims Bar Date Application**

124.    By the Claims Bar Date Application, the Debtor seeks entry of an order (a) establishing (i) the date by which all entities, other than governmental units as defined in section 101(27) of the Bankruptcy Code and certain other parties as set forth therein, must file proofs of claim ("Proofs of Claim") (including any claims entitled to priority under section 503(b)(9) of the Bankruptcy Code) in this chapter 11 case; (ii) the date (the "Governmental Bar Date") by which all

governmental units must file Proofs of Claim in the chapter 11 case; (iii) the date (the "Rejection Bar Date") by which all Proofs of Claim (including for administrative claims arising under section 503(b) of the Bankruptcy Code) relating to the Debtor's rejection of executory contracts or unexpired leases must be filed in the chapter 11 case; and (iv) the date (the "Amended Schedules Bar Date", and collectively with the General Bar Date, the Governmental Bar Date, and the Rejection Bar Date, the "Bar Dates") by which all entities must file Proofs of Claim in the Chapter 11 Case as a result of any amendment of the Debtor's Schedules and Statements (as defined below); (b) authorizing procedures for the Residents to file Proofs of Claim; and (c) approving the form and manner of notice of the Bar Dates (the "Bar Date Notice").

125.    As further discussed in the Claims Bar Date Application, the Debtor proposes the following Bar Dates:

- General Bar Date: August 3, 2021, 2021 at 5:00 p.m. (prevailing Eastern Time);

- Governmental Bar Date: December 13, 2021 at 5:00 p.m. (prevailing Eastern Time);

- Rejection Bar Date: The later of the General Bar Date or the date that is thirty (30) days after entry of an order rejecting the contract; and

- Amended Schedules Bar Date: Thirty (30) days after the Debtor serves notice of an amended Schedules and Statements.

126.    Additionally and as discussed above, because The Harborside operates a nursing home that qualifies as a licensed healthcare provider, the Debtor is subject to HIPAA and other privacy requirements, which protect the privacy of Protected Health Information. Accordingly, the Claims Bar Date Application proposes certain procedures with respect to Residents that file Proofs of Claim to prevent disclosure of the Protected Health Information. I believe that the proposed procedures would adequately protect the rights of Residents while preserving the spirit of notice and disclosure under the Bankruptcy Code.

127.    The Debtor is filing this Claims Bar Date Application on the Petition Date because the Debtor seeks to effectuate a balance sheet restructuring pursuant to the Plan that contemplates confirmation of the Plan within approximately seventy-five (75) days of the Petition Date.  The Debtor has filed the Claims Bar Date Application to comply with all applicable Bankruptcy Rules and Local Rules regarding claims bar dates, while maintaining its proposed timeline for the confirmation of the Plan.

128.    To proceed with the restructuring process pursuant to the proposed timeline, and to make distributions to creditors under the Plan, the Debtor requires, among other things, complete and accurate information regarding the nature, validity, and amount of claims that will be asserted in the Chapter 11 Case.  Consequently, to avoid any delay in the restructuring process, I respectfully request that the Court establish the Bar Dates and related claims procedures proposed herein and approve the form and manner of notice thereof.

## INFORMATION REQUIRED BY LOCAL RULE 1007-4

129.    It is my understanding that the Local Bankruptcy Rules for the Eastern District of New York (the "Local Rules") require the disclosure of certain information related to the Debtor. The information required by Local Rule 1007-4 is set forth below and in attached exhibits.

(i)    I do not believe that the Debtor is a small business debtor within the meaning of the section 101(51D) of the Bankruptcy Code.

(ii)    The nature of the Debtor's business and the circumstances leading to the Debtor's filing under chapter 11 have been described above.

(iii)    Exhibit A provides a list, to the extent available, with respect to the committees that have been appointed or formed prior to the Petition Date and any committee professionals thereof.

48

(iv)  Exhibit B provides a list, to the extent available, with respect to the Debtor's thirty largest unsecured claims: (1) the creditor's name, address, and telephone number; (2) the person(s) familiar with the Debtor's account; and (3) the amount of the claim and whether the claim is contingent, unliquidated, disputed, or partially secured.

(v)   Exhibit C provides a list, to the extent available, with respect to the Debtor's five (5) largest secured claims: (1) the creditor's name, address, and telephone number; and (2) the amount of the claim, estimated value of the collateral securing the claim, and whether the claim or lien is disputed.

(vi)  Exhibit D provides an unaudited balance sheet, dated March 31, 2021, showing the Debtor's assets and liabilities as of that date.

(vii) The Debtor is a not-for-profit corporation.  Therefore, there are no shares of stock in the Debtor that are publicly held.  There are no debentures or securities that are publicly held.

(viii) None of the Debtor's property is in the possession of any custodian, public officer, mortgagee, assignee, or secured creditor.

(ix)  Exhibit E lists the premises owned or leased by the Debtor in which the Debtor operates its business.

(x)   Exhibit F lists the location of the Debtor's significant assets, and the location of the Debtor's books and records.  The Debtor has no significant assets held outside the territorial limits of the United States.

(xi)  Exhibit G lists the nature and status of each action pending or threatened against the Debtor or its property.

49

(xii)    Exhibit H lists (1) the name of individuals who comprise the Debtor's senior management; (2) their tenure with the Debtor; and (3) a summary of their relevant responsibilities and experience.

(xiii)   Exhibit I lists the estimated amount of weekly payroll to be paid to employees for the thirty (30) day period following the Petition Date.

(xiv)   Exhibit J lists the amount proposed to be paid to officers and directors in the thirty (30) day period following the Petition Date.

(xv)    Exhibit K provides a schedule of the estimated cash receipts, net gain or loss, and obligations and receivables expected to accrue that remain unpaid, other than professional fees, for the thirty (30) day period following the Petition Date.

(xvi)   Exhibit L is a simplified organization chart showing the Debtor and its affiliates.

## **CONCLUSION**

The Debtor respectfully requests that the orders granting relief requested in the First Day Pleadings be entered.  I reserve the right to supplement and/or amend this Declaration with testimony and/or exhibits.

I declare under the penalty of perjury that the foregoing is true and correct.

Dated:  06/14/2021

Amsterdam House Continuing
Care Retirement Community, Inc.

*Debtor and Debtor in Possession*

James Davis
President & Chief Executive Officer

**Exhibit A**

**Committees and Committee Professionals**

Before the Petition Date, the following entities formed an ad hoc committee of bondholders consenting to the Debtor's proposed Plan.

| Consenting Holders Member | Advisors |
|---|---|
| Holders of approximately 73% of the principal amount outstanding of Series 2014 Bonds (excluding accreted principal under the Series C Bonds) issued by the 2014 Issuer under the 2014 Indenture. | Legal Counsel[1]<br>Daniel S. Bleck, Esq.<br>Mintz Levin Cohn Ferris Glovsky & Popeo, PC<br>One Financial Center<br>Boston, Massachusetts 02111<br>dsbleck@mintz.com |

---

[1] Mintz Levin Cohn Ferris Glovsky & Popeo, PC is counsel to the 2014 Bond Trustee, and does not represent individual Consenting Holders. The 2014 Bond Trustee works under the direction of bondholders, including the Consenting Holders.

**Exhibit B**

**Debtor's Thirty Largest Unsecured Claims**

| Creditor Number | Name of creditor and complete mailing address, including zip code | Name, telephone number, and fax number of employees, agent or department of creditor familiar with claim who may be contacted | Nature of claim (trade debt, bank loan, government contract, etc.) | Amount of claim as of date | Indicate if claim is contingent, unliquidated, disputed, or subject to setoff |
|---|---|---|---|---|---|
| 1 | Resident # 10026 [REDACTED] | [REDACTED] | Entrance Fee Liability | $1,364,632.50 | Contingent, Unliquidated |
| 2 | Resident # 10014 [REDACTED] | [REDACTED] | Entrance Fee Liability | $1,360,333.18 | Contingent, Unliquidated |
| 3 | Resident # 10003 [REDACTED] | [REDACTED] | Entrance Fee Liability | $1,285,200.00 | Contingent, Unliquidated |
| 4 | Resident # 10005 [REDACTED] | [REDACTED] | Entrance Fee Liability | $1,240,359.20 | Contingent, Unliquidated |
| 5 | United States Small Business Administration 409 3rd Street SW Washington, DC 20416 | | Paycheck Protection Program (PPP) Loan | $1,156,304.00 | Contingent |
| 6 | Resident # 10017 [REDACTED] | [REDACTED] | Entrance Fee Liability | $1,133,481.60 | Contingent, Unliquidated |
| 7 | Resident # 10009 [REDACTED] | [REDACTED] | Entrance Fee Liability | $1,094,752.00 | Contingent, Unliquidated |
| 8 | Resident # 10015 [REDACTED] | [REDACTED] | Entrance Fee Liability | $1,075,612.80 | Contingent, Unliquidated |
| 9 | Resident # 10016 [REDACTED] | [REDACTED] | Entrance Fee Liability | $1,061,650.00 | Contingent, Unliquidated |
| 10 | Resident # 10021 [REDACTED] | [REDACTED] | Entrance Fee Liability | $1,055,237.60 | Contingent, Unliquidated |
| 11 | Resident # 10008 [REDACTED] | [REDACTED] | Pending Refund to Former Resident | $1,048,728.80 | |
| 12 | Resident # 10020 [REDACTED] | [REDACTED] | Entrance Fee Liability | $1,023,779.20 | Contingent, Unliquidated |
| 13 | Resident # 10019 [REDACTED] | [REDACTED] | Pending Refund to Former Resident | $1,016,592.00 | |
| 14 | Resident # 10023 | [REDACTED] | Entrance Fee | $1,015,987.20 | Contingent, |

| Creditor Number | Name of creditor and complete mailing address, including zip code | Name, telephone number, and fax number of employees, agent or department of creditor familiar with claim who may be contacted | Nature of claim (trade debt, bank loan, government contract, etc.) | Amount of claim as of date | Indicate if claim is contingent, unliquidated, disputed, or subject to setoff |
|---|---|---|---|---|---|
| | [REDACTED] | | Liability | | Unliquidated |
| 15 | Resident # 10004 [REDACTED] | [REDACTED] | Entrance Fee Liability | $1,003,666.50 | Contingent, Unliquidated |
| 16 | Resident # 10007 [REDACTED] | [REDACTED] | Pending Refund to Former Resident | $1,003,468.26 | |
| 17 | Resident # 10012 [REDACTED] | [REDACTED] | Entrance Fee Liability | $988,631.20 | Contingent, Unliquidated |
| 18 | Resident # 10010 [REDACTED] | [REDACTED] | Entrance Fee Liability | $950,300.00 | Contingent, Unliquidated |
| 19 | Resident # 10027 [REDACTED] | [REDACTED] | Entrance Fee Liability | $941,615.72 | Contingent, Unliquidated |
| 20 | Resident # 10024 [REDACTED] | [REDACTED] | Pending Refund to Former Resident | $938,669.00 | |
| 21 | Resident # 10013 [REDACTED] | [REDACTED] | Entrance Fee Liability | $918,355.30 | Contingent, Unliquidated |
| 22 | Resident # 10028 [REDACTED] | [REDACTED] | Pending Refund to Former Resident | $918,247.20 | |
| 23 | Resident # 10018 [REDACTED] | [REDACTED] | Entrance Fee Liability | $917,643.85 | Contingent, Unliquidated |
| 24 | Resident # 10022 [REDACTED] | [REDACTED] | Entrance Fee Liability | $904,369.60 | Contingent, Unliquidated |
| 25 | Resident # 10000 [REDACTED] | [REDACTED] | Entrance Fee Liability | $902,116.00 | Contingent, Unliquidated |
| 26 | Resident # 10025 [REDACTED] | [REDACTED] | Entrance Fee Liability | $883,709.30 | Contingent, Unliquidated |
| 27 | Resident # 10002 [REDACTED] | [REDACTED] | Entrance Fee Liability | $883,709.30 | Contingent, Unliquidated |
| 28 | Resident # 10011 [REDACTED] | [REDACTED] | Entrance Fee Liability | $878,137.60 | Contingent, Unliquidated |
| 29 | Resident # 10006 [REDACTED] | [REDACTED] | Entrance Fee Liability | $869,567.57 | Contingent, Unliquidated |
| 30 | Resident # 10001 [REDACTED] | [REDACTED] | Entrance Fee Liability | $855,212.67 | Contingent, Unliquidated |

## Exhibit C

### Top Five Largest Secured Claims

| Creditor | Mailing Address & Phone Number | Counsel | Approximate Amount of Claim as of June 12 2021 | Description and Estimated Value of Collateral | Contingent, Unliquidated, Disputed |
|---|---|---|---|---|---|
| UMB Bank, n.a., as 2014 Bond Trustee | 1010 Grand Avenue P.O. Box 419 226 Kansas City, MO 64106-6226 800.860.3020 (bondholder relations) | Mintz Levin Cohn Ferris Glovsky and Popeo PC, One Financial Center, Boston, MA 02111 | $214,252,157 | Substantially all of the Debtor's assets–value unknown. | |

**Exhibit D**

**Unaudited Balance Sheet, Dated March 31, 2021**

**The Amsterdam at Harborside**
**Statement of Financial Position**
**As of March 31, 2021**
**UNAUDITED**

| | Current Month | Prior Month | Variance |
|---|---|---|---|
| **ASSETS** | | | |
| Cash and Cash Equivalents | 2,626,523 | 1,324,404 | 1,302,119 |
| Escrow Entrance Fees and Reservation Deposits | 2,617,153 | 2,617,089 | 64 |
| Net A/R Residents | 876,153 | 1,050,765 | (174,612) |
| Other Receivables | 16,510 | 16,086 | 424 |
| Inventory | 40,634 | 40,713 | (79) |
| Deposits | 3,391 | 3,391 | - |
| Prepaid Expenses | 770,095 | 446,466 | 323,630 |
| **Total Current Assets** | **6,950,460** | **5,498,914** | **1,451,546** |
| CIP | 1,798,300 | 1,502,396 | 295,904 |
| Fixed Assets | 259,639,937 | 259,635,448 | 4,489 |
| Accumulated Depreciation | (69,256,586) | (68,701,906) | (554,680) |
| Capitalized Marketing | 12,161,341 | 12,161,341 | - |
| Accumulated Amortization | (11,978,226) | (11,978,226) | - |
| Restricted Assets | 10,827,581 | 11,078,500 | (250,920) |
| **TOTAL ASSETS** | **210,142,806** | **209,196,467** | **946,339** |
| **LIABILITIES** | | | |
| Accounts Payable | 2,127,307 | 1,402,104 | 725,203 |
| Payroll Related Current Liabilities | 728,993 | 672,901 | 56,093 |
| Accrued Operating Expenses | 759,617 | 900,154 | (140,536) |
| Deferred CARES Act Revenue | 91,336 | 91,336 | - |
| Resident Current Liabilities | 16,444,782 | 14,611,153 | 1,833,628 |
| Accrued Bond Interest Expense - Series A and B | 4,636,917 | 3,864,097 | 772,820 |
| **Total Current Liabilities** | **24,788,952** | **21,541,744** | **3,247,208** |
| Entrance Fee Liability | 167,732,815 | 169,935,999 | (2,203,184) |
| Long Term Debt (net of Deferred financing costs) | 195,031,739 | 195,013,018 | 18,721 |
| Accrued Bond Interest Expense - Series C | 8,066,104 | 7,953,992 | 112,112 |
| Subordinated Loan | 3,000,000 | 3,000,000 | - |
| Accrued Interest on Subordinated Loan | 3,846,614 | 3,826,864 | 19,750 |
| Future Services Obligation Liability | 21,786,000 | 21,786,000 | - |
| Paycheck Protection Program Loan | 1,156,272 | - | 1,156,272 |
| **TOTAL LIABILITIES** | **425,408,496** | **423,057,618** | **2,350,878** |
| **EQUITY** | | | |
| Fund Balance (Deficit) | (212,334,915) | (212,334,915) | - |
| Net Income (Loss) | (2,930,775) | (1,526,235) | (1,404,540) |
| **TOTAL EQUITY** | **(215,265,690)** | **(213,861,151)** | **(1,404,540)** |
| **TOTAL LIABILITIES & EQUITY** | **210,142,806** | **209,196,467** | **946,339** |

## Exhibit E

### Premises Owned or Leased by Debtor

| Debtor/Lessee | Property Address | Lease Expiration Date | Type of Interest |
|---|---|---|---|
| AHCCRC, Inc. | 300 E. Overlook Port Washington, NY 11050 | N/A | Owned |

## Exhibit F

### Location of Debtor's Significant Assets and Records

Pursuant to Local Rule 1007-4(a)(xi), the following lists the location of the Debtor's substantial assets, books and records, and nature, location, and value of any assets held by the Debtor outside the United States:

#### Location of Debtor's Substantial Assets

300 E. Overlook
Port Washington, New York 11050

The Debtor's real property, leaseholds and inventory, and the location of these assets are provided in <u>Exhibit E</u>.

#### Location of the Debtor's Books and Records:

300 E. Overlook
Port Washington, New York 11050

1060 Amsterdam Avenue
New York, New York 10025

#### Debtor's Assets Outside of the United States
The Debtor holds no assets outside of the United States.

## Exhibit G

## Litigation Pending Against Debtor or its Property

| Caption | Jurisdiction | Status or Disposition | Nature of Proceeding |
|---|---|---|---|
| Marlene Padover vs. Amsterdam House Continuing Care Retirement Community, Inc. d/b/a The Amsterdam at Harborside; Docket No. 614818/2020 (N.Y. Sup Ct. Feb 09, 2021) | New York | Plaintiff filed a motion for summary judgment; no decision has been entered to date. | Entrance fee refund |
| Cathleen Colligan, as Executor of the Estate of Thomas Colligan v. Amsterdam House Continuing Care Retirement Community, Inc. d/b/a The Amsterdam at Harborside; Docket No. 601521/2021 (N.Y. Sup Ct. Feb 08, 2021) | New York | Plaintiff filed a motion for summary judgment; no decision has been entered to date. | Entrance fee refund |
| Thomas Baranello and Steven Baranello, as Co-Executors of the Estate of Johanna Baranello v. Amsterdam House Continuing Care Retirement Community, Inc. d/b/a The Amsterdam at Harborside; Docket No. 612483/2020 (N.Y. Sup Ct. Nov. 4, 2020) | New York | Plaintiff filed a Summons and Complaint against the Debtor; the Debtor filed an Answer. No further action in case. | Entrance fee refund |
| Larry M. Fields and Paul B. Fields, as Executors of the Estate of Joan Lewander v. Amsterdam House Continuing Care Retirement Community, Inc. d/b/a The Amsterdam at Harborside; Docket No. 611908/2020 (N.Y. Sup Ct. Oct 27, 2020) | New York | Plaintiff filed a Summons and Complaint against the Debtor; the Debtor filed an Answer. No further action in case. | Entrance fee refund |
| Stephen R. Flanagan, as Executor of the Estate of Joan Flanagan v. Amsterdam | New York | Plaintiff filed a Summons and Complaint against the Debtor; the | Entrance fee refund |

| | | | |
|---|---|---|---|
| House Continuing Care Retirement Community, Inc. d/b/a The Amsterdam at Harborside; Docket No. 607467/2020 (N.Y. Sup Ct. Jul 23, 2020) | | Debtor filed an Answer. No further action in case. | |
| Daniel June vs. Amsterdam House Continuing Care Retirement Community, Inc. d/b/a The Amsterdam at Harborside; Docket No. 61751/2013 (N.Y. Sup Ct. Mar 10, 2014) | New York | Pike Construction indemnified the Debtor. | Personal Injury |

**Exhibit H**

**Summary of Debtor's Senior Management**

| Name | Tenure in Position | Position | Responsibilities |
|---|---|---|---|
| James Davis | 33 years[1] | President and CEO | As President and CEO, James Davis is responsible for overseeing the operations of the corporation and its assets. He directs and supervises operations of the Debtor, its administration, and each of its departments. Mr. Davis' responsibilities also consist of supervising the Debtor's overall restructuring efforts and reporting to the Board of Directors regarding the Debtor's operations and strategy. |
| Mark Pancirer | 30 years[2] | Senior Vice President and CFO | As Senior Vice President and CFO, Mr. Pancirer's primary responsibilities include the following: (a) monitor and report fiscal operations to the President and Chief Executive Officer, Executive Director, the Board of Directors, and governmental regulatory agencies; (b) develop long-term fiscal policies; (c) coordinate and secure financing of building expansion projects and long term borrowing options; (d) prepare executive summary and interim monthly financial reports; (e) prepare year-end and government audits; and (f) negotiate contracts with various service agencies. |
| Brooke Navarre | 3 years | Executive Director | The Executive Director assists in the development of the initial draft of the operating and capital expenditure budget for the corporation. She prepares initial variance analysis of monthly financial statements utilizing the Greystone format. Further, Ms. Navarre initiates, promotes and provides ongoing commitment to excellence in services through the Greystone "Living in Style" program. |
| Pamela Landman | 2 years | General Counsel | The General Counsel oversees and manages the provision of all legal services to the corporation to ensure maximum protection of its legal rights and to maintain its operations within the limits prescribed by law. Among Ms. Landman's responsibilities, she provides strategic guidance to the corporation on a variety of legal issues, and examines and drafts |

---

[1] This figure includes the tenure spent with affiliated entities.

[2] This figure includes the tenure spent with affiliated entities.

| | | | |
|---|---|---|---|
| | | | business agreements and contracts with Residents, vendors and other outside parties. |
| Kelly DeJesus | 1 year | Health Care Administrator | The Health Care Administrator's duties include planning, developing, organizing, implementing, and evaluating the Health Center's programs and activities. Ms. DeJesus also assists with the development of the Health Center's organizational structure and articulates the roles of department heads within that structure. Further, Ms. DeJesus works on the development and administration of the Health Center's overall budget process. Ms. DeJesus is a licensed nursing home administrator in the state of New York. |

**Exhibit I**

**Estimated Payroll 30-Days Following Petition Date**

| | |
|---|---|
| **Payments to Employees (Not Including Officers and Directors)** | $420,000 |
| **Payments to Financial and Business Consultants** | $712,750[1] |

---

[1] Payments include $52,750 to be paid in to ordinary course professionals and $660,000 to be paid to restructuring professionals.

### **Exhibit J**

**Estimated Payment to Officers and Directors 30-Days Following Petition Date**

| Payments to Officers and Directors | $32,111[1] |
|---|---|

---

[1] Inclusive of the estimated amount to be paid to Amsterdam Consulting which provides certain management services to the Debtor.

**<u>Exhibit K</u>**

**Schedule of Estimated Cash Receipts, Net Gains or Loss, Obligations, and Receivables Unpaid for 30-Days Following Petition Date**

| | |
|---|---|
| **Cash Receipts** | $2,331,000 |
| **Cash Disbursements** | $1,918,679 |
| **Net Cash Gain/Loss** | $412,321 |

| | |
|---|---|
| **Unpaid Obligations** | $1,296,899 |
| **Unpaid Receivables** | $1,181,957 |

**<u>Exhibit L</u>**

**Organizational Chart**



Legend

**Non-Debtor Entities**

**Debtor Entity**

**Amsterdam Continuing Care Health System, Inc. (NY 501(c)(3) Corporation) ("ACCH System")**

Sole Member

Sole Member

**Other ACCH System Entities***

**Amsterdam Consulting, LLC (New York Limited Liability Company)**

**AHCCRC, Inc. d/b/a The Amsterdam at Harborside (NY 501(c)(3) Corporation)**

*ACCH System is either the parent entity of, or has overlapping board members with, such entities.

## Exhibit M

**Plan Support Agreement, dated June 14, 2021**

## PLAN SUPPORT AGREEMENT

This PLAN SUPPORT AGREEMENT (this "Plan Support Agreement") is made and entered into as of June 14, 2021 (the "PSA Effective Date") by and between Amsterdam House Continuing Care Retirement Community, Inc. (the "Borrower"), Amsterdam Continuing Care Health System, Inc. as sole member of the Borrower ("ACCHS") and each of the undersigned holders of or investment advisers or subadvisers to holders of Bonds (as defined herein) (the "Consenting Holders", and together with the Borrower, each a "Party" and collectively the "Parties").

## RECITALS

A.    Nassau County Industrial Development Agency (the "Issuer") issued its (a) Continuing Care Retirement Community Fixed Rate Revenue Bonds (Amsterdam at Harborside Project) Series 2014A (the "Series 2014A Bonds"), (b) Continuing Care Retirement Community Fixed Rate Revenue Bonds (Amsterdam at Harborside Project) Series 2014B (the "Series 2014B Bonds") and (c) Continuing Care Retirement Community Excess Cash Flow Revenue Bonds (Amsterdam at Harborside Project) Series 2014C (the "Series 2014C Bonds" and together with the Series 2014A Bonds and Series 2014B Bonds, the "Bonds") pursuant to the Indenture of Trust dated November 1, 2014, as amended by the First Amendment to Indenture of Trust dated January 22, 2020 (as so amended, the "Indenture") between the Issuer and UMB Bank, N.A., as trustee (the "Trustee") for the purpose of refinancing that certain continuing care retirement community known as "The Amsterdam at Harborside" (the "Project").

B.    Simultaneously therewith, the Issuer and the Borrower entered into that certain Installment Sale Agreement dated November 1, 2014, as amended by the First Amendment to the Installment Sale Agreement dated January 22, 2020 (as so amended, the "Installment Sale Agreement") to provide for, among other things, payment of an installment purchase price for the acquisition of the Project by the Borrower, such amounts to be paid at such times and in such amounts to pay principal of and interest on the Bonds when due.

C.    As security for its obligations under the Installment Sale Agreement, the Borrower granted the Trustee a security interest against the Mortgaged Property and a security interest against substantially all of the Borrower's assets pursuant to that Mortgage, Assignment of Lease and Rents and Security Agreement dated November 1, 2014 (the "Mortgage") and the Trust Estate pursuant to the Indenture (all such collateral so granted, the "Collateral").[1]  The Indenture, the Installment Sale Agreement, the Bonds, the Mortgage and any other document or agreement delivered as security for, or in respect to, the Bonds or the Borrower's obligations under any of such documents are collectively referred to herein as the "Bond Documents."

---

[1]    Capitalized terms not otherwise defined herein have the meaning ascribed to such term in the Bond Documents (as defined below).

D.    Each Consenting Holder holds or is the investment adviser or subadviser to various funds and accounts that each holds debt arising out of, or related to, the Bonds and the Consenting Holders hold or are the investment advisers or subadvisers to various funds and accounts that hold debt, in aggregate, arising out of or related to the Bonds equal to at least seventy-three (73%) of the principal amount of the Bonds outstanding.

E.    Defaults, potential defaults or Events of Default have occurred (or will occur) under the Bond Documents.

F.    The Borrower desires to implement a restructuring (the "Restructuring") of its financial obligations with respect to the Bonds and its other outstanding obligations on the terms and conditions set forth in the restructuring term sheet  attached hereto as **Exhibit 1,** as supplemented by the supplemental term sheet attached hereto as **Exhibit 2,** (Exhibits 1 and 2, collectively, the "Term Sheet").

G.    The Parties have agreed to the Restructuring, solely on the terms and conditions outlined in the Term Sheet.

H.    The Borrower intends to implement the Restructuring by filing a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") commencing a case (the "Chapter 11 Case") in the United States Bankruptcy Court for the Eastern District of New York, Central Islip Division (the "Bankruptcy Court") no later than June 18, 2021 (the "Outside Petition Date").

I.    Each Party has reviewed, or has had the opportunity to review, this Plan Support Agreement and the Term Sheet with the assistance of professional legal advisors of its own choosing.

## STATEMENT OF AGREEMENT

In consideration of the premises and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1.    Preliminary Statements. The statements set forth in the recitals are incorporated herein and form an integrated part of this Plan Support Agreement, subject to such modifications and amendments as may be permitted pursuant to Section 14 hereof.

2.    Effectiveness of Plan Support Agreement. Upon the execution of this Plan Support Agreement by the Parties, this Plan Support Agreement will constitute the legally binding and enforceable agreement of the Parties, subject to the applicable provisions of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code") and the terms of the Term Sheet, effective as of the PSA Effective Date.

3.    Agreements of the Borrower. Consistent with the Borrower's business judgment and the exercise of its fiduciary duties, the following are material covenants and conditions to the agreements contained herein:

(a)    The Borrower shall provide drafts of the following documents (collectively, the "Bankruptcy Documents") to ACCHS, the Consenting Holders and the Trustee on or before May 24, 2021, ACCHS, the Consenting Holders and the Trustee shall provide any comments on the Bankruptcy Documents on or before June 8, 2021, and the Bankruptcy Documents shall be in form and substance satisfactory to the Consenting Holders, ACCHS, and the Trustee by June 13, 2021.

i)      Chapter 11 Petition with related documents, including: (i) officer's certificate, (ii) board resolutions, (iii) top 30 unsecured creditors list, (iv) Bankruptcy Rules 1007(a)(1) and 7007.1 corporate ownership statement, and (v) Rule 1007(a)(3) list of equity security holders;

ii)     "First Day" Hearing Agenda;

iii)    Debtor's Emergency Motion for Entry of an Order Establishing Certain Notice, Case Management and Administration Procedures and Omnibus Hearing Dates (the "Case Management Motion");

iv)     Debtor's Emergency Motion for Interim and Final Orders (I) Authorizing the Debtor to Use the Cash Collateral of UMB Bank, N.A., as 2014 Bond Trustee; (II) Providing UMB Bank, N.A., as 2014 Bond Trustee, Adequate Protection; and (III) Modifying the Automatic Stay (the "Cash Collateral Motion");

v)      Plan of Reorganization (the "Plan");

vi)     Disclosure Statement with respect to the Plan of Reorganization (the "Disclosure Statement");

vii)    Organizational Chart;

viii)   Emergency Motion for Entry of Interim and Final Orders Authorizing (I) Continued Use of the Debtor's Existing Cash Management System, (II) Maintenance of Its Existing Bank Accounts, (III) Continued Use of Its Existing Business Forms, and (IV) a Waiver of Certain Deposit and Investment Requirements in 11 U.S.C. § 345(b) and the UST Guidelines (the "Cash Management Motion");

ix)     Debtor's Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to (a) Pay Prepetition Wages, Salaries, Commissions, Employee Benefits, Prepetition Payroll Taxes, and Other Obligations, (b) Maintain Compensation and Benefits Programs, and Pay

Related Administrative Obligations, and (c) Make Payroll Deductions, (II) Authorizing Applicable Banks and Other Financial Institutions to Honor and Process Related Checks and Transfers, and (III) Granting Related Relief (the "<u>Employee Wages Motion</u>");

x) Debtor's Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to (a) Maintain Existing Insurance Policies and Pay All Insurance Obligations Arising Thereunder and (b) Renew, Revise, Extend, Supplement, Change or Enter into New Insurance Policies, and (II) Granting Certain Related Relief (the "<u>Insurance Motion</u>");

xi) Debtor's Emergency Motion for Entry of Interim and Final Orders (I) Prohibiting Utilities from Altering, Refusing, or Discontinuing Service, (II) Deeming the Utility Providers Adequately Assured of Future Performance, and (III) Establishing Procedures for Determining Requests for Additional Adequate Assurance (the "<u>Utilities Motion</u>");

xii) Debtor's Emergency Motion for Entry of an Interim and Final Order (I) Authorizing the Debtor to Pay Certain Prepetition Taxes and Fees, (II) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers, and (III) Granting Related Relief (the "<u>Taxes Motion</u>");

xiii) Debtor's Emergency Motion for Entry of an Order Authorizing Debtor to Continue Escrowing and Refunding Entrance Fees in the Ordinary Course of Business (the "<u>Escrow Motion</u>");

xiv) Debtor's Emergency Motion for Entry of an Order Authorizing the Implementation of Procedures to Maintain and Protect Confidential Resident Information (the "<u>Resident Confidentiality Motion</u>");

xv) Debtor's Emergency Motion for Entry of an Order Authorizing the Debtor to Assume the Plan Support Agreement (the "<u>Plan Support Agreement Motion</u>");

xvi) Debtor's Emergency Application for Appointment of Kurtzman Carson Consultants LLC as Claims and Noticing Agent for the Debtor Effective as of the Petition Date (the "<u>KCC Retention Application</u>");

xvii)  Debtor's Emergency Application for an Order (a) Establishing Bar Dates Pursuant to Bankruptcy Rule 3003(c) and (b) Approving Form and Manner of Notice Thereof (the "<u>Claims Bar Date Application</u>"); and

xviii)  Debtor's Emergency Motion for Entry of an Order Pursuant to Section 333(a) of Bankruptcy Code and Bankruptcy Rule 2007.2 (I)Waiving the Appointment of Patient Care Ombudsman and (II) Allowing Debtor to Self-Report (the "<u>Ombudsman Motion</u>").

(b)  The Borrower shall make all commercially reasonable efforts to file the Chapter 11 Case, contemporaneously with the Bankruptcy Documents, no later than the Outside Petition Date (the date on which the Chapter 11 Case and Bankruptcy Documents are actually filed shall be referred to herein as the "<u>Petition Date</u>").

(c)  The Borrower shall take all reasonably necessary steps in seeking to obtain from the Bankruptcy Court an order confirming the Plan reasonably acceptable in form and substance to ACCHS, the Consenting Holders and the Trustee (the "<u>Confirmation Order</u>") on or before August 25, 2021.

(d)  The Borrower shall take all reasonably necessary steps in seeking to obtain from the Bankruptcy Court an order authorizing the assumption of this Plan Support Agreement under Section 365 of the Bankruptcy Code.

(e)  The Plan effective date shall occur on or before September 8, 2021 (the "<u>Effective Date</u>").

(f)  The Borrower shall take no action inconsistent with the Restructuring, the transactions contemplated thereby, or the expeditious confirmation and consummation of such transactions.

(g)  Subject to the exercise of its fiduciary duties, the Borrower shall not file a petition under the Bankruptcy Code or seek any similar relief without providing ACCHS, the Trustee and the Consenting Holders at least five (5) business days' written notice thereof.

(h)  In the event the Borrower proposes a plan of reorganization that does not comply with this Plan Support Agreement or that constitutes a Support Agreement Termination Event (as defined below), the Borrower will not assert that ACCHS, the Consenting Holders or the Trustee have expressly or impliedly supported, endorsed, or otherwise agreed to any financial information, including any projections or liquidation analysis, included in the Bankruptcy Documents or have otherwise agreed to or acknowledged any facts set forth in the Bankruptcy Documents.

(i)     The Borrower will not:

        i)     incur any further indebtedness with priority over the Bonds without the Trustee's consent;

        ii)    transfer any assets other than in the ordinary course of its business other than miscellaneous assets not necessary for the operations of the Project; and

        iii)   take any action that would result in entry of an order terminating, whether in whole or in part, the Borrower's exclusive right to file a Chapter 11 plan pursuant to Section 1121 of the Bankruptcy Code.

4.    <u>Agreements of Consenting Holders</u>.

    (a)    <u>Restrictions on Transfers</u>. Until this Plan Support Agreement has been terminated in accordance with Section 10, each Consenting Holder shall not voluntarily sell, transfer, or assign any of its Bonds or Claims or any option thereon or any right or interest (voting or otherwise) therein unless the transferee thereof (i) has already executed this Plan Support Agreement or (ii) agrees in writing by executing the form of Joinder attached hereto as **Exhibit 3** to be bound, for the benefit of the Parties, by all of the terms of this Plan Support Agreement.  Subject to applicable securities and bankruptcy law, this Plan Support Agreement shall in no way be construed to preclude any Consenting Holder or any of its respective subsidiaries or affiliates from acquiring additional Bonds; *provided*, *however*, that any such additional Bonds acquired by such Consenting Holder or any subsidiary or affiliate thereof shall automatically be deemed to be subject to the terms of this Plan Support Agreement.

    (b)    <u>Voting on the Plan and Releases</u>.  Subject to the terms and conditions of this Plan Support Agreement, and so long as this Plan Support Agreement has not been terminated, and further provided that the Disclosure Statement approved by the Bankruptcy Court contains information substantially similar to that set forth in the Disclosure Statement filed as part of the Bankruptcy Documents, each Consenting Holder will vote all claims that it holds or as to which it has voting authority with respect to the Bonds outstanding, the Claims, and all other claims, rights, or interests that exist against the Borrower to accept the Plan, <u>provided</u> it is in a form substantially similar to that set forth in the Plan filed as part of the Bankruptcy Documents and shall not, if applicable, opt out of any releases contained in the Plan.

    (c)    <u>Support</u>.  So long as this Plan Support Agreement has not been terminated, absent the consent of the Borrower, each Consenting Holder will not, and shall direct the Trustee not to:

    i)      support or encourage, directly or indirectly, any financial restructuring or sale of assets concerning the Borrower or its assets, other than the Restructuring;

    ii)     take any action inconsistent with the Term Sheet, the transactions contemplated hereby or thereby, or the expeditious confirmation and consummation of such transactions;

    iii)    vote against the Plan or otherwise agree, consent, or provide any support, to any other Chapter 11 plan or other restructuring or sale or liquidation of assets concerning the Borrower or its assets, other than the Restructuring;

    iv)    object to or otherwise commence any proceeding to oppose or alter the Plan or any of the terms of the Restructuring (or any other document filed in furtherance of, and that is consistent with the Restructuring); or

    v)     direct the Trustee to take any action or otherwise act in a manner contrary to the terms of this Plan Support Agreement.

(d)    Each Consenting Holder commits to purchase the Series 2021A Bonds (as defined in the Term Sheet) in the respective amounts set forth on **Schedule 2**, subject to the following terms and conditions:

    i)      Definitive documentation in form and substance acceptable to such Consenting Holder regarding the issuance of the Series 2021A Bonds, including without limitation, covenants, make-whole redemption price and terms;

    ii)     No Support Agreement Termination Event has occurred; and

    iii)    No material adverse change regarding the operations or financial condition of the Borrower has occurred.

(e)    <u>Adequate Information; Compliance with Section 1125(g) of the Bankruptcy Code</u>.  Each Consenting Holder has obtained "adequate information" (within the meaning of that phrase for purposes of Section 1125(a)(1) of the Bankruptcy Code) regarding the Restructuring and that the Borrower has provided all material, relevant information that the Consenting Holder has requested in advance of executing this Plan Support Agreement. Additionally, for purposes of this Plan Support Agreement, the solicitation of its support of the Plan in accordance with the terms and conditions hereof complies with applicable law and that each Consenting Holder was solicited in a manner complying with applicable law.

(f)     <u>Appearing in the Bankruptcy Court</u>.  Notwithstanding any provision in this Plan Support Agreement to the contrary, nothing in this Plan Support Agreement shall be construed to prohibit any Party from appearing as a party-in-interest in any matter to be adjudicated in the Bankruptcy Court so long as such appearance and the positions advocated in connection therewith are not inconsistent with this Plan Support Agreement and the Restructuring and are not for the purpose of hindering, delaying, or preventing the consummation of the Restructuring.

(g)     <u>Direct the Trustee</u>.  To the extent necessary, each Consenting Holder will direct the Trustee to take actions consistent with this Plan Support Agreement.

(h)     <u>Cash Collateral Order</u>.  The Trustee shall provide a draft of the interim Cash Collateral Order to the Borrower and ACCHS on or before May 24, 2021, the Borrower and ACCHS shall provide comments on the interim Cash Collateral Order on or before June 3, 2021 and the interim Cash Collateral Order shall be in form and substance satisfactory to the Parties by June 13, 2021.

(i)     <u>Plan Releases</u>. The obligations of the Consenting Holders hereunder are contingent upon the inclusion of customary releases in the Plan from the other Parties to this Plan Support Agreement in favor of the Consenting Holders and the Trustee.

(j)     <u>Trustee Documents</u>.   The Trustee shall provide drafts of the following documents (the "<u>Trustee Documents</u>") to the Borrower and ACCHS on or before June 18, 2021 and the Trustee Documents shall be in form and substance satisfactory to the Parties by July 8, 2021:

        i)     2021 Indenture of Trust;

        ii)     2021 Installment Sale Agreement;

        iii)     2021 Mortgage and Security Agreement; and

        iv)     2021 Loan Agreement (if required).

5.     <u>Agreements of ACCHS</u>.

(a)     <u>Support</u>. ACCHS shall make all commercially reasonable efforts to assist and support the Debtor in consummating the Restructuring and obtaining confirmation of the Plan, in each case in accordance with the Term Sheet, including without limitation by taking all commercially reasonable actions to consummate the transactions described in the section of the Term Sheet titled "Contribution by Sponsor" in accordance with the terms thereof, contingent upon the inclusion of customary releases from the other Parties to this Plan Support Agreement and from all other parties under the Plan of Reorganization and Confirmation Order, subject to any opt-outs in accordance therewith, in favor of ACCHS in the Plan.  So long

as this Plan Support Agreement has not been terminated, absent the consent of the Borrower and Trustee, ACCHS will not:

      i)      support or encourage, directly or indirectly, any financial restructuring or sale of assets concerning the Borrower or its assets, other than the Restructuring;

      ii)      take any action inconsistent with the Term Sheet, the transactions contemplated hereby or thereby, or the expeditious confirmation and consummation of such transactions;

      iii)      vote against the Plan or otherwise agree, consent, or provide any support, to any other Chapter 11 plan or other restructuring or sale or liquidation of assets concerning the Borrower or its assets, other than the Restructuring;

      iv)      object to or otherwise commence any proceeding to oppose or alter the Plan or any of the terms of the Restructuring (or any other document filed in furtherance of, and that is consistent with the Restructuring); or

      v)      otherwise act in a manner contrary to the terms of this Plan Support Agreement.

      6.    <u>Representations and Warranties of the Borrower</u>. The Borrower represents and warrants to ACCHS and the Consenting Holders that the following statements are true, correct, and complete as of the date hereof:

      (a)    it has all requisite corporate or similar authority to enter into this Plan Support Agreement and, subject to any necessary Bankruptcy Court approval, carry out the transactions contemplated hereby and perform its obligations contemplated hereunder, and the execution and delivery of this Plan Support Agreement and the performance of the Borrower's obligations hereunder have been duly authorized by all necessary corporate, limited liability, partnership, or other similar action on its part;

      (b)    the execution, delivery, and, subject to any necessary Bankruptcy Court approval, performance by such Borrower of this Plan Support Agreement does not and shall not violate any provision of law, rule, or regulation applicable to it or any of its subsidiaries or its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries;

      (c)    the execution, delivery, and performance by such Borrower of this Plan Support Agreement does not and shall not require any registration or filing with, consent or approval of, notice to, or other action to, with or by, any federal, state, or governmental authority or regulatory body;

(d)     to the best of its knowledge, after reasonable diligence, the information provided in connection with the Restructuring and this Plan Support Agreement did not and does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made therein, in light of the circumstances under which they were made, not misleading; and

(e)     this Plan Support Agreement is, and after the Petition Date but subject to the assumption of this Plan Support Agreement pursuant to Section 365, of the Bankruptcy Code shall be, a legally valid and binding obligation of the Borrower, enforceable in accordance with its terms.

7.     <u>Representations and Warranties of the Consenting Holders</u>. Each Consenting Holder represents and warrants to the Borrower that the following statements are true, correct, and complete as of the date hereof:

(a)     as of the date hereof, such Consenting Holder either (i) is the sole legal or beneficial owner of a principal amount of the Bonds outstanding as set forth on **Schedule 1** hereto, and all related claims, rights, powers, and causes of action arising out of or in connection with or otherwise relating to such Bonds or the Bond Documents (collectively, the "<u>Claims</u>"), or (ii) is the investment adviser or subadviser to the legal and beneficial owner(s) of such Bonds and Claims or otherwise has the power and authority to bind such owners to the terms of this Plan Support Agreement and, in either case, such Consenting Holder has full power and authority to vote on and consent to such matters concerning such Bonds outstanding and such Claims and to exchange, assign and transfer such Bonds and Claims.

(b)     it has all requisite corporate, partnership, limited liability company, or similar authority to enter into this Plan Support Agreement and perform its obligations contemplated hereunder, and the execution and delivery of this Plan Support Agreement and the performance of its obligations hereunder have been duly authorized by all necessary corporate, limited liability, partnership, or other similar action on its part;

(c)     the execution, delivery, and performance by the undersigned of and under this Plan Support Agreement does not and shall not violate any provision of law, rule, or regulation applicable to it or any of its subsidiaries or its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries;

(d)     the execution, delivery, and performance by the undersigned of and under this Plan Support Agreement does not and shall not require any registration or filing with, consent or approval of, notice to, or other action to, with or by, any federal, state or governmental authority or regulatory body; and

(e)     this Plan Support Agreement is the legally valid and binding obligation of such Consenting Holder, enforceable in accordance with its terms.

8.    <u>Representations and Warranties of ACCHS</u>. ACCHS represents and warrants to the Borrower and the Consenting Holders that the following statements are true, correct, and complete as of the date hereof:

(a)    it has all requisite corporate, partnership, limited liability company, or similar authority to enter into this Plan Support Agreement and perform its obligations contemplated hereunder, and the execution and delivery of this Plan Support Agreement and the performance of its obligations hereunder have been duly authorized by all necessary corporate, limited liability, partnership, or other similar action on its part;

(b)    the execution, delivery, and performance by the undersigned of and under this Plan Support Agreement does not and shall not violate any provision of law, rule, or regulation applicable to it or any of its subsidiaries or its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries;

(c)    the execution, delivery, and performance by the undersigned of and under this Plan Support Agreement does not and shall not require any registration or filing with, consent or approval of, notice to, or other action to, with or by, any federal, state or governmental authority or regulatory body, but if it does, such authority has been or will be sought prior to the Petition Date; and

(d)    this Plan Support Agreement is the legally valid and binding obligation of ACCHS, enforceable in accordance with its terms.

9.    <u>Alternative Transactions</u>.  From and after execution of this Plan Support Agreement until it is terminated pursuant to Section 10 hereof, and subject to the provisions of Section 130 hereof, neither the Borrower nor any of its officers, directors, employees, agents, representatives, or affiliates (including any investment banker or financial advisor retained by the Borrower) shall, directly or indirectly, encourage, solicit, or initiate any inquiry or proposal from, or encourage, solicit, or initiate any negotiations with, or solicit or initiate any discussions with any person or entity (other than  ACCHS, the Consenting Holders and the Trustee or an affiliate, associate, representative or agent of such parties) concerning any potential sale of the Borrower or restructuring of the Borrower or a transaction that is similar to, in conflict with or in substitution of the Restructuring pursuant to the terms hereof (each, an "<u>Alternative Transaction</u>"), or agree to endorse or take any other action to facilitate any Alternative Transaction, unless the Borrower has obtained the prior written consent of ACCHS, the Consenting Holders holding all rights related to or otherwise having voting authority with respect to at least 75% of the principal amount of the Bonds held collectively by the Consenting Holders who are signatory hereto (the "<u>Requisite Consenting Holders</u>").

10.    <u>Termination of Support Agreement</u>. Upon the occurrence of any Support Agreement Termination Event, this Plan Support Agreement shall be deemed terminated upon three business days' (or such later date as is agreed to in writing by the non-breaching Parties and, in the case of a breach by the Borrower or ACCHS, requiring the agreement of the other and the Requisite Consenting Holders) written notice and three-day opportunity to cure from the non-breaching Party to the breaching Party.  In the event of

any such termination, all Parties shall be immediately relieved of any obligations hereunder. If the Chapter 11 Case has been filed prior to such occurrence, such notice may be provided as part of a motion for relief from the automatic stay; _provided_ that nothing herein shall be deemed to require a motion for relief from the automatic stay to effect such termination. Notwithstanding the above or anything else in this Plan Support Agreement to the contrary, upon termination of this Plan Support Agreement, ACCHS or any Consenting Holder shall be entitled as of right to change or withdraw its vote in favor of the Plan and be relieved from all obligations of a Consenting Holder under this Plan Support Agreement (collectively, a "Withdrawal"), with prior written notice thereof to the Borrower and, if applicable, compliance with Rule 3018 of the Federal Rules of Bankruptcy Procedure. The occurrence of any one or more the following shall constitute a "Support Agreement Termination Event":

(a)    Failure by the Parties hereto to agree to the form and substance of any of the Bankruptcy Documents by June 13, 2021 or such later date as is agreed by the Requisite Consenting Holders;

(b)    Any of the Bankruptcy Documents is withdrawn, materially modified or amended (except in the case of a document which is an interim order, by replacement with a final order that would otherwise meet the requirements of a Bankruptcy Document, or with the consent of the ACCHS and the Consenting Holders and/or the Trustee);

(c)    The Borrower fails to file the Bankruptcy Documents on the Petition Date;

(d)    The Petition Date does not occur on or before the Outside Petition Date;

(e)    The Borrower:

i)    files or supports confirmation of, or fails to actively oppose confirmation of, a plan of reorganization that requests or would result in a withdrawal, modification, or amendment of the Plan, or that, as to any provision of the Plan, materially adversely affects the Consenting Holders;

ii)    files a motion, pleading, objection, lawsuit, or administrative or adversary proceeding (or takes any action in support of such a motion or pleading filed by another party) in the Bankruptcy Court or other court, or otherwise assists in any of the foregoing, that requests or would result in a withdrawal, modification, or amendment (including in the case of document which is an interim order, by replacement with a final order) of the Restructuring; or

iii)　　files a motion, complaint, application, or other request which is inconsistent with the Term Sheet and seeks to disallow, subordinate, or limit in any way the Bonds held by the Consenting Holders, the Claims, or the liens of the Consenting Holders and/or the Trustee, or seeking entry of an order by the Bankruptcy Court disallowing, subordinating, or limiting in any way the Bonds, Claims, or liens of the Consenting Holders and/or the Trustee, or asserting a claim against any Consenting Holder and/or the Trustee to avoid any transfer or obligation, or seeking any other monetary or equitable relief from or against any Consenting Holder and/or the Trustee.

(f)　　Following the Petition Date, the Bankruptcy Court has:

i)　　entered an order materially staying, reversing, vacating, materially amending or modifying the Cash Collateral Orders (other than the replacement of the interim order with the final order) without the prior written approval of the Trustee, or fails to enter the interim Cash Collateral Order on or before the date that is eight (8) days after the Petition Date, or the final Cash Collateral Order on or before the date that is thirty (30) days after the Petition Date on such terms as set out in the Cash Collateral Orders or by such later date as is agreed to in writing by the Requisite Consenting Holders;

ii)　　not approved the Disclosure Statement on or before July 30, 2021, or by such later date as is agreed to in writing by the Requisite Consenting Holders;

iii)　　not entered the Confirmation Order on or before August 25, 2021, or by such later date as is agreed to in writing by the Requisite Consenting Holders;

iv)　　entered an order denying confirmation of the Plan;

v)　　entered an order pursuant to Section 1104 of the Bankruptcy Code appointing a trustee or appointing an examiner with powers beyond the duty to investigate and report (as set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code), including, without limitation, to operate and manage the Borrower's business (unless the motion resulting in such order was filed or supported by the Trustee), or the Borrower files a motion, application or other pleading consenting to or acquiescing in any such appointment;

vi)       entered an order dismissing the Chapter 11 Case or an order pursuant to Section 1112 of the Bankruptcy Code converting the Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code;

vii)      entered an order suspending the Chapter 11 Case under Section 305 of the Bankruptcy Code;

viii)     entered an order in the Chapter 11 Case, over the objection of the Trustee, approving financing pursuant to Section 364 of the Bankruptcy Code that (i) would grant an additional security interest or a lien that is equal or senior to that of the Trustee on any Collateral, or (ii) would grant to any party other than the Trustee a super priority administrative claim that is senior or equal to that granted to the Trustee under the Cash Collateral Orders; or

ix)      granted relief that is inconsistent with this Plan Support Agreement or the Plan or that would result in a withdrawal, modification, or amendment of the Restructuring that is contrary to the Term Sheet and that has a material adverse effect on the Consenting Holders; *provided* that such relief has not resulted from any action or inaction by the Consenting Holders or the Trustee.

(g)   The Effective Date of the Plan shall not have occurred on or before September 8, 2021 or by such later date as is agreed to by ACCHS and  the Requisite Consenting Holders;

(h)   An injunction, judgment, order, decree, ruling, or charge shall have been entered that prevents consummation of the Restructuring and that remains in effect for longer than thirty (30) days;

(i)   There is a mutual written agreement to terminate this Plan Support Agreement by the Parties;

(j)   Failure by the Borrower to comply with any obligations under this Plan Support Agreement, other than those set forth in this Section 100 (which shall be an automatic termination upon three business days' written notice), and such failure is not cured within five (5) business days after written notice thereof has been given to the Borrower;

(k)   Failure by the Borrower to comply with any obligations under this Section 100; and

(l)   Failure by any of the Consenting Holders to comply with any of its obligations under this Plan Support Agreement, and such failure is not cured

within five (5) business days after written notice thereof has been given by the Borrower to such Consenting Holder and the Trustee.

11.    Effect of Termination.  Upon termination of this Plan Support Agreement, all obligations hereunder, shall terminate and shall be of no force and effect.

12.    Cooperation; Further Assurances; Acknowledgment; Definitive Documents. The Parties shall cooperate with each other and shall coordinate their  activities (to the extent practicable) in respect of all commercially reasonable actions necessary to consummate the Restructuring.  The Parties further agree to execute and deliver such other instruments and to perform such commercially reasonable acts, in addition to the matters herein specified, as may be appropriate or necessary, from time to time, to effectuate the Restructuring.

13.    Fiduciary Out. Nothing herein shall prevent a determination by the Borrower, made in good faith and following consultation with external counsel, subsequent to the date hereof that its compliance with any covenant, obligation or agreement contained in this Plan Support Agreement or the Plan Term Sheet is no longer consistent with its fiduciary duties under applicable law. Upon such determination, the Borrower shall give written notice thereof to the other Parties, in which event this Plan Support Agreement shall, notwithstanding anything herein to the contrary, be deemed automatically terminated 14 business days after such notice is provided to the Parties.  Nothing herein shall prejudice any Party from challenging such exercise of the Borrower's fiduciary duties, including without limitation, seeking a determination from a court of competent jurisdiction that the actions or inactions by the Borrower described in this Section constitute an unlawful exercise of its fiduciary duties, or the Borrower from opposing such challenge.

14.    Amendments. This Plan Support Agreement may not be modified, amended or supplemented except in a writing signed by the Parties.

15.    GOVERNING LAW; JURISDICTION.  THIS PLAN SUPPORT AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO ANY CONFLICT OF LAWS PROVISIONS THAT WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION. BY ITS EXECUTION AND DELIVERY OF THIS PLAN SUPPORT AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ANY LEGAL ACTION, SUIT, OR PROCEEDING AGAINST IT WITH RESPECT TO ANY MATTER UNDER, OR ARISING OUT OF OR IN CONNECTION WITH, THIS PLAN SUPPORT AGREEMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT RENDERED IN ANY SUCH ACTION, SUIT, OR PROCEEDING, SHALL BE BROUGHT IN ANY FEDERAL OR STATE COURT IN THE STATE OF NEW YORK HAVING JURISDICTION, AND BY EXECUTION AND DELIVERY OF THIS PLAN SUPPORT AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY ACCEPTS AND SUBMITS ITSELF TO THE EXCLUSIVE JURISDICTION OF EACH SUCH COURT, GENERALLY AND UNCONDITIONALLY, WITH RESPECT TO ANY SUCH ACTION, SUIT OR

PROCEEDING; <u>PROVIDED</u>, THAT AFTER THE PETITION DATE THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION OVER ANY ISSUES RELATING TO THIS PLAN SUPPORT AGREEMENT PROVIDED THAT THE BANKRUPTCY COURT SHALL FOLLOW APPLICABLE CHOICE OF LAW RULES.

16.   <u>Specific Performance</u>.  It is understood that the Borrower and ACCHS shall only be entitled to seek specific performance and injunctive or other equitable relief as a remedy of any breach by the Consenting Holders of this Plan Support Agreement.  Such remedies shall be the exclusive remedies available to the Borrower, ACCHS or their representatives for a breach of this Plan Support Agreement.

17.   <u>Survival</u>. Notwithstanding any sale of the Bonds outstanding or Claims in accordance with Section 4(a) of this Plan Support Agreement, the agreements and obligations herein shall survive such sale and shall continue in full force and effect for the benefit of the Borrower and the Consenting Holders in accordance with the terms hereof, and any purchaser of such Bonds and/or Claims shall be bound by and subject to the terms of this Plan Support Agreement.

18.   <u>Headings</u>. The headings of the Sections, paragraphs, and subsections of this Plan Support Agreement are inserted for convenience only, and shall not affect the interpretation hereof.

19.   <u>Successors and Assigns; Severability; Several Obligations.</u> This Plan Support Agreement is intended to bind and inure to the benefit of the Parties and its respective successors, assigns, heirs, executors, administrators, and representatives. The invalidity or unenforceability at any time of any provision hereof shall not affect or diminish in any way the continuing validity and enforceability of the remaining provisions hereof. The agreements, representations, and obligations of the Consenting Holders under this Plan Support Agreement are, in all respects, several and not joint.

20.   <u>No Third-Party Beneficiaries</u>. Unless expressly stated herein, this Plan Support Agreement shall be solely for the benefit of the Parties, and no other person or entity shall be a third party beneficiary hereof.

21.   <u>Consideration</u>. No consideration shall be due or paid to the Consenting Holders and the Trustee for agreement of the Consenting Holders to support the Restructuring and to vote in favor of the Plan in accordance with the terms and conditions of this Plan Support Agreement, other than the Borrower's agreement to pursue the Restructuring and to file, pursue confirmation of, and implement the Plan in accordance with the terms and conditions of this Plan Support Agreement, which the Parties acknowledge is fair and sufficient consideration to support the Parties' respective agreements hereunder.

22.   <u>Prior Negotiations; Entire Agreement</u>. This Plan Support Agreement constitutes the entire agreement of the Parties related to the Restructuring, and supersedes

all other prior negotiations with respect to the subject matter hereof, except that the Parties acknowledge that all Bond Documents shall continue in full force and effect.

23.    <u>Counterparts</u>.  This Plan Support Agreement and any amendments, joinders (including the joinder in the form of **Exhibit 3** hereto), consents, or supplements hereto, may be executed in one or more counterparts, each of which shall be deemed an original and all of which shall constitute one and the same agreement.  Facsimile or scanned signatures on this Plan Support Agreement shall be treated as originals for all purposes.

24.    <u>Construction</u>.  This Plan Support Agreement shall be deemed to have been negotiated and prepared at the joint request, direction, and construction of the Parties, and at arm's length and shall be interpreted without favor to any Party.

25.    <u>Time of the Essence</u>.  Time shall be of the essence with respect to each and every of the various undertakings and obligations set forth in this Plan Support Agreement.

26.    <u>Notices</u>.  All notices, demands, requests, consents, approvals, and other communications ("<u>Notice</u>" or "<u>Notices</u>") hereunder shall be in writing and delivered by (i) courier or messenger service, (ii) express or overnight mail, (iii) electronic mail, or (iv) by registered or certified mail, return receipt requested and postage prepaid, addressed to the respective parties as follows:

**If to Borrower:**

Amsterdam House Continuing Care
Retirement Community, Inc.
300 East Overlook
Port Washington, NY 11050
Attn: James Davis

**Copy to:**

Amsterdam House Continuing Care
Retirement Community, Inc.
300 East Overlook
Port Washington, NY 11050
Attn: Pamela Landman

**And:**

Sidley Austin LLP
787 Seventh Avenue
New York, NY 10019
Attn: Thomas Califano and William Curtin

**If to Trustee:**

> UMB Bank, N.A.
> Corporate Trust Services
> 120 Sixth Street South, Suite 1400
> Minneapolis, MN 55402
> Attn: Virginia Housum

**Copy to:**

> Mintz, Levin, Cohn, Ferris, Glovsky and
> Popeo, P.C.
> One Financial Center
> Boston, MA 02111
> Attn: Daniel S. Bleck

**And:**

> Consenting Bondholders
> [See Schedule 1 Attached Hereto]

**If to ACCHS:**

> Amsterdam Continuing Care Health System, Inc.
> 1060 Amsterdam Avenue
> New York, NY 10025
> Attn: James Davis

**Copy to:**

> Amsterdam House Continuing Care
> Retirement Community, Inc.
> 1060 Amsterdam Avenue
> New York, NY 10025
> Attn: Pamela Landman

**And:**

> Moritt Hock & Hamroff LLP
> 1407 Broadway, 39th Floor
> New York, NY 10018
> Attn: Ted A. Berkowitz

**And:**

Moritt Hock & Hamroff LLP
400 Garden City Plaza
Garden City, NY 11530
Attn: Allison Arotsky

or to such other addresses as any Party may hereafter designate.  Notice by courier or messenger service or by express or overnight mail shall be effective upon receipt.  Notice by electronic mail shall be effective upon receipt.  Notice by mail shall be complete at the time of deposit in the United States mail system, but any right or duty to do any act or make any response within any prescribed period or on a date certain after the service of such Notice given by mail shall be, without further action by any Party, automatically extended three (3) days.

27.    Reservation of Rights.  Except as expressly provided in this Plan Support Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict the ability of any Party to protect and preserve its rights, remedies, and interests, including its Claims.  Nothing herein shall be deemed an admission of any kind.  If the transactions contemplated herein are not consummated, or this Plan Support Agreement is terminated for any reason, the Parties hereto fully reserve any and all of their rights.  Except as required by the Bankruptcy Code to assume, perform, or disclose this Plan Support Agreement, pursuant to Rule 408 of the Federal Rule of Evidence, any applicable state rules of evidence, and any other applicable law, foreign or domestic, this Plan Support Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.

28.    Nature of Consenting Holder Obligations.    The obligations of each Consenting Holder hereunder shall be several, and not joint with the obligations of any other Consenting Holder herein, and no Consenting Holder shall be responsible in any way for the performance of the obligations of any other Consenting Holder hereunder.  Nothing herein or in any other agreement or document, and no action taken by any Consenting Holder pursuant hereto or thereto, shall be deemed to constitute the Consenting Holders as a group, a partnership, an association, a joint venture or any other kind of entity, or to create a presumption that the Consenting Holders are in any way acting in concert or as a group with respect to such obligations or the transaction contemplated by this Plan Support Agreement.  Each Consenting Holder shall be entitled to protect and enforce its rights, including without limitation, the rights arising out of this Plan Support Agreement, and it shall not be necessary for any other Consenting Holder to be joined as an additional party in the proceeding for such purpose.

29.    Automatic Stay.  The Borrower acknowledge that after any commencement of the Chapter 11 Case, the giving of notice of termination by any Party pursuant to this Plan Support Agreement or a withdrawal shall not be a violation of the automatic stay of Section 362 of the Bankruptcy Code.

30. <u>Support Agreement Not a Plan</u>. This Plan Support Agreement does not constitute a plan of reorganization or confirmation thereof under the Bankruptcy Code. The Plan will not become effective unless and until the Bankruptcy Court enters an order confirming the Plan and the Plan becomes effective in accordance with its terms.  This Plan Support Agreement is not intended to constitute a solicitation or acceptance of the Plan.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

BORROWER:

**Amsterdam House Continuing Care Retirement Community, Inc.**

By:_____

Print Name: James Davis

Title: President and Chief Executive Officer

[Consenting Holder signature pages on file with the Debtor]

ACCHS:

**Amsterdam Continuing Care Health System, Inc.**

By: _____
    Print Name:  Pamela Landman
    Title: General Counsel

# **SCHEDULE 1**

"CONSENTING HOLDERS"


[On file with the Debtor]

**<u>Schedule 2</u>**

"BOND PURCHASE AMOUNTS"


[On file with the Debtor]

# **EXHIBIT 1**

TERM SHEET

## TERM SHEET

This Term Sheet and the undertakings contemplated herein are subject in all respects to the necessary consents and approvals and negotiation, execution and delivery of mutually acceptable definitive documentation between Amsterdam Continuing Care Retirement Community, Inc. (the "**Borrower**"), Amsterdam Continuing Care Health System, Inc. (the **"Sponsor"**), the Issuer, the Trustee, and the members of an informal steering committee comprised of bondholders currently holding ___% of the outstanding aggregate principal amount of Series 2014 Bonds (the "**Steering Committee**").  This Term Sheet is not and shall not be deemed to be a solicitation of votes for the acceptance of the Plan or any plan of reorganization.

**THE TERM SHEET IS BEING PROVIDED AS PART OF A COMPREHENSIVE COMPROMISE AND SETTLEMENT, EACH ELEMENT OF WHICH IS CONSIDERATION FOR THE OTHER ELEMENTS AND AN INTEGRAL ASPECT OF THE PROPOSED RESTRUCTURING OF THE SERIES 2014 BONDS.  THE TERM SHEET IS SUBJECT TO FEDERAL RULE OF EVIDENCE 408 AND COMPARABLE STATE STATUTES.  NOTHING IN THE TERM SHEET SHALL CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, A STIPULATION OR A WAIVER, OR A COMMITMENT ON BEHALF OF THE BORROWER, SPONSOR, STEERING COMMITTEE OR THE TRUSTEE AND EACH STATEMENT CONTAINED HEREIN IS MADE WITHOUT PREJUDICE, SOLELY FOR SETTLEMENT PURPOSES, WITH A FULL RESERVATION AS TO ALL RIGHTS, REMEDIES AND DEFENSES OF BORROWER, SPONSOR, THE TRUSTEE, THE STEERING COMMITTEE, AND ALL OTHER PARTIES.  THE TERMS HEREOF ARE SUBJECT TO NECESSARY REGULATORY APPROVALS.  IN PARTICULAR, THIS TERM SHEET IS CONDITIONED UPON AND SUBJECT TO CONTINUATION OF AND ALLOWANCE OF THE BORROWER AND SPONSOR TO RETAIN CURRENT HEAL GRANT FUNDS IN THEIR POSSESSION.**

| | |
|---|---|
| **New Money Bonds (Series 2021A Bonds)** | Holders of the existing bonds will purchase up to $40,710,000 in Series 2021A Bonds.  To the extent permitted by bond counsel, the bonds will be issued as tax-exempt bonds.  Series 2021A Bonds will fund (i) $20,835,000 repayment of refund obligations, (ii) $9 million for the MLR, and (iii) the remainder shall fund a debt service reserve fund, a contingency and cost of issuance. |
| | Series 2021A Bonds will accrue interest at the fixed rate of 9.0% per annum.  To the extent permitted by bond counsel, as much of the principal amount of the Series 2021A Bonds will be issued tax exempt as possible and the term sheet will be revised to reflect such structure.  The Series 2021A Bonds will mature 20 years from issuance.  Payments on the Series 2021A Bonds shall be: (i) interest only for the first 5 years (through FY2025) due and payable semi-annually; and (ii) principal will start amortizing beginning FY2026 over a 15 year period, and structured to level debt service, provided that the Series 2021A Bonds will be subject to mandatory redemption from Excess Cash as discussed below.  The Series 2021A Bonds will subject to optional redemption at par in year 10 (the "Par Call Date").  The Series 2021A Bonds shall also be subject to optional redemption at a make-whole redemption price from year 5 to the Par Call Date. |
| | The Series 2021A Bonds will be secured by a first priority lien on all assets of Amsterdam, except the Funded LSA (as defined below) and have payment priority. |
| **Series 2014A/B Bonds Exchanged for Series 2021B Bonds and Series 2021C Bonds** | The Series 2014A Bonds and Series 2014B Bonds (in the current aggregate principal amount of $139,917,130) will be exchanged for new Series 2021B Bonds in a principal amount equal to 91% of the current principal amount. |
| | The Series 2021B Bonds will be subordinate in payment and security to the Series 2021A Bonds. |

|  | Interest on the Series 2021B Bonds will be reduced from the current fixed blended rate of 6.613% to a fixed rate of 5.0% per annum.  The interest rate shall increase by 25 basis points upon the earlier of (i) incurrence of indebtedness for Phase II, (ii) 20 years from the Effective Date and (iii) the Borrower has 150 DCOH above the MLR Requirement. The 2021B Bonds shall mature 37 years from issuance. Payments on the Series 2021B Bonds shall be: (i) interest only for the first 20 years due and payable semi-annually; and (ii) principal will start amortizing beginning FY2040, provided that the Series 2021B Bonds will be subject to mandatory redemption from Excess Cash (as discussed below) after the Series 2021A Bonds are paid in full. The Series 2021B Bonds will not be subject to optional redemption for the first 5 years. The Series 2021B Bonds will be subject to optional redemption in the following years at the following prices: |
|---|---|
|  | <table><tr><td>**Year**</td><td>**Redemption Price, plus accrued and unpaid interest**</td></tr><tr><td>6</td><td>107%</td></tr><tr><td>7</td><td>106</td></tr><tr><td>8</td><td>105</td></tr><tr><td>9</td><td>105</td></tr><tr><td>10</td><td>105</td></tr><tr><td>11</td><td>105</td></tr><tr><td>12</td><td>105</td></tr><tr><td>13</td><td>104</td></tr><tr><td>14</td><td>103</td></tr><tr><td>15</td><td>102</td></tr><tr><td>16</td><td>101</td></tr><tr><td>17 and thereafter</td><td>100</td></tr></table> |
| **Series 2014C Bonds** | The Series 2014C Bonds will be cancelled in whole without any payment or consideration.  The accreted value of the Series 2014C Bonds as of February 25, 2021 is $67,472,967.62. |
| **Contribution by Sponsor** | The Sponsor shall contribute $9 million to the Borrower (the "***Sponsor Contribution***").<br><br>The Sponsor Contribution shall be funded on the effective date of the Borrower's confirmed chapter 11 plan of reorganization containing terms and conditions acceptable to the Sponsor's Board, including without limitation, third party releases of the Sponsor, Sponsor's Board and its affiliates, professionals, employees and advisors.<br><br>Approximately $3,600,000 of the Sponsor Contribution will come from the proceeds of the closing of the sale of the real property located in the hamlet of Mount Sinai within the Town of Brookhaven in Suffolk County, New York, subject to the Sponsor obtaining New York State Department of Health approval for the use of such funds to make the Sponsor Contribution.<br><br>The Sponsor Contribution shall be subject to the following conditions: (i) the transaction is subject to approval by NCIDA (or any other bond issuer); (ii) the transaction is subject to the Sponsor obtaining all requisite state and local approvals, including, without limitation, the Charites Bureau of the New York State Attorney General, the New York State Department of Health and the New York State Department of Financial Services, if required; and (iii) the Subvention Certificate evidencing the $3,000,000 subvention from Sponsor to the Amsterdam issued on |

|  | March 31, 2004 will survive the restructuring, subordinate to all the Series 2021 Bonds.<br><br>Sponsor shall also provide an additional $9 million LSA (the "***Funded LSA***") for not less than a 10-year period, which shall be reserved for making payments to keep the Borrower in regulatory compliance, including with respect to payments of unpaid entrance fee refunds and satisfaction of minimum liquidity reserve requirements that may become due in the future.  The Funded LSA shall not be subject to the liens of the Trustee.<br><br>The Funded LSA is contingent on the closing of the sale of substantially all of the assets of Amsterdam Nursing Home and will be fully funded in cash from such closing. |
|---|---|
| **Covenants** | The Series 2021 Bond Documents shall contain such other provisions and covenants as are in the existing Series 2014 Bond Documents, subject to changes agreed upon by the parties.  With respect to additional indebtedness for Phase II, the Series 2021 Bond Documents shall contain the same requirements except that the 70% deposit requirement shall be 50% and such additional debt will be on parity with the Series 2021B Bonds. |

# **EXHIBIT 2**

SUPPLEMENTAL TERM SHEET

This Supplemental Term Sheet and the undertakings contemplated herein are subject in all respects to the necessary consents and approvals and negotiation, execution and delivery of mutually acceptable definitive documentation between Amsterdam Continuing Care Retirement Community, Inc. (the "***Borrower***" or "***Amsterdam***"), Amsterdam Continuing Care Health System, Inc. (the ***"Sponsor"***), the Issuer, the Trustee, and the "Steering Committee". This Term Sheet is not and shall not be deemed to be a solicitation of votes for the acceptance of the Plan or any plan of reorganization. This Supplemental Term Sheet supplements the Term Sheet attached to the Plan Support Agreement and in the event of any inconsistency the Term Sheet shall govern.

**THE SUPPLEMENTAL TERM SHEET IS BEING PROVIDED AS PART OF A COMPREHENSIVE COMPROMISE AND SETTLEMENT, EACH ELEMENT OF WHICH IS CONSIDERATION FOR THE OTHER ELEMENTS AND AN INTEGRAL ASPECT OF THE PROPOSED RESTRUCTURING OF THE SERIES 2014 BONDS. THE TERM SHEET IS SUBJECT TO FEDERAL RULE OF EVIDENCE 408 AND COMPARABLE STATE STATUTES. NOTHING IN THE TERM SHEET SHALL CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, A STIPULATION OR A WAIVER, OR A COMMITMENT ON BEHALF OF THE BORROWER, SPONSOR, STEERING COMMITTEE OR THE TRUSTEE AND EACH STATEMENT CONTAINED HEREIN IS MADE WITHOUT PREJUDICE, SOLELY FOR SETTLEMENT PURPOSES, WITH A FULL RESERVATION AS TO ALL RIGHTS, REMEDIES AND DEFENSES OF BORROWER, SPONSOR, THE TRUSTEE, THE STEERING COMMITTEE, AND ALL OTHER PARTIES. THE TERMS HEREOF ARE SUBJECT TO NECESSARY REGULATORY APPROVALS. IN PARTICULAR, THIS TERM SHEET IS CONDITIONED UPON AND SUBJECT TO CONTINUATION OF AND ALLOWANCE OF THE BORROWER AND SPONSOR TO RETAIN CURRENT HEAL GRANT FUNDS IN THEIR POSSESSION.**

| Series 2021A Bonds | The Series 2021A Bonds are issued in the aggregate principal amount of $40,710,000, and will mature on January 1, 2041 and bear interest at 9.00% per annum. Interest on the Series 2021A Bonds shall be payable semi-annually on each January 1 and July 1, commencing January 1, 2022. |
|---|---|
| | Amortization schedule* for the Series 2021A Bonds is as set forth on Schedule "A" attached hereto. |
| | The Series 2021A Bonds are subject to optional redemption prior to maturity by the Issuer at the written direction of Amsterdam to the Trustee with notice thereof from Amsterdam to the Issuer, Bond Registrar and Paying Agent, on or after [Tenth Anniversary of Effective Date] (the "Par Call Date"), in whole or in part (on a pro rata basis with respect to the Bonds to be redeemed as described below) at any time, at a redemption price of 100% of the principal amount thereof plus accrued interest thereon to the date fixed for redemption. |
| | The Series 2021A Bonds are also subject to redemption on and after [Fifth Anniversary of Effective Date] and prior to the Par Call Date, by the Issuer at the written direction of Amsterdam to the Trustee with notice thereof from Amsterdam to the Issuer, Bond Registrar and Paying Agent, in whole or in part (on a pro rata basis with respect to the Bonds to be redeemed as described below), at a redemption price equal to the greater of: |

|  | (i)      100% of the principal amount of the Bonds to be redeemed; or |
|---|---|
|  | (ii)      the sum of the present values of the remaining scheduled payments of principal and interest on the Bonds to be redeemed (exclusive of interest accrued to the date fixed for redemption) discounted to the date of redemption from the Par Call Date on a semiannual basis (assuming a 360-day year consisting of twelve 30-day months) at the Treasury Rate plus 25 basis points, plus accrued and unpaid interest on the Bonds being redeemed to the date fixed for redemption. |
|  | "Treasury Rate" means, with respect to any redemption date for a particular Bond, the yield to maturity as of such redemption date of United States Treasury securities with a constant maturity (as compiled and published in the Federal Reserve Statistical Release H.15 (519) that has become publicly available at least two Business Days, but not more than 45 calendar days, prior to the redemption date (excluding inflation indexed securities) (or, if such Statistical Release is no longer published, any publicly available source of similar market data)) most nearly equal to the period from the redemption date to Par Call Date; provided, however, that if the period from the redemption date to such maturity date is less than one year, the weekly average yield on actually traded United States Treasury securities adjusted to a constant maturity of one year will be used. |
|  | *Such dates are set based on an anticipated Effective Date in September 2021.  If Effective Date does not occur by such date, the redemption dates are subject to change. |
| **Series 2021B Bonds/Exchange** | The Series 2021B Bonds are issued in the aggregate principal amount of $127,327,200 and will mature on January 1, 2058.  The Series 2021B Bonds will bear interest at the rate of (i) 5.00% per annum, provided that upon the earlier of (x) the incurrence of indebtedness by Amsterdam, the Sponsor or any affiliate thereof for Phase II, (y) [Twentieth Anniversary of Effective Date] and (z) the date on which Amsterdam has 150 Days Cash on Hand in excess of the MLR Requirement, the interest rate on the Series 2021B Bonds shall increase to 5.25%. Interest on the Series 2021B Bonds shall be payable semi-annually on each January 1 and July 1, commencing January 1, 2022. |
|  | Amortization schedule* for the Series 2021B Bonds is as set forth on Schedule "B" attached hereto. |
|  | The Series 2021B Bonds are subject to optional redemption prior to maturity by the Issuer at the written direction of Amsterdam to the Trustee with notice thereof from Amsterdam to the Issuer, Bond Registrar and Paying Agent, on or after [Fifth Anniversary of Effective Date], in whole or in part at any time, at a Redemption Price below (as a percentage of the principal amount of the Series 2021B Bonds), plus accrued interest thereon to the date fixed for redemption. |

| Redemption Date* | Redemption Price |
|---|---|
| October 1, 2026 – September 30, 2027 | 107% |
| October 1, 2027 – September 30, 2028 | 106 |
| October 1, 2028 – September 30, 2029 | 105 |
| October 1, 2029 – September 30, 2030 | 105 |
| October 1, 2030 – September 30, 2031 | 105 |

| | |
|---|---|
| | October 1, 2031 – September 30, 2032 — 105 |

October 1, 2031 – September 30, 2032    105
October 1, 2032 – September 30, 2033    105
October 1, 2033 – September 30, 2034    104
October 1, 2034 – September 30, 2035    103
October 1, 2035 – September 30, 2036    102
October 1, 2036 – September 30, 2037    101
October 1, 2037 and thereafter    100

*Such dates are set based on an anticipated Effective Date in September 2021. If Effective Date does not occur by such date, the redemption dates are subject to change.

## Indenture Held/Amsterdam Held Funds

| | |
|---|---|
| **Operating Account** | Upon the Effective Date, Amsterdam shall hold and maintain an operating account (the "***Operating Account***"), which shall be subject to the lien of the Trustee under the 2021 Indenture pursuant to a deposit account control agreement with a depository bank that is reasonably acceptable to the Master Trustee. The Operating Account shall contain no more than [45] Days Cash on Hand as an unrestricted reserve amount funded as of the Effective Date (the "***Unrestricted Reserve Amount***"). |
| **Revenue Fund** | The 2021 Indenture shall establish a Revenue Fund with the Trustee, subject to the lien of the 2021 Indenture, pursuant to which all revenues and other income of Amsterdam (the "***Revenues***"), shall, upon the Effective Date, be deposited into a revenue fund (the "***Revenue Fund***"). Funds from the Revenue Fund shall be withdrawn and disbursed pursuant to the Distribution Waterfall below. |
| **Operating Reserve Fund** | Upon the Effective Date, Amsterdam shall maintain an Operating Reserve Fund with the Trustee, subject to the lien of the 2021 Indenture. The Operating Reserve Fund will be funded on the Effective Date from proceeds of the Series 2021A Bonds, the Sponsor Contribution and cash available through the Distribution Waterfall on the Effective Date. The Operating Reserve Fund Requirement shall be the amount necessary to meet the MLR Requirement after taking into consideration the Operating Account, LSA and any other monies available to meet the MLR Requirement (the "***Operating Reserve Fund Requirement***"). |
| **Bond Fund** | Upon the Effective Date, Amsterdam shall establish a Bond Fund (the "**Bond Fund**") under the 2021 Indenture, subject to the lien of the 2021 Indenture, with subaccounts for each series of Series 2021 Bonds. In accordance with the Distribution Waterfall below, the Bond Fund will receive monthly payments of principal and interest due and payable under the Series 2021 Bonds. |
| **Entrance Fees and Entrance Fee Fund** | Upon the Effective Date, Amsterdam shall establish an Entrance Fee Fund (the "**Entrance Fund**") under the 2021 Indenture, subject to the lien of the 2021 Indenture. Entrance Fees shall be deposited therein upon receipt by Amsterdam. Amsterdam shall use such amounts to pay Refunds due and payable and then deposit any excess to the Revenue Fund. Entrance Fees shall be set forth in an Exhibit to the new Bond Documents. Neither the Amsterdam nor the Manager shall be permitted to discount or provide incentives equivalent to discounts |

| | |
|---|---|
| | except as agreed to by the Majority Holders.  Permitted Discounts to be discussed in the context of the projections. |
| **Debt Service Reserve Fund** | Upon the Effective Date, Amsterdam shall establish a Debt Service Reserve Fund (the "***New Debt Service Reserve Fund***") under the 2021 Indenture, subject to the lien of the 2021 Indenture.  The New Debt Service Reserve Fund shall have two subaccounts for the Series 2021A Bonds and Series 2021B Bonds.  Proceeds of the Series 2021A Bonds shall fund the subaccount(s) for the Series 2021A Bonds.  All amounts held by the Trustee in the Debt Service Reserve Fund with respect to the Existing Bonds, after the payment of the Trustee's fees and expenses shall be transferred to the subaccount for the Series 2021B Bonds in the New Debt Service Reserve Fund up to the Debt Service Reserve Fund Requirement (as defined below).  To the extent of any initial shortfall therein or deficiency, the subaccount for the Series 2021B Bonds in the New Debt Service Reserve Fund shall also be partially funded from the proceeds of the Series 2021A Bonds, any available cash on hand and also funded from the Distribution Waterfall. The Debt Service Reserve Fund Requirement shall equal Maximum Annual Debt Service.  A draw on the New Debt Service Reserve Fund shall constitute an Event of Default. |
| **Distribution Waterfall** | All post-Effective Date Revenues of Amsterdam shall be deposited in the Revenue Fund, as applicable; provided, however, that Revenues with respect to any government payor shall be deposited into an account in the name of Amsterdam, and such Revenues shall be swept into the Revenue Fund on a weekly basis.<br><br>(a)    On the first (1st) Business Day of each calendar month, amounts in the Revenue Fund shall be transferred or deposited, as applicable, by the Trustee in the following order of priority (the "Distribution Waterfall"):<br><br>(i)    First, to Amsterdam's Operating Account the amount certified by Corporation (in a certificate setting forth in reasonable detail the projected application of the amount so certified) as necessary to (i) pay anticipated Operating Expenses for the upcoming month (taking into account any unapplied amount withdrawn for such purpose in a prior month) in accordance with the Annual Budget approved by the Majority of Holders as set forth in Section 8.9 of the Loan Agreement and (ii) fund the Operating Account such that the balance therein is equal to the Unrestricted Reserve Amount;<br><br>(ii)    Second, to the Series A Debt Service Account, in an amount equal to 1/6th of the interest due on the next Interest Payment Date;<br><br>(iii)    Third, to the Series B Debt Service Account, in an amount equal to 1/6th of the interest due on the next Interest Payment Date;<br><br>(iv)    Fourth, to the Series A Debt Service Account, in an amount equal to 1/12th of the principal or Sinking Fund Installment due on the next principal payment date; |

|  | (v)      Fifth, to the Series B Debt Service Account, in an amount equal to 1/12th of the principal or Sinking Fund Installment due on the next principal payment date;<br><br>(vi)      Sixth, to replenish the balance of the Operating Reserve Fund such that the amount therein equals the Operating Reserve Fund Requirement;<br><br>(vii)      Seventh, to the New Debt Service Reserve Fund necessary to make the amount therein equal the Debt Service Reserve Fund Requirement, first to fund the Series A Account as necessary then the Series B Account;<br><br>(viii)      Eighth, any remaining amounts after application of paragraphs first to seventh above shall be transferred as follows:<br><br>(1)      If Amsterdam has Days Cash on Hand as of the transfer date in excess of 150 Days Cash on Hand (not counting the amount necessary to meet the MLR Requirement), such excess amount (the "Excess Cash") shall be deposited in the Series A Redemption Account of the Bond Fund to redeem the Series 2021A Bonds until the Series 2021A Bonds are paid in full and then to the Series B Redemption Account to redeem the Series 2021B Bonds.<br><br>(2)      Amounts other than Excess Cash shall be deposited in the Operating Reserve Fund. |
|---|---|
| **Operating/Financial Covenants** | |
| **Days Cash on Hand** | Amsterdam covenants to maintain at least (i) [175] Days' Cash on Hand as of each of June 30, 2022 and December 31, 2022 and (ii) [200] as of each Liquidity Testing Date commencing June 30, 2023 and thereafter (each a "Liquidity Covenant").<br><br>Testing Compliance.  The Liquidity Covenant is required to be (a) calculated quarterly based on Amsterdam's unaudited financial statements and (b) tested (1) annually as of each December 31, based on Amsterdam's audited financial statements and (2) annually as of each June 30, based on Amsterdam's unaudited financial statements. The term "Liquidity Testing Date" shall mean each June 30 and December 31.<br><br>Failure to Maintain Liquidity Covenant.  (A) If the required Liquidity Covenant is not met for any quarterly test date or for any fiscal year, Amsterdam shall deliver within 60 days of delivery of the unaudited quarterly or audited annual financial statements, as applicable, in accordance with Sections 8.9(a) and (b) hereof, respectively, a Management Consultant's report and plan pursuant to Section 8.7(a) hereof that recommends corrective action, which corrective action shall be implemented to the extent not prohibited by law or existing contracts. Amsterdam shall adopt a specific plan setting forth the steps designed to achieve |

| | |
|---|---|
| | the required Liquidity Covenant by the end of the second fiscal quarter following the date such report and plan are delivered.  Such report and plan shall be prepared and implemented pursuant to Section 8.7(a) hereof.<br><br>(B)      If Amsterdam fails to meet any Liquidity Covenant following the end of the second fiscal quarter after the report and plan is due, Amsterdam shall, at the direction of a Majority of Holders, engage a New Manager in accordance with Section 8.7 below.<br><br>(C)      It shall constitute an Event of Default hereunder if (i) on any Liquidity Testing Date, the Days Cash on Hand is equal to or below 130, (ii) Amsterdam is not in compliance with the MLR Requirement, or (iii) Amsterdam fails to meet Liquidity Covenant on any three consecutive Liquidity Testing Date.<br><br>Days Cash on Hand shall include [TBD] |
| **Additional Permitted Indebtedness** | <u>Long-Term Indebtedness</u>.  If no Event of Default shall have occurred and then be continuing, the Corporation may incur or assume additional Long-Term Indebtedness for the purpose of financing a Capital Addition for the construction of additional independent living units not to exceed seventy-one (71) units, expanded commons and related renovation, construction and equipping (i.e. kitchen renovation or expansion and parking facilities) ("Phase II"), or any portion thereof; provided that, on or before the date on which any Long-Term Indebtedness, whether secured or unsecured, is to be incurred or assumed, the Corporation shall deliver to the Trustee:<br><br>*General Requirements - Opinion of Counsel*.  An opinion or opinions of counsel to the effect that: (A) the purpose of the Long-Term Indebtedness, as stated in such certified resolution, is one for which Long-Term Indebtedness may be incurred under this Section 8.14; (B) all conditions prescribed herein as precedent to such incurrence have been fulfilled; and (C) the additional Long-Term Indebtedness has been validly authorized; and<br><br>*General Requirements - Architect's Certificate for Capital Additions*.  An Architect's Certificate stating that, in the signer's opinion (A) the plans and specifications have been approved by the signer and all regulatory bodies required to approve them (specifying such regulatory bodies) and (B) the contracts entered into by the Corporation and its agents (which contracts shall be specified) cover substantially all phases of the construction not being done by employees of the Corporation and (C) the contractors have furnished payment and performance bonds covering the work to be performed under such contracts naming the Corporation, the Agency and Trustee as obligees; and<br><br>*Corporation Certificate.* A certificate of the Corporation that (A) at least ninety-two percent (92%) of the independent living units in the existing Project are occupied or reserved with ten percent (10%) deposits, (B) at least fifty percent (50%) of the independent living units to be constructed as Phase II have been reserved with executed Residence Agreements and deposits at least equal to ten percent (10%) of the Entrance Fee shall have been received for such units; (C) |

|  | there is a guaranteed maximum price or stipulated construction contract for Phase II; (D) Debt Service Coverage Ratio and the Liquidity Covenant were met on the most recent evaluation date, (E) all required deposits have been made into the Operating Reserve Fund; (G) a Management Consultant's forecast shows that the Debt Service Coverage Ratio for the two (2) Fiscal Years following the completion of Phase II will be at least 1.25 and the Days' Cash on Hand at the end of the first Fiscal Year in which the average occupancy of such Independent Living Units is forecasted to reach eighty-five (85%) will be at least 250.<br><br>*Refunding Indebtedness*.  In the case of Long-Term Indebtedness incurred to refinance outstanding Long-Term Indebtedness, (i) a Corporation Certificate stating that the Maximum Annual Debt Service on the proposed Long-Term Indebtedness does not exceed the Maximum Annual Debt Service on the Long-Term Indebtedness to be refinanced, and the consent of a Majority of Holders and (ii) an opinion or opinions of counsel to the effect that: (A) the purpose of the Long-Term Indebtedness, as stated in such certified resolution, is one for which Long-Term Indebtedness may be incurred under this Section 8.14; (B) all conditions prescribed herein as precedent to such incurrence have been fulfilled; and (C) the additional Long-Term Indebtedness has been validly authorized;<br><br>*Subordinated Indebtedness*. The Subvention Certificate, which shall be unsecured and shall provide that no payment may be made on such Subvention Certificate unless the Series 2021 Bonds have been paid in full, as further set forth in the Subordination Agreement;<br><br>*Other Indebtedness*. Indebtedness incurred with the written consent of the Holders of 66% of the Outstanding principal amount of the Series 2021A Bonds and Series 2021B Bonds, each series treated as a separate class; and<br><br>*Capitalized Leases*. Indebtedness relating to Capitalized Leases, incurred in connection with the purchase or acquisition of equipment or other personal Property, provided that the principal amount of such Indebtedness, together with any other Indebtedness outstanding under this clause (e), shall not exceed One Million Dollars ($1,000,000). |
|---|---|
| **Debt Service Coverage Ratio** | Amsterdam covenants that it shall maintain a Debt Service Coverage Ratio of at least (i) 1.10 as of each fiscal quarter commencing September 30, 2022, through, and including June 30, 2023, (ii) 1.20 as of the fiscal quarter commencing September 30, 2023 and thereafter until Stabilization, and (iii) 1.20 as of each fiscal year from and after Stabilization.  "Stabilization" means December 31 of the second consecutive fiscal year in which the annual average occupancy of independent living was 90% or greater and no Event of Default or default which, with the passage of time would be an Event of Default has occurred.<br><br>Testing Compliance.  Commencing with the first fiscal quarter testing is required, compliance with the Debt Service Coverage Ratio covenant shall be tested by Amsterdam quarterly on the basis of the unaudited financial reports required by Section 8.9(a) of the Installment Sale Agreement for the preceding 12-month period, except for the fourth quarter, which shall be done on the basis of |

| | Amsterdam's audited financial statements required pursuant to Section 8.9(b) hereof; provided however that for the September 30, 2022 testing date, the test shall be calculated based on a rolling 9 months.  From and after Stabilization, compliance with the Debt Service Coverage Ratio shall be tested annually based on the audited financial statements instead of quarterly.

Failure to Maintain Debt Service Coverage Ratio.  (A) If the required Debt Service Coverage Ratio is not met for any testing period, Amsterdam shall deliver within 60 days of delivery of the unaudited quarterly or audited annual financial statements, as applicable, in accordance with Sections 8.9(a) and (b) of the Installment Sale Agreement, respectively, a Management Consultant's report and plan pursuant to Section 8.7(a) of the Installment Sale Agreement that recommends corrective action, which corrective action shall be implemented to the extent not prohibited by law.  Amsterdam shall adopt a specific plan setting forth the steps designed to achieve the required Debt Service Coverage Ratio by the end of the second fiscal quarter following the date such report and plan are due.  Such report and plan shall be prepared and implemented pursuant to Section 8.7(a) of the Installment Sale Agreement.

(B)     If Amsterdam fails to meet the required Debt Service Coverage Ratio following the end of the second fiscal quarter after the report and plan is due, Amsterdam shall, at the direction of a Majority of Holders, engage a New Manager in accordance with Section 8.7(b) of the Installment Sale Agreement.

(C)     It shall constitute an Event of Default hereunder if, (i) the Debt Service Coverage Ratio is 1.0 or below on any testing date or (ii) prior to Stabilization, Amsterdam fails to meet Debt Service Coverage Ratio for three consecutive testing periods or (iii) after Stabilization, Amsterdam fails to meet Debt Service Coverage Ratio on any two consecutive testing periods. |
| **IL Occupancy Covenants** | Amsterdam covenants that, commencing with the fiscal quarter ended March 31, 2022, it shall market, or cause the Marketing Agent to market, the Residential Units in the Project and execute Residence Agreements and collect Entrance Fees pursuant to such Residence Agreements ("Reserved Units"), so that the percentage of the number of Residential Units which are occupied or entitled to be occupied by residents who have paid their Entrance Fees in full and the initial Monthly Service Fee attributable to their Residential Unit, is at least equal to the "Residential Unit Occupancy Target" set forth on Schedule "B" (the "**Resident Unit Occupancy Covenant**"). |

|  | If Amsterdam (i) fails to meet any Residential Unit Occupancy Target for any occupancy quarter, a Marketing Consultant's report and plan must be prepared within 60 days of delivery of the unaudited quarterly financial statements in accordance with Section 8.9(a) hereof describing in detail the reasons for the failure to meet such Residential Unit Occupancy Target, and recommending action to achieve the respective target on the earliest practicable date. Such report and plan shall be prepared and implemented pursuant to Section 8.7 of the Installment Sale Agreement.

If Amsterdam fails  to meet any Residential Unit Occupancy Target following the end of the second fiscal quarter after the report and plan is due, Amsterdam shall, at the direction of a Majority of Holders, caused to be engaged a New Marketing Agent in accordance with Section 8.7(b) of the Installment Sale Agreement.

Notwithstanding any other provision of this Agreement, the failure of Amsterdam to achieve an Residential Unit Occupancy Target shall not be deemed to constitute an Event of Default hereunder, so long as Amsterdam takes all action within its control to comply with the procedures set forth in this Sections 8.6 and 8.7 of the Installment Sale Agreement for preparing and implementing a report and plan for correcting such deficiency, unless Amsterdam has failed to achieve the Residential Unit Occupancy Target for any three consecutive fiscal quarters or to engage a New Marketing Agent as required hereby. |
| **Assisted Living and Nursing Center Occupancy Covenants** | Amsterdam covenants that, commencing with the first fiscal quarter with the Closing, it shall market, or cause the Marketing Agent to market, the Assisted Living Units in the Project so that the average percentage of the number of Assisted Living Units which are occupied is at least the amount set forth in Schedule D for fiscal quarter ("AL Occupancy Target") and it shall market the beds in the Nursing Center, so that the average percentage of the number of beds in the Nursing Center which are occupied or entitled to be occupied by payment of the first monthly fee, is at least equal to the amount set forth in Schedule D for each fiscal quarter ("NC Occupancy Target"). The Residential Unit Occupancy Target, AL Occupancy Target and NC Occupancy Target are each referred to herein as an "Occupancy Target" and collectively as the "Occupancy Targets". |

| | |
|---|---|
| | If the Corporation fails to meet any AL Occupancy Target or NC Occupancy Target for any occupancy quarter, a Management Consultant's report and plan must be prepared within 60 days of delivery of the unaudited quarterly financial statements in accordance with Section 8.9(a) of the Installment Sale Agreement describing in detail the reasons for the failure to meet such AL Occupancy Target or NC Occupancy Target, and recommending action to achieve the respective target on the earliest practicable date Such report and plan shall be prepared and implemented pursuant to Section 8.7 of the Installment Sale Agreement. |
| | If the Corporation fails to meet the AL Occupancy Target or NC Occupancy (as applicable) Target following the end of the second fiscal quarter after the report and plan are due, the Corporation shall, at the direction of a Majority of Holders, engage a New Manager in accordance with Section 8.7(b) of the Installment Sale Agreement. |
| | Notwithstanding any other provision of this Agreement, the failure of the Corporation to achieve an Occupancy Target required by this Section shall not be deemed to constitute an Event of Default hereunder, so long as the Corporation takes all action within its control to comply with the procedures set forth in this Sections 8.6 and 8.7 of the Installment Sale Agreement for preparing and implementing a report and plan for correcting such deficiency, unless the Corporation has failed to achieve the AL Occupancy Target for any three consecutive fiscal quarters or the NC Occupancy Target for any three consecutive fiscal quarters or to engage a New Manager as required hereby. |
| **Reporting Requirements** | |
| **Reporting** | Amsterdam shall deliver reporting as set forth in the Installment Sale Agreement. |
| | Amsterdam shall enter into a new Continuing Disclosure Agreement providing for the same reporting as required by the existing Continuing Disclosure Agreement (in addition to the information required above), except for any amendments thereto required to reflect changes to Rules 15c2-12. |

## Schedule A

Amortization Schedule – Series 2021A Bonds

(b) The Series 2021A Bonds shall be subject to mandatory sinking fund redemption by the Issuer prior to maturity, pro rata, on January 1 of each of the years, and in the principal amounts set forth below (subject to reduction by the principal amount of the Series 2021A Bonds of the same maturity purchased by Amsterdam and surrendered to the Trustee for cancellation or purchased by the Trustee for cancellation pursuant to Section 5.04(f) hereof), at a Redemption Price equal to 100% of the principal amount thereof, together with interest accrued to the date of redemption:

| Redemption Date January 1 | Sinking Fund Installment | Redemption Date January 1 | Sinking Fund Installment |
|---|---|---|---|
| 2027 | $1,387,000 | 2035 | $2,763,000 |
| 2028 | 1,511,000 | 2036 | 3,011,000 |
| 2029 | 1,647,000 | 2037 | 3,282,000 |
| 2030 | 1,796,000 | 2038 | 3,578,000 |
| 2031 | 1,957,000 | 2039 | 3,900,000 |
| 2032 | 2,133,000 | 2040 | 4,251,000 |
| 2033 | 2,325,000 | 2041[*] | 4,634,000 |
| 2034 | 2,535,000 | | |

_____

[*] Final maturity.

**Schedule B**

Amortization Schedule – Series 2021B Bonds

The Series 2021B Bonds shall be subject to mandatory sinking fund redemption by the Issuer prior to maturity, as selected by the Trustee, on January 1 of each of the years, and in the principal amounts set forth below (subject to reduction by the principal amount of the Series 2021B Bonds of the same maturity purchased by Amsterdam and surrendered to the Trustee for cancellation or purchased by the Trustee for cancellation pursuant to Section 5.04(f) hereof), at a Redemption Price equal to 100% of the principal amount thereof, together with interest accrued to the date of redemption:

| Redemption Date January 1 | Sinking Fund Installment | Redemption Date January 1 | Sinking Fund Installment |
|---|---|---|---|
| 2042 | $4,927,000 | 2051 | $7,644,000 |
| 2043 | 5,174,000 | 2052 | 8,026,000 |
| 2044 | 5,433,000 | 2053 | 8,428,000 |
| 2045 | 5,704,000 | 2054 | 8,849,000 |
| 2046 | 5,989,000 | 2055 | 9,291,000 |
| 2047 | 6,289,000 | 2056 | 9,756,000 |
| 2048 | 6,603,000 | 2057 | 10,244,000 |
| 2049 | 6,933,000 | 2058[*] | 10,757,200 |
| 2050 | 7,280,000 | | |

_____

[*] Final maturity.

**Schedule C**

IL Occupancy Covenant

| Fiscal Quarter Ended | IL Occupancy Covenant |
|---|---|
| March 31, 2022 – December 31, 2022 | 74% |
| March 31, 2023 – December 31, 2023 | 76% |
| March 31, 2024 – December 31, 2024 | 78% |
| March 31, 2025 – December 31, 2025 | 80% |
| March 31, 2026 – December 31, 2026 | 85% |
| March 31, 2027 – December 31, 2027 | 88% |
| March 31, 2028 and each quarter thereafter | 90% |

**Schedule D**

Healthcare Occupancy Covenant

| Fiscal Quarter Ended | AL Occupancy Covenant |
|---|---|
| March 31, 2022 – June 30, 2022 | 75% |
| September 30, 2022 – December 31, 2022 | 80% |
| March 31, 2023 and each quarter thereafter | 85% |

| Fiscal Quarter Ended | NC Occupancy Covenant |
|---|---|
| March 31, 2022 – June 30, 2022 | 75% |
| September 30, 2022 – December 31, 2022 | 80% |
| March 31, 2023 and each quarter thereafter | 85% |

**<u>EXHIBIT 3</u>**

JOINDER

# FORM OF JOINDER

This Joinder to the Plan Support Agreement, dated as of [_____] [__], 2021, by and among the Borrower and the Consenting Holders (the "<u>Support Agreement</u>"), is executed and delivered by _____ (the "<u>Joining Party</u>") as of _____, 2021.  Each capitalized term used herein but not otherwise defined shall have the meaning set forth in the Support Agreement.

1.  <u>Agreement to be Bound</u>. The Joining Party hereby agrees to be bound by all of the terms of the Plan Support Agreement (and all exhibits and annexes thereto), attached to this Joinder as **Annex I** (as such Plan Support Agreement, exhibits and annexes may be hereafter amended, restated, or otherwise modified from time to time).  The Joining Party shall hereafter be deemed to be a "Consenting Holder" and a "Party" for all purposes under the Plan Support Agreement.

2.  <u>Representations and Warranties</u>. With respect to the Bonds set forth below its name on the signature page hereof and all related claims, rights, and causes of action arising out of or in connection with or otherwise relating to such Bonds, the Joining Party hereby makes to the Borrower the representations and warranties of the Consenting Holders set forth in the Plan Support Agreement.

3.  <u>Notices</u>. For purposes of notices and other communications to be delivered to the Joining Party the relevant addresses and facsimile numbers are set forth below.

4.  <u>Governing Law</u>. This Joinder shall be governed by and construed in accordance with the laws of the state of New York, without regard to any conflict of laws provisions that would require the application of the law of any other jurisdiction.

\* \* \* \* \*

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]