Thomas R. Califano
William E. Curtin
Shafaq Hasan
**SIDLEY AUSTIN LLP**
787 Seventh Avenue
New York, New York 10019
Tel: (212) 839-5300
Fax: (212) 839-5599
Email: tom.califano@sidley.com
        wcurtin@sidley.com
        shafaq.hasan@sidley.com

Jackson T. Garvey
**SIDLEY AUSTIN LLP**
One South Dearborn
Chicago, IL 60603
Tel: (312) 853-7000
Fax: (312) 853-7036
Email: jgarvey@sidley.com

*Proposed Counsel to the Debtor and Debtor-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>AMSTERDAM HOUSE CONTINUING CARE RETIREMENT COMMUNITY, INC.,[1]<br><br>Debtor. | Chapter 11<br><br>Case No. 21-_____ (___) |

**DISCLOSURE STATEMENT FOR DEBTOR'S PLAN OF**
**REORGANIZATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

Dated:  June 14, 2021

**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE COURT.**

---

[1] The last four digits of the Debtor's federal tax identification number are 1764. The Debtor's mailing address is 300 East Overlook, Port Washington, New York 11050.

## IMPORTANT INFORMATION FOR YOU TO READ

**Amsterdam House Continuing Care Retirement Community, Inc. d/b/a The Amsterdam at Harborside (the "Debtor" or "Reorganized Debtor") is providing you with the information in this *Disclosure Statement for Debtor's Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* (as may be amended, modified, altered, revised or supplemented from time to time, the "Disclosure Statement") because you are a creditor entitled to vote on the *Debtor's Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* (as may be amended, modified, altered, revised or supplemented from time to time, the "Plan") or are otherwise a party in interest in the Debtor's chapter 11 case (the "Chapter 11 Case"). Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Plan. Nothing in this Disclosure Statement may be relied upon or used by any Person for any other purpose. The Debtor is soliciting your vote to approve the Plan.**

**The consummation and effectiveness of the Plan are subject to certain material conditions precedent described herein and set forth in Section 8 of the Plan. There is no assurance that the United States Bankruptcy Court for the Eastern District of New York (the "Court") will confirm the Plan or, if the Court does confirm the Plan, that the conditions necessary for the Plan to become effective will be satisfied or otherwise waived.**

**The Debtor is filing this Disclosure Statement and the accompanying Plan on the same day that it commences this Chapter 11 Case and will seek a scheduling order to set a hearing on the 1) approval of this Disclosure Statement and 2) proposed solicitation procedures with regard to the Plan.**

**The Board of Directors of the Debtor and the Debtor's sole corporate member approved the transactions contemplated by the Plan and described in this Disclosure Statement. The Debtor believes that the compromises contemplated under the Plan are fair and equitable, maximize the value of the Estate[2] and provide the best recovery to Holders of Claims. The Debtor, therefore, strongly recommends that all Holders of Claims whose votes are being solicited submit votes to <u>accept</u> the Plan by returning their Ballots so as to be <u>actually received</u> by the Voting Agent no later than [●] <u>at 5:00 p.m. (prevailing Eastern Time)</u> pursuant to the instructions provided herein and on the Ballots. Pursuant to the Plan Support Agreement, the Plan is currently supported by Holders of approximately seventy-three percent (73%) of the Bond Claims.**

---

| |
|---|
| **THE DEADLINE TO VOTE ON THE PLAN IS [●], 2021 AT 5:00 P.M. (PREVAILING EASTERN TIME).**<br><br>**FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE <u>ACTUALLY RECEIVED</u> BY THE VOTING AGENT BEFORE THE VOTING DEADLINE IN ACCORDANCE WITH THE INSTRUCTIONS PROVIDED HEREIN** |

---

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Plan.

## DISCLAIMER

**IF YOU ARE ENTITLED TO VOTE TO APPROVE THE PLAN, YOU ARE RECEIVING A BALLOT WITH YOUR NOTICE OF THIS DISCLOSURE STATEMENT. THE DEBTOR URGES YOU TO VOTE TO ACCEPT THE PLAN.**

**EACH HOLDER OF A CLAIM AGAINST THE DEBTOR ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN SHOULD READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING. NO SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN MAY BE MADE EXCEPT PURSUANT TO THIS DISCLOSURE STATEMENT AND BANKRUPTCY CODE SECTION 1125. NO HOLDER OF A CLAIM SHOULD RELY ON ANY INFORMATION RELATING TO THE DEBTOR, THEIR PROPERTY OR THE PLAN OTHER THAN THAT CONTAINED IN THIS DISCLOSURE STATEMENT AND THE ATTACHED EXHIBITS.**

**THIS DISCLOSURE STATEMENT CONTAINS A SUMMARY OF CERTAIN PROVISIONS OF THE PLAN. ALTHOUGH THE DEBTOR BELIEVES AND HAS MADE EVERY EFFORT TO ENSURE THAT THIS SUMMARY PROVIDES ADEQUATE INFORMATION WITH RESPECT TO THE PLAN, IT DOES NOT PURPORT TO BE COMPLETE AND IS QUALIFIED TO THE EXTENT IT DOES NOT SET FORTH THE ENTIRE TEXT OF THE PLAN. IF THERE IS ANY INCONSISTENCY BETWEEN THE PLAN AND THE SUMMARY OF THE PLAN CONTAINED IN THIS DISCLOSURE STATEMENT, THE PLAN SHALL CONTROL. ACCORDINGLY, EACH HOLDER OF A CLAIM SHOULD REVIEW THE PLAN IN ITS ENTIRETY.**

**THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH BANKRUPTCY CODE SECTION 1125 AND BANKRUPTCY RULE 3016 (BUT HAS NOT BEEN APPROVED BY THE COURT AS COMPLYING WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016) AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAW OR OTHER APPLICABLE NON-BANKRUPTCY LAW. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING CLAIMS AGAINST THE DEBTOR SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH IT WAS PREPARED. THIS DISCLOSURE STATEMENT SHALL NOT BE CONSTRUED TO BE ADVICE ON THE TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE REORGANIZATION OF THE DEBTOR AS TO HOLDERS OF CLAIMS AGAINST THE DEBTOR.**

**IRS CIRCULAR 230 NOTICE: TO ENSURE COMPLIANCE WITH IRS CIRCULAR 230, HOLDERS OF CLAIMS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY HOLDERS OF CLAIMS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING BY THE DEBTOR OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS OF**

CLAIMS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

THIS DISCLOSURE STATEMENT WAS NOT FILED WITH THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE AUTHORITY AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN. NEITHER THIS DISCLOSURE STATEMENT NOR THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN CONSTITUTES AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY SECURITIES IN ANY STATE OR JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED.

THIS DISCLOSURE STATEMENT MAY CONTAIN "FORWARD LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. SUCH STATEMENTS CONSIST OF ANY STATEMENT OTHER THAN A RECITATION OF HISTORICAL FACT AND CAN BE IDENTIFIED BY THE USE OF FORWARD LOOKING TERMINOLOGY SUCH AS "MAY," "EXPECT," "ANTICIPATE," "ESTIMATE" OR "CONTINUE" OR THE NEGATIVE THEREOF OR OTHER VARIATIONS THEREON OR COMPARABLE TERMINOLOGY. THE READER IS CAUTIONED THAT ALL FORWARD LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE AND THERE ARE CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD LOOKING STATEMENTS.

ALL OF THE PROJECTED RECOVERIES TO CREDITORS ARE BASED UPON THE ANALYSIS PERFORMED BY THE DEBTOR AND ITS PROFESSIONALS. ALTHOUGH THE DEBTOR HAS MADE EVERY EFFORT TO VERIFY THE ACCURACY OF THE INFORMATION PRESENTED HEREIN AND IN THE EXHIBITS ATTACHED HERETO, THE DEBTOR CANNOT MAKE ANY REPRESENTATIONS OR WARRANTIES REGARDING THE ACCURACY OF THE INFORMATION.

THE DEBTOR CANNOT ASSURE YOU THAT THE DISCLOSURE STATEMENT, INCLUDING ANY EXHIBITS THERETO, THAT IS ULTIMATELY APPROVED BY THE COURT IN THE CHAPTER 11 CASE (I) WILL CONTAIN ANY OF THE TERMS DESCRIBED IN THIS DISCLOSURE STATEMENT; OR (II) WILL NOT CONTAIN DIFFERENT, ADDITIONAL OR MATERIAL TERMS THAT DO NOT APPEAR IN THIS DISCLOSURE STATEMENT. THE DEBTOR URGES EACH HOLDER OF A CLAIM TO (I) READ AND CAREFULLY CONSIDER THIS ENTIRE DISCLOSURE STATEMENT (INCLUDING THE PLAN AND THE MATTERS DESCRIBED AS "RISK FACTORS" BELOW); AND (II) TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN AND EACH OF THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY PRIOR TO DECIDING WHETHER TO ACCEPT OR REJECT THE PLAN. YOU SHOULD NOT RELY ON THIS DISCLOSURE STATEMENT FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO ACCEPT OR REJECT THE PLAN.

**NO INDEPENDENT AUDITOR OR ACCOUNTANT HAS REVIEWED THE LIQUIDATION ANALYSIS DESCRIBED HEREIN.    THE DEBTOR HAS NOT AUTHORIZED ANY PERSON TO GIVE ANY INFORMATION OR ADVICE, OR TO MAKE ANY REPRESENTATION IN CONNECTION WITH THE PLAN OR THIS DISCLOSURE STATEMENT.    THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION OR WAIVER.    THE DEBTOR MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE ANY CLAIMS AND CAUSES OF ACTION AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIED ANY SUCH CLAIMS OR OBJECTIONS TO SUCH CLAIMS.  HOLDERS OF CLAIMS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, SECURITIES OR TAX ADVICE AND SHOULD CONSULT THEIR OWN ADVISORS BEFORE VOTING ON THE PLAN.**

**THE DEBTOR RECOMMENDS THAT CREDITORS SUPPORT AND VOTE TO ACCEPT THE PLAN.    IT IS THE OPINION OF THE DEBTOR THAT THE TREATMENT OF CREDITORS UNDER THE PLAN CONTEMPLATES A GREATER RECOVERY THAN THAT WHICH IS LIKELY TO BE ACHIEVED UNDER OTHER ALTERNATIVES FOR THE REORGANIZATION OR LIQUIDATION OF THE DEBTOR.  ACCORDINGLY, THE DEBTOR BELIEVES THAT CONFIRMATION OF THE PLAN IS IN THE BEST INTERESTS OF CREDITORS.**

## TABLE OF CONTENTS

I.   EXECUTIVE SUMMARY ................................................................... 1

    A.    **Introduction.** ........................................................................... 1

    B.    **Overview of the Debtor's Recent Financial Challenges.** .................................. 2

    C.    **Proposed Refinancing Transaction.** ................................................ 3

    D.    **Purpose of the Disclosure Statement.** .............................................. 5

    E.    **The Solicitation Package.** .......................................................... 6

    F.    **The Plan.** ............................................................................. 6

II.   BACKGROUND INFORMATION .................................................. 11

    A.    **Overview of the Debtor's Business.** ............................................ 11

    B.    **Residency and Admission Agreements and Fees.** .......................... 12

    C.    **Facility Description.** ............................................................ 14

    D.    **Organizational Structure of the Debtor.** ...................................... 16

    E.    **The Debtor's Prepetition Capital Structure.** .................................. 17

III.   THE CHAPTER 11 PLAN ............................................................ 19

    A.    **Treatment of Claims and Interests Under the Plan.** ........................ 19

    B.    **Cramdown.** ...................................................................... 23

    C.    **Means for Implementation of the Plan.** ...................................... 23

    D.    **Assumption of Executory Contracts and Unexpired Leases.** ............ 31

    E.    **Conditions Precedent to Confirmation and the Effective Date.** .......... 33

    F.    **Effect of Confirmation.** ........................................................ 34

    G.    **Modification, Revocation or Withdrawal of the Plan.** ...................... 41

    H.    **Retention of Jurisdiction.** ...................................................... 42

    I.    **Miscellaneous Provisions.** ...................................................... 43

IV.   RISK FACTORS IN CONNECTION WITH THE PLAN .................... 46

    A.    **Bankruptcy Considerations.** .................................................... 47

    B.    **Risks Related to the Debtor's Business and Industry** ...................... 47

    C.    **Additional Factors** ............................................................... 52

V.   PLAN CONFIRMATION AND CONSUMMATION .......................... 53

    A.    **The Confirmation Hearing.** .................................................... 53

    B.    **Plan Confirmation Requirements Under the Bankruptcy Code.** .......... 54

VI.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN ........................................................................................................ 57

     A.    **Chapter 7 Liquidation.** ......................................................................... 57

     B.    **Alternative Plan Pursuant to Chapter 11 of the Bankruptcy Code.** ..................................................................................................... 57

VII.    CERTAIN FEDERAL TAX MATTERS RELATING TO THE PLAN ........................ 58

     A.    **Introduction** ........................................................................................ 58

     B.    **U.S. Federal Income Tax Consequences to the Debtor.** ................... 59

     C.    **U.S. Federal Income Tax Consequences to Holders of Claims.** ..................... 60

     D.    **U.S. Tax Consequences of Ownership of the Series 2021 Bonds** ................... 61

     E.    **Information Reporting and Backup Withholding** ........................................... 61

VIII.    RECOMMENDATION AND CONCLUSION ............................................................. 62

## <u>EXHIBITS</u>

Exhibit A       Debtor's Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code,
                dated June 14, 2021

Exhibit B       Plan Support Agreement, dated June 14, 2021

Exhibit C       2021 Bond Documents

Exhibit D       Financial Projections

Exhibit E       Liquidation Analysis

Exhibit F       Form of Opinion of Bond Counsel

I.      **EXECUTIVE SUMMARY**

This Executive Summary is only a general overview of the Disclosure Statement and the material terms of, and transactions proposed by, the Plan. This Executive Summary is qualified in its entirety by the more detailed discussions herein and the exhibits attached hereto, including the Plan. The Debtor urges all parties to read this Executive Summary in conjunction with the Disclosure Statement and the Plan. A copy of the Plan is attached hereto as **Exhibit A.**

A.      **Introduction.**

Incorporated in 2004, the Debtor is a New York not-for-profit corporation that has built a best-in-class senior living community in Port Washington, New York, dedicated to giving its residents an enriching lifestyle. In particular, the Debtor operates a continuing care retirement community ("CCRC") licensed under Article 46 of the New York Public Health Law that offers its senior residents a continuum of care in a campus-style setting, providing living accommodations and related health care and support services to a target market of seniors aged sixty-two (62) and older. The Debtor's sole corporate member is Amsterdam Continuing Care Health System, Inc. ("ACCHS" or the "Member"), which is also a New York not-for-profit corporation.

As will be discussed in greater detail herein, the Debtor has experienced increasing financial distress from slowed new occupancies and resulting cash flow shortfalls, causing it to fail to comply with a statutory and contractual obligation to pay entrance fee refunds. This problem was greatly exacerbated by the impact of the COVID-19 pandemic. The Debtor believes that the Plan, which is the result of extensive, arm's-length negotiations among (i) the Debtor, (ii) the Member, (iii) UMB Bank, N.A., as both the 2014 Bond Trustee (as defined in the Plan) and the successor bond trustee and successor master trustee (in either capacity, as applicable, the "Trustee"), and (iv) the Holders of approximately seventy-three (73%) of the Bond Claims (the "Consenting Holders"), provides the Debtor with a long-term resolution of its financial issues, compliance with all applicable New York State law and regulations, ability to fulfill its charitable mission and wherewithal to honor its commitments to its residents. In particular, the Debtor, the Member, and the Consenting Holders, as applicable, have agreed to the terms of a Plan Support Agreement together with a refinancing of the Debtor's bond obligations (each defined and described below) that collectively provide for the following (the "Refinancing Transaction"):

1.      The funding of an additional $40,710,000 in new money bond financing (the "Series 2021A Bonds") fund (i) $20,835,000 partial repayment of outstanding and anticipated resident refund obligations as of the Effective Date; (ii) $9,000,000 toward the Debtor's minimum liquid reserve requirements ("MLRR") under applicable New York State law, and (iii) a debt service reserve fund, a contingency and the costs of issuance;

2.      The contribution of $9 million from the Member to the Debtor to fund the balance of the MLRR;

3.      An exchange of the current Series 2014A Bonds and Series 2014B Bonds for new Series 2021B Bonds ("Series 2021B Bonds", and together with the Series 2021A

1

Bonds, the "Series 2021 Bonds") in the aggregate principal amount of $127,327,200 (the "Bond Refinancing"); and

4.      The provision of a Liquidity Support Agreement ("LSA") from the Member to the Debtor to be fully funded from the closing of the sale of a not-for-profit nursing home operated by an affiliate of the Debtor and Member, to be dedicated to regulatory compliance, including the funding of future MLRR and entrance fee refund obligations. The funds provided under the LSA in the original principal amount of $9 million shall be held in a segregated account at the Debtor and shall not be subject to the Trustee's liens.

The Debtor submits this Disclosure Statement in connection with its solicitation of votes on the Plan.

### B.      Overview of the Debtor's Recent Financial Challenges.

This is the Debtor's second chapter 11 filing. On July 21, 2014, the Debtor and holders of approximately 75% of the aggregate principal amount of the then-outstanding Series 2007 Bonds executed a Plan Support Agreement whereby the parties agreed to restructure the Series 2007 Bonds. This restructuring, which would have otherwise required unanimous consent of all existing holders of the Series 2007 Bonds, was implemented through a chapter case 11 (the "2014 Chapter 11 Case") that was commenced on July 22, 2014 in the Court under case number 14-73348 (AST). On October 23, 2014, the Court entered an order confirming the Plan of Reorganization (the "2014 Plan"). The 2014 Plan was effective on November 13, 2014 ("2014 Effective Date"). On the 2014 Effective Date, the Series 2007 Bonds (plus accrued and unpaid interest during the bankruptcy period) were exchanged for new Series 2014 Bonds ("Series 2014 Bonds").

As discussed in greater detail herein, the Debtor relies on revenue generated by existing and new residents to, among other things, maintain its day-to-day operations, service its debt obligations and honor its resident refund obligations. However, as has become common in the senior living industry, and in particular among CCRCs, the inability to attract new residents and statutory requirements regarding the repayment of refunds caused a severe liquidity crisis for the Debtor. To preserve liquidity during the COVID-19 pandemic the Debtor ceased making payments on the 2014 Bond Obligations and ceased making payments of resident entrance fee refunds. The failure to make refund payments caused the Debtor to fall out of compliance with the terms of its residency agreements and New York Public Health Law ("PHL") Section 4609, both of which require payment of entrance fee refunds no later than thirty days after the formerly-occupied unit has been resold and in no event later than one year after the formerly-occupied unit has been vacated. The Debtor reported non-compliance to New York State Department of Health ("DOH") and on May 28, 2020, DOH issued a citation for non-payment of nine refunds at a total amount of $5.2 million, which DOH updated with an addendum dated January 8, 2021 relating to a total of nineteen (19) entrance fee refunds totaling approximately $12 million. Currently, thirty-three (33) refunds at a total of approximately $20.3 million are due and unpaid.

Required disclosures of the Debtor's financial condition further hampered sales and marketing and the impact of COVID-19 and related restrictions imposed by the state of New York caused an almost complete shutdown of sales and marketing and ensuing events of default under the 2014 Bond Obligations. Thereafter, the Debtor and the Trustee executed a series of three

Forbearance Agreements dated October 21, 2020, November 30, 2020 and January 31, 2021 whereby the Trustee agreed to forbear from exercising remedies under the 2014 Bond Documents ("2014 Bond Documents").

### C.    Proposed Refinancing Transaction.

The proposed restructuring of the Debtor has several inter-dependent aspects, which are intended as a whole to bring the Debtor into regulatory compliance, resolve existing bond defaults, provide future operational stability and enable the community to enjoy robust sales and marketing. These elements include:

### 1.    Series 2021A Bonds (New Money).

Certain of the existing holders of the Series 2014 Bonds will purchase $40,710,000 in Series 2021A Bonds. These bonds will be used to fund (i) $20,835,000 partial repayment of outstanding and anticipated resident refund obligations as of the Effective Date; (ii) $9,000,000 towards the MLRR, and (iii) a debt service reserve fund, a contingency and the costs of issuance.

The 2021A Bonds will bear interest at a taxable rate of 9.0% per annum and on January 1, 2041. Interest is payable semi-annually on each January 1 and July 1. Principal amount of the Series 2021A Bonds shall be subject to mandatory sinking fund installments commencing January 1, 2027. The Series 2021A Bonds will be subject to optional redemption at par on or after October 1, 2031 (the "Par Call Date") and also subject to optional redemption at a make-whole redemption price from Year 5 to the Par Call Date. The Series 2021A Bonds will be secured by a first priority lien on all assets of the Debtor, except the LSA.

### 2.    Series 2021B Bonds.

The Existing Series 2014 A and 2014 B Bonds ("Series 2014A Bonds" and "Series 2014B Bonds", respectively), which currently total $139,917,130 in principal amount, will be exchanged for new Series 2021B Bonds in the aggregate principal amount of $127,327,200. The Series 2021B Bonds will be subordinate in payment and security to the Series 2021A Bonds. Interest on the Series 2021B Bonds will be reduced from the current fixed blended rate of 6.613% to a fixed rate of 5.0% per annum. The Series 2021B Bonds will bear interest at the rate of (i) 5.00% per annum, provided that upon the earlier of (x) the incurrence of indebtedness by the Corporation, the Sponsor or any affiliate thereof for Phase II, (y) twenty years after the Effective Date and (z) the date on which the Corporation has 150 Days Cash on Hand in excess of the MLRR (as defined below), the interest rate on the Series 2021B Bonds shall increase to 5.25% per annum. Principal on the Series 2021B Bonds will amortize commencing January 1, 2042 as set forth in 2021 Bond Documents ("2021 Bond Documents"). The Series 2021B Bonds will not be subject to optional redemption prior to October 1, 2026. The Series 2021B Bonds will be subject to optional redemption at the following prices:

| Redemption Date | Redemption Price |
|---|---|
| October 1, 2026 – September 30, 2027 | 107% |
| October 1, 2027 – September 30, 2028 | 106 |
| October 1, 2028 – September 30, 2029 | 105 |
| October 1, 2029 – September 30, 2030 | 105 |

| October 1, 2030 – September 30, 2031 | 105 |
| October 1, 2031 – September 30, 2032 | 105 |
| October 1, 2032 – September 30, 2033 | 105 |
| October 1, 2033 – September 30, 2034 | 104 |
| October 1, 2034 – September 30, 2035 | 103 |
| October 1, 2035 – September 30, 2036 | 102 |
| October 1, 2036 – September 30, 2037 | 101 |
| October 1, 2037 and thereafter | 100 |

### 3.    Accrued Interest and Series 2014C Bonds.

Past due and accrued interest on the Series 2014A Bonds and Series 2014B Bonds and the entirety of the Series 2014C Bonds will be extinguished ("Series 2014C Bonds").

### 4.    Member Contribution.

Upon the Effective Date, pursuant to that certain Member Contribution Agreement by and between the Debtor and the Member dated June 14, 2021 (the "Member Contribution Agreement"), the Member will contribute $9.0 million (the "Member Contribution") to the Debtor to be used to meet Plan obligations.  Approximately $3.6 million of this contribution will be funded from excess proceeds from the sale of land purchased with proceeds from a pre-existing HEAL Grant.  The availability of the Member Contribution, including any required regulatory approval, is a Condition Precedent to the Effective Date.

### 5.    LSA.

The Member has also committed to provide liquidity support under the LSA for a 10-year period as provided in the LSA, which shall be reserved for making payments to keep the Debtor in regulatory compliance, including with respect to payments of unpaid entrance fee refunds and satisfaction of minimum liquid reserve requirements that may become due in the future.  The LSA will be funded from the proceeds of the sale of substantially all of the assets of the Amsterdam Nursing Home Corporation (1992).  The LSA shall not be subject to the liens of the Trustee.

### 6.    Plan Support Agreement

On June 14, 2021, the Debtor, the Member and certain holders of the Series 2014 Bonds (the "Consenting Holders") entered into a Plan Support Agreement (the "Plan Support Agreement"), a copy of which is attached hereto as **Exhibit B**.  The Plan Support Agreement obligates the Debtor to, among other things, meet certain milestones regarding the preparation, filing and prosecution of the Chapter 11 Case, as well as take certain actions in support of confirmation of the Plan as contemplated in the Plan Support Agreement, subject to the exercise of its fiduciary duties.

Subject to the terms thereof, the Plan Support Agreement also obligates the Consenting Holders to, among other things, support the Plan to the exclusion of any other resolution of the Chapter 11 Case and vote to accept the Plan, refrain from transferring their bonds or claims to parties who do not support the Plan, and refrain from certain actions that may interfere with the Chapter 11 Case or confirmation of the Plan.

4

The Plan Support Agreement obligates the Member to, among other things, support the Plan to the exclusion of any other resolution of the Chapter 11 Case, including by making the Member Contribution and providing the funds under the LSA.

### 7.    The Chapter 11 Case.

On June 14, 2021 in order to effect the transactions outlined in the Term Sheet and the Plan Support Agreement, the Debtor commenced this chapter 11 case:

> **a.**    The Plan will provide for the following classes of Claims and Interests, and treatment of such Claims and Interests:

| Class | Claims and Interests | Status | Entitled to Vote |
|:---:|:---:|:---:|:---:|
| 1 | Other Priority Claims | Unimpaired | No (Deemed to Accept) |
| 2 | Other Secured Claims | Unimpaired | No (Deemed to Accept) |
| 3 | Bond Claims | Impaired | Yes |
| 4 | General Unsecured Claims, including Rejection Damage and Bond Trustee Deficiency Claims | Impaired | Yes |
| 5 | Resident Refund Claims | Impaired | Yes |
| 6 | Intercompany Claims | Impaired | No (Deemed to Reject) |
| 7 | Interests in the Debtor | Unimpaired | No (Deemed to Accept) |

> **b.**    All Executory Contracts and unexpired leases except for those expressly rejected under the Plan or motion filed by the Debtor prior to the Effective Date, will be assumed pursuant to section 365 of the Bankruptcy Code.
>
> **c.**    The Debtor will release certain parties, including, without limitation, the Trustee, the Consenting Holders, the Member and the 2021 Issuer.

### D.    Purpose of the Disclosure Statement.

The Debtor submits this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code in connection with: (i) the solicitation of votes on the Plan, and (ii) a hearing to consider confirmation of the Plan.

Section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement that contains information of a kind, and in sufficient detail, to permit a hypothetical reasonable investor to make an informed judgment regarding acceptance of a proposed chapter 11 plan of reorganization before soliciting acceptances of such proposed plan. The Debtor provides this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code to certain Holders of Claims against because the Debtor is asking such Holders of Claims to vote to accept the Plan. This Disclosure Statement sets forth certain information regarding (i) the Debtor's prepetition operating and financial history; (ii) Debtor's need to file for relief under chapter 11 of the Bankruptcy Code; (iii) the terms of the Plan; (iv) the manner in which distributions will be made

5

under the Plan; (v) certain effects of confirmation of the Plan; (vi) certain risk factors associated with the Plan; and (vii) the confirmation process and the voting procedures that Holders of Claims entitled to vote under the Plan must follow for their votes to be counted.  The Debtor believes that the confirmation and implementation of the Plan is in the best interests of the Debtor's Estate, Creditors and all other interested parties.

This Disclosure Statement is subject to the Court's approval, as containing information of a kind, and in sufficient detail, adequate to enable a hypothetical, reasonable investor typical of each of the Classes whose votes are being solicited to make an informed judgment with respect to the Plan. **THE COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A DETERMINATION WITH RESPECT TO THE MERITS OF THE PLAN.  ALL CREDITORS ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND ITS EXHIBITS CAREFULLY AND IN THEIR ENTIRETY BEFORE DECIDING TO VOTE TO ACCEPT OR REJECT THE PLAN.**

The summary of the Plan provided herein is qualified in its entirety by reference to the Plan.  To the extent that the information provided in this Disclosure Statement and the Plan (including any Plan Supplements) conflict, the terms of the Plan (including any Plan Supplements) will control, provided however that the 2021 Bond Documents shall control with respect to the 2021 Bonds.  Terms not otherwise specifically defined herein will have the meanings attributed to them in the Plan.  Each definition in this Disclosure Statement and in the Plan includes both the singular and plural.  Headings are for convenience or reference and shall not affect the meaning or interpretation of this Disclosure Statement.

E.    **The Solicitation Package.**

Only record holders of Claims in Class 3, 4 and 5 as of the voting record date, [●], are entitled to vote on the Plan.  Holders of Claims in Class 3, 4 and 5 will receive a solicitation package consisting of the following materials (collectively, the "Solicitation Materials"):

- a form ballot (the "Ballot"), which shall include the voting instructions; and

- this Disclosure Statement with all exhibits, including the Plan, and any other supplements or amendments to these documents.

F.    **The Plan.**

1.    **Purpose and Effect of the Plan.**

Chapter 11 of the Bankruptcy Code allows debtors to reorganize or to liquidate and wind up their affairs for the benefit of the debtors and their creditors.  Upon the commencement of a chapter 11 case, an estate is created comprised of all the legal and equitable interests of a debtor as of the date the petition is filed, which typically remain in control of the debtor as a debtor-in-possession.

Pursuant to section 362 of the Bankruptcy Code, the filing of a chapter 11 petition imposes an automatic stay of all attempts by creditors or third-parties to collect or enforce prepetition claims

against a debtor or otherwise interfere with its property or business, unless relief from the automatic stay is obtained from the Court.

The Bankruptcy Code is designed to encourage the parties-in-interest in a chapter 11 proceeding to negotiate the terms of a chapter 11 plan so that it may be confirmed. A chapter 11 plan is the vehicle for satisfying or otherwise addressing the claims against and the interests in the debtor. Confirmation of a chapter 11 plan makes it binding on the debtor and all of its creditors and the prior obligations owed by the debtor to such parties are compromised in exchange for the obligations specified in the plan.

### 2.    Feasibility of the Plan.

In order to establish the feasibility of the Plan for purposes of section 1129(a)(11) of the Bankruptcy Code, the Debtor and its management team and advisors, have developed financial projections (the "Financial Projections") that are attached hereto as **Exhibit D**. The Financial Projections set forth the projected financial performance of the Reorganized Debtor over a defined period of time based upon a number of assumptions and factors.

### 3.    Analysis of Recoveries to Holders of Claims and Interests under the Plan and Recommendation of the Debtor.

The Plan provides for a comprehensive restructuring of the Debtor's Bond Obligations. The treatment of Class 3 is the product of extensive negotiations between the Debtor, the Member, the Trustee and the Consenting Holders. The Consenting Holders support the treatment of Holders of Bond Claims in Class 3 subject to the terms of the Plan Support Agreement.

After a careful review of its current operations and liquidity, prospects as an ongoing business, and estimated recoveries to creditors in a sale scenario, the Debtor concluded that it will maximize recoveries to its stakeholders by reorganizing as a going concern through the Refinancing Transaction embodied in the Plan. The Debtor believes that any alternative to confirmation of the Plan, such as liquidation, a partial sale of assets, or a sale of all or substantially all of its Assets, would result in materially lower recoveries for stakeholders, significant delays, protracted litigation, and greater administrative costs. For these reasons, the Debtor believes that its business and Assets have significant value that would not be realized in a forced sale or a liquidation, either in whole or in substantial part, and that the value of the Debtor's Estate is considerably greater as a going concern.

As set forth more fully below, the Debtor believes that the Plan provides the best recoveries possible for the Debtor's stakeholders and recommend that, if you are entitled to vote, you vote to accept the Plan.

### 4.    Classification and Treatment of Claims Under the Plan.

Certain Classes of Claims are Impaired under the Plan. The Debtor is seeking votes to accept the Plan from Holders of Claims in Classes 3, 4 and 5. For a description of the Classes of Claims and their treatment under the Plan, see Sections 3 and 4 of the Plan – Classification and Treatment of Claims.

Each Class of Claims, except Administrative Expense Claims, Accrued Professional Compensation Claims and Priority Tax Claims, are placed in the following Classes and will receive the following treatment under the Plan:

*Summary of Classification and Treatment of Claims Under the Plan*

| Class | Claims and Interests | Status | Entitled to Vote |
|-------|---------------------|--------|------------------|
| 1 | Other Priority Claims | Unimpaired | No (Deemed to Accept) |
| 2 | Other Secured Claims | Unimpaired | No (Deemed to Accept) |
| 3 | Bond Claims | Impaired | Yes |
| 4 | General Unsecured Claims, including Rejection Damage and Bond Trustee Deficiency Claims | Impaired | Yes |
| 5 | Resident Refund  Claims | Impaired | Yes |
| 6 | Intercompany Claims | Impaired | No (Deemed to Reject) |
| 7 | Interests in the Debtor | Unimpaired | No (Deemed to Accept) |

### 5.    Summary of Voting Requirements for Plan Confirmation.

#### a.    In General.

Creditors should refer only to this Disclosure Statement and the Plan to determine whether to vote to accept or reject the Plan.  Under the Bankruptcy Code, only Holders of Claims that are "impaired" are entitled to vote to accept or reject the Plan.  Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a plan unless (1) the plan leaves unaltered the legal, equitable and contractual rights to which such claim or interest entitles the holder thereof; or (2) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan, among other things, cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.  An impaired class of creditors votes to accept a plan if the holders of at least two-thirds (2/3) in dollar amount, and more than one-half (1/2) in number, of those creditors that actually cast ballots vote to accept such plan.  Those classes that are not impaired are not entitled to vote and are deemed to accept a plan.  Those classes that are not entitled to a distribution and will not retain property under a plan are deemed to reject a plan.

A class of interest holders is deemed to accept a plan if the holders of at least two-thirds (2/3) in amount of those interest holders that actually cast ballots vote to accept such plan.  A class of interest holders is impaired, not entitled to vote, and deemed to reject the plan if the plan treats such holders by providing that they will retain no property and receive no distributions under the plan.

Pursuant to the Bankruptcy Code, only creditors who actually vote on the Plan will be counted for purposes of determining whether the required number of acceptances have been obtained.  Failure to deliver a *properly completed ballot* by the Voting Deadline (as defined below) will result in an abstention; consequently, the vote will neither be counted as an acceptance nor rejection of the Plan.

**6.    Impaired Classes Entitled to Vote.**

The Claims in Class 3, 4 and 5 are Impaired under the Plan and Holders of such Claims in this Class are entitled to vote to accept or reject the Plan.

**7.    Unimpaired Classes Deemed to Accept the Plan.**

If a Creditor or Interest Holder holds a Claim included within a Class that is not Impaired under the Plan, under Bankruptcy Code section 1126(f), the Creditor or Interest Holder is deemed to have accepted the Plan with respect to such Claim and its vote of such Claim will not be solicited.  Classes 1, 2, and 7 are Unimpaired under the Plan.

**8.    Classes Deemed to Reject the Plan and Do Not Vote.**

Under Bankruptcy Code section 1126(g), Class 6 will receive no distributions on account of such Claims.  Thus, Class 6 is deemed to have rejected the Plan and the vote of Holders of such Claims in Class 6 will not be solicited.

**9.    Voting Deadline.**

The Debtor has engaged Kurtzman Carson Consultants, LLC as its voting agent (the "Voting Agent") to assist in the transmission of voting materials and tabulation of votes with respect to the Plan.  If a Creditor holds a Claim classified as a voting Class of Claims under the Plan, the Creditor's acceptance or rejection of the Plan is important and must be in writing and submitted on time.  The record date for determining which Creditors may vote on the Plan is July [●], 2021 (the "Voting Record Date").  The voting deadline is [●] at 5:00 p.m. (prevailing Eastern Time) (the "Voting Deadline").

**10.    Voting Instructions.**

Section 1126(c) of the Bankruptcy Code defines "acceptance" of a plan by a class of claims as acceptance by creditors in that class that hold at least two-thirds in dollar amount and more than one-half in number of the allowed claims in that class, counting only those claims that actually vote to accept or to reject such plan.

The Voting Deadline for the Plan is [●] at 5:00 p.m. (prevailing Eastern Time).  In order to be counted as votes to accept or reject the Plan, all Ballots must be properly executed, completed, and timely delivered.

Most Holders of Claims related to the Bonds will submit votes by completing a Ballot and returning it to their specified bank, broker, nominee or other intermediary (a "Nominee").  Each Nominee may provide specific instructions to beneficial Holders of Claims related to the Bonds on how to complete and submit a Ballot.  Such Holders will be instructed to return their Ballot to the Nominee to enable the Nominee to complete and submit a master Ballot to the Voting Agent so that it is received by the Voting Deadline.  Beneficial Holders of Claims related to the Bonds should carefully follow the instructions that accompany their Ballot to ensure that it is properly received by the Nominee with sufficient time for the Nominee to complete a master Ballot that can

be delivered to the Voting Agent by the Voting Deadline. Instructions for voting are more fully described in the Ballots.

Unless otherwise directed by the Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, revocation, or withdrawal of Ballots will be determined by the Debtor in its sole discretion, following consultation with the Trustee, and such determination will be final and binding unless otherwise ordered by the Court. Once a party delivers a valid Ballot for the acceptance or rejection of the Plan, such party may not withdraw or revoke such acceptance or rejection without the Debtor's written consent or an order of the Court. The Debtor also reserves the right to reject any and all Ballots not in proper form, if the acceptance of which would, in the opinion of the Debtor with the advice of its counsel, be unlawful.

The Debtor further reserves the right to waive any defects or irregularities or conditions of delivery as to any particular Ballot. The interpretation (including the Ballot and the respective instructions therein) by the Debtor, unless otherwise directed by the Court, will be final and binding on all parties. Unless waived, any defects or irregularities in connection with deliveries of Ballots must be cured within such time as the Debtor (or the Court) determines. Neither the Debtor nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots nor will any of them incur any liabilities for failure to provide such notification. Unless otherwise directed by the Court, delivery of such Ballots will not be deemed to have been made until such irregularities are cured or waived. Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) will be invalidated.

If you cast more than one Ballot voting the same Claim prior to the Voting Deadline, the last valid Ballot timely received shall be deemed to reflect the voter's intent and shall supersede and revoke any earlier received Ballot. If you simultaneously cast inconsistent duplicate Ballots with respect to the same Claim, such Ballots shall not be counted.

## 11.    Additional Information.

If you have any questions about (i) the procedure for voting on your Claim, (ii) the package of materials that you have received, or (iii) obtaining or replacing a Ballot, the Plan, this Disclosure Statement, or any exhibits to such documents, please contact the Voting Agent by (a) calling (888) 733-1431 (U.S./Canada) or (310) 751-2632 (International); (b) writing to Harborside Claims Processing Center, c/o KCC, 222 N. Pacific Coast Highway, Suite 300, El Segundo, CA 90245; or (c) emailing at HarborsideInfo@kccllc.com.

## 12.    The Confirmation Hearing.

Upon approval of this Disclosure Statement, the Debtor will seek to schedule a hearing on confirmation of the Plan on the earliest possible date. The Debtor will provide notice of the Confirmation Hearing to all necessary parties in accordance with applicable law.

The Confirmation Hearing may be continued from time to time without further notice other than an adjournment announced in open court or a notice of adjournment filed with the Court and served on any master service list ordered by the Court and any entities which filed objections to the Plan, without further notice to parties in interest. The Court, in its discretion and prior to the

Confirmation Hearing, may put in place additional procedures governing the Confirmation Hearing.  The Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing, without further notice to parties in interest.

### 13.    Effect of Confirmation and Consummation of the Plan.

Following Confirmation, subject to Section 8 of the Plan, the Plan will be consummated on the Effective Date.  Among other things, on the Effective Date, certain release, injunction, exculpation and discharge provisions set forth in Section 9 of the Plan will become effective.  As such, it is important to read the provisions contained in Section 9 of the Plan very carefully so that you understand how confirmation and consummation of the Plan will affect you and any Claim you may hold against the Debtor so that you cast your vote accordingly.

Following the Effective Date, the Nassau County Local Economic Assistance Corporation will issue the Series 2021 A Bonds, the existing Series 2014 Bonds will be cancelled and the 2021 Series 2014B Bonds will be issued on a pro rata basis to the holders of Series 2014A Bonds and Series 2014B Bonds on a pro rata basis and the Member will deliver its contribution and enter into the LSA.

## II.    BACKGROUND INFORMATION

### A.    Overview of the Debtor's Business.

The Debtor was organized in 2004 as a New York not-for-profit corporation that is exempt from federal income taxation under section 501(a) of the Internal Revenue Code (the "IRC") as an organization described in section 501(c)(3) of the IRC. The Debtor's sole member is ACCHS, which is also a New York not-for-profit corporation that is exempt from federal income taxation.

The Debtor owns and operates The Amsterdam at Harborside ("The Harborside"), which is situated on approximately 8.9 acres in Port Washington, New York.  The Harborside is Nassau County's first continuing care retirement community, or CCRC, licensed under Article 46 of the New York Public Health Law.  Generally, CCRCs provide senior citizens with a full range of living accommodations and healthcare services during their retirement years, from independent living to skilled nursing care.  As such, CCRCs allow seniors to live in the same location as their healthcare needs change over time.  In addition, CCRCs provide residents with various social and entertainment outlets for all stages of retirement life.  The Harborside offers approximately 229 units of varying sizes for independent living.  Notably, the Harborside also has 100 units in the Isaac H. Tuttle Center (the "Health Center"), composed of twenty-six (26) enriched living units, eighteen (18) special needs assisted living residence units also licensed as enhanced assisted living residence units, and fifty-six (56) skilled nursing beds to provide short-term rehabilitation and long-term care to its residents and to individuals living in the community.  The Health Center is certified for Medicare and Medicaid by the United States Department of Health and Human Services' Centers for Medicare & Medicaid Services, and is also licensed by DOH. Approximately ten (10) percent of residents in the Health Center are covered by Medicaid.  The Harborside averages 370 residents in high occupancy years.

**B.      Residency and Admission Agreements and Fees.**

      **1.      Residency Agreements.**

Before occupying The Harborside, each permanent resident is required to execute with the Debtor a Residency Agreement ("Residency Agreement").  The Residency Agreement provides the terms and conditions that each independent living unit resident must abide by while residing at The Harborside, and also outlines the resident's obligations regarding the payment of Entrance Fees ("Entrance Fees"), the resident's rights to a refund of such Entrance Fees, and other monthly charges that may be due to the Debtor during the duration of the resident's stay at The Harborside (referred to herein as the "Monthly Service Fees").

The Debtor currently offers prospective independent living residents the choice of three residency plans, each evidenced by a different Residency Agreement. The residency plans primarily differ with regard to the required Entrance Fee, the Monthly Service Fees, and the amount that potentially can be refunded thereunder.

The terms of each form of Residency Agreement that the Debtor currently offers are summarized as follows:

- 75% Refundable Plan: This plan offers Residents a 75% refundable contract (without interest).  The Entrance Fees under this plan amortize[3] at 1% per month over a period of twenty-five months, until the allowable refund amount is reached.

- 50% Refundable Plan: This plan offers Residents a 50% refundable contract (without interest).  The Entrance Fees under this plan amortize at 2% per month over a period of twenty-five months, until the allowable refund amount is reached. The Monthly Service Fees under this plan are 20% lower than the Monthly Service Fees for the 75% Refundable Plan.

- 0% Refundable Plan: This plan offers Residents a traditionally amortizing 0% refundable contract.  The Entrance Fees under this plan amortize at 2% per month over a period of fifty months, until no refund is due.  The Entrance Fees under this plan are 30% lower than the Entrance Fees for the 75% Refundable Plan.

The Debtor has historically offered other Residency Agreements, different from the above, with different amortization rates and refund amounts (the "Prior Residency Agreements"), but any such agreements are no longer offered to new residents. As of the Petition Date, approximately 156 residents have Prior Residency Agreements.

---

[3] Under the Residency Agreements, and consistent with Article 46 of New York's Public Health Law, a certain percentage of the Entrance Fee, typically between 1%–2%, amortizes and becomes non-refundable each month on account of the Resident's occupancy at Harborside, for the number of months specified under the Residency Agreement.

2.    **Entrance Fees.**

Generally, the purpose of the Entrance Fee is to pay for refunds, certain project costs, retire debt, cover operating expenses, and generate investment income for the benefit of the Harborside and its residents. Prospective residents typically pay ten percent (10%) of the Entrance Fee upon execution of a Residency Agreement, and the remaining balance prior to or at occupancy. The Entrance Fees range from $527,249 to $2,229,194, depending upon the Residency Agreement and unit selected, and must be approved by New York State Department of Financial Services ("DFS"). Under the Residency Agreements, prospective residents are entitled to a full refund of any monies paid to the Debtor if they seek a refund prior to occupying an independent living unit at the Harborside. After occupancy, a resident is entitled to a refund of a portion of the Entrance Fees on the earlier of (a) thirty (30) days after a new resident executes a Residency Agreement and occupies the vacated independent living unit at The Harborside, or (b) one year after termination of the Residency Agreement. The terms of any refund rights are outlined in the Residency Agreements.

Historically, in certain circumstances, and in the ordinary course of business, the Debtor has provided prospective residents the option of deferring payment of up to fifty percent (50%) of their Entrance Fees for up to ninety (90) days to allow that resident to obtain the funds necessary to pay the Entrance Fees. This optional deferral is offered in circumstances when residents are unable to sell their existing home or have not yet sold and require funds from the sale of such home to pay the Entrance Fees to the Debtor. Residents under the deferral program execute a promissory note requiring them to pay the Entrance Fees fourteen (14) days after the closing of the sale of their home, or within ninety (90) days after occupying the Harborside, whichever is earlier. DFS suspended blanket approval of all marketing initiatives and is considering requests on a case-by-case basis. The Debtor intends to continue offering the deferral program on a case-by-case basis, and in the ordinary course of business, during the pendency of the Chapter 11 Case, subject to DFS approval. All of the incentive programs offered to residents, such as the deferral program discussed above, have been approved by the DOH and the DFS.

3.    **Monthly Fees.**

In addition to the Entrance Fee, the Debtor also charges residents a Monthly Service Fee. For residents under a Residency Agreement, the Monthly Service Fees range from $2,593 to $8,089 per month, depending upon the Residency Agreement and unit selected. The Debtor reviews Monthly Service Fees periodically and adjusts them as necessary to meet The Harborside's financial requirements. Changes in the Monthly Service Fees must be approved by the DFS.

4.    **Admission Agreements**

For a limited period of time, the New York Public Health Law permits the Debtor to admit certain individuals not residing in an independent living unit to the Health Center by entering into

an admission agreement (each, an "Admission Agreement") with the Debtor.[4] See N.Y. Pub. Health Law § 4605; 10 N.Y.C.R.R. § 900.8. The Admission Agreement is a contract that provides the terms and conditions such an individual must abide by while admitted to the Health Center, and outlines such an individual's obligation to pay fees or charges for healthcare services[5] rendered by the Debtor.[6]

### C.    Facility Description.

#### 1.    Types of Units

The Harborside is a CCRC located on approximately nine (9) acres in the Harbor View development adjacent to the Harbor Links golf course in Port Washington, New York. The Harborside includes 229 independent living units ranging in size from 714 square foot one-bedroom apartments to 2,519 square foot two-bedroom penthouse apartments, and a Health Center consisting of 26 enriched housing units, 18 special needs assisted living residence units also licensed as enhanced assisted living residence units and a 56-bed skilled nursing facility.

#### 2.    Community Features

The Harborside contains common area spaces available to all residents including a main dining room, two private dining rooms, two casual dining rooms, a bistro, living room and lounge areas, a beauty salon and barbershop, a fully-equipped business center, a card lounge, a billiards room, a media center, a library, a creative arts studio, a community ballroom, a greenhouse, and postal services and administrative offices. The Harborside includes a fitness center that contains an indoor heated swimming pool, fitness area, and locker rooms. The Harborside also includes a wellness program offering educational and screening programs promoting wellness and preventive health maintenance.

The Health Center, in addition to the nursing facility beds and enriched housing facility, has dining rooms, lounges, activity areas and outdoor terraces.

#### 3.    Services and Amenities

The following services and amenities are included in Monthly Service Fee and Residency Agreement:

- Use of an independent living unit;

---

[4] Under the terms of the Residency Agreements, independent living unit Residents are also eligible to receive treatment in the Health Center. Under this arrangement, such Residents continue paying Monthly Service Fees while receiving treatment in the Health Center.

[5] For the avoidance of doubt, individuals entering the Health Center under an Admission Agreement do not pay Entrance Fees.

[6] As of the Petition Date, the Debtor believes that approximately thirty-three (33) Residents are contracted under Admission Agreements.

- Use of all community facilities, as described above;

- One meal per day;

- Weekly housekeeping;

- Changing personal bed linens;

- Tray service, when medically necessary;

- Water, electricity, heat and air-conditioning;

- Basic cable television;

- Wiring for Internet access;

- One underground parking space;

- Valet parking;

- Scheduled local transportation;

- Repairs and maintenance of community property, including grounds;

- An emergency alert system with 24-hour emergency response, smoke detectors and sprinkler system; and

- Priority access and care in the skilled nursing facility or enriched housing facility, as more fully described in the Residency Agreement.

The following services and amenities are available for an additional fee:

- Beauty salon services;

- Additional meals;

- Additional housekeeping services;

- Telephone service;

- Premium cable television;

- Prescription and non-prescription medicines; and

- High-speed Internet access.

## 4.    Completion Project Reconfiguration Application.

The Debtor submitted an application for reconfiguration of the Debtor's existing Certificate of Authority to DOH and DFS in December 2019.  The proposed reconfiguration constitutes Phase II of the original operating plan for The Harborside and includes the addition of 71 independent living apartments, expansion and renovations of existing common areas.  The Debtor's ability to do so is subject to the satisfaction of certain regulatory requirements and satisfaction of certain covenants in the Series 2021 Bonds. Given changes in the financial condition and debt restructuring of the Debtor, as noted in this Disclosure Statement, subsequent to the submission of the reconfiguration application, the Debtor will have to revise and resubmit the application before

DOH and DFS can take action on the proposed reconfiguration. At this time, it cannot be determined when the resubmission of application materials will occur.

### D.    Organizational Structure of the Debtor.

#### 1.    Corporate Governance.

The Debtor is a not-for-profit corporation formed under the laws of the State of New York exempt from federal income taxes pursuant to Section 501(c)(3) of the IRC, and is governed by a voluntary Board of Directors ("Board of Directors" or "Directors") who serve without compensation.  None of the members of the Board of Directors of the Debtor or any affiliated entity has an ownership interest in the assets of the Debtor.  Two of the Directors are residents of The Harborside.  The Board of Directors takes such actions and performs such duties and responsibilities as may be authorized by law and the Debtor's by-laws.  No part of the net earnings of the Debtor may be used for the benefit of or be distributed to the Directors of the Debtor or of any affiliated entity or other private individuals, nor does any person involved in the management of the Debtor have any proprietary interest in the Debtor.  The Debtor's sole corporate member is ACCHS.  ACCHS is also a not-for-profit corporation incorporated under the laws of the State of New York, exempt from federal income taxes pursuant to Section 501(c)(3) of the IRC.

#### 2.    Services by Greystone.

##### a.    Financial Advisory Services

On October 23, 2014, the Debtor entered into a Financial Services Advisory Agreement (the "FSAA") with GMSC New York, LLC ("Greystone"), a Texas limited liability company and a wholly-owned subsidiary of GMSC, LLC, under which Greystone provides financial advisory services for the Debtor from November 2014 through October 2022.

Per the terms of the FSAA, Greystone advises the Debtor in the financial management of The Harborside including assisting with the annual plan and operating budget, financial analysis and financial reporting.  The FSAA specifies Greystone's fees are $17,500 per month.  On each anniversary of the effective date, Greystone's fee is adjusted for inflation by a percentage amount equivalent to the New York State trend factor. There is no downward adjustments in the fee based on the calculation.  Greystone acts as an independent contractor in the performance of its obligations under the agreement.

##### b.    Marketing.

On March 31, 2004, the Debtor originally entered into a Marketing Advisory Services Agreement with GCD New York, LLC (also defined as "Greystone").  A second Marketing Advisory Services Agreement was executed (as amended, "Marketing Agreement") between the Debtor and Greystone upon the effective date of the 2014 Chapter 11 Case on November 13, 2014, under which Greystone provides marketing advisory services for the Debtor.  Per the terms of the Marketing Agreement, Greystone advises the Debtor in the marketing of the independent living units, including providing a marketing plan with a projected budget of all the funds required to market, advertising and conducting public relations, recommending any modifications to the

Debtor regarding move-in incentives, and recruiting and hiring Greystone employees in accordance with the Marketing Agreement.

For its services, Greystone is paid a Services Fee, which varies based upon meeting certain performance metrics (the "Services Fee"). The Second Amendment to the Marketing Agreement, executed in December 2019, specifies that Greystone's Services Fee shall be $6,500.00 per move-in of the independent living units, as allocated in the Annual Operating Budget. For each move-in that exceeds the number of expected move-ins in the Annual Operating Budget, the Services Fee shall be $9,000.00. On each anniversary of the effective date, Greystone's fee is adjusted for inflation by a percentage amount equivalent to the New York State trend factor. There is no downward adjustments in the fee based on the calculation. Greystone acts as an independent contractor in the performance of its obligations under the agreement. The term of the Marketing Agreement has been extended to October 2022.

### 3.    Services by ASC.

The Debtor is a party to an Administrative Services Agreement with Amsterdam Services Corp. ("ASC"), a New York not-for-profit corporation, dated as of March 31, 2004 and amended as of November 15, 2007. In July 2008, ASC assigned the Administrative Services Agreement to Amsterdam Consulting, LLC ("ACLLC"). The commencement date of the contract was March 1, 2010 for an initial term of five (5) years. In October 2015, the Debtor and ACLLC entered into a second amendment to the agreement revising the terms to be automatically renewed for successive one-year terms, among other changes.

The Administrative Services Agreement calls for ACLLC to provide administrative, supervisory and fiscal advisory and consulting services for the skilled nursing facility component of The Harborside. Additionally, ACLLC provides financial services for the Debtor including the preparation of monthly operating statements. For services performed under this agreement, the Debtor paid $333,811 in administrative services fees for fiscal year ending December 31, 2020. The annual administrative services fee may increase annually by an amount not to exceed the increase in the Consumer Price Index for All Urban Consumers (medical care index).

### 4.    Regulatory Agencies.

The CCRC industry nationwide is regulated by various state and federal agencies. As a CCRC operating in the State of New York pursuant to Article 46 of the New York Public Health Law and Regulation 140 of the New York Insurance Regulations, the Debtor is regulated by the DFS and the DOH. In addition, as a participant in the Medicare and Medicaid Programs, the Debtor is subject to certification by the United States Department of Health and Human Services' Centers for Medicare and Medicaid Services.

### E.    The Debtor's Prepetition Capital Structure.

### 1.    Assets and Liabilities

As of March 31, 2021, on a book value basis, the Debtor had approximately $210,142,806 in Assets consisting of approximately: (i) $2,626,523 in cash and cash equivalents; (ii) $876,153

in accounts receivable; (iii) $192,181,651 million in net fixed assets; (iv) $13,444,734 of restricted cash; and (v) $183,114 of other Assets, net of accumulated amortization and depreciation.

As of March 31, 2021, the Debtor had approximately $425,408,496 of liabilities, net of accumulated amortization of non-refundable entrance fees, deferred financing costs and original issue premium, which consisted of approximately: (i) $1,424,193 of trade accounts payable; (ii) $16,444,782 of current resident refund obligations; (iii) $167,732,815 in future entrance fee liabilities; (iv) $199,188,011 of long-term municipal bond obligations; and (v) $1,156,272 in Paycheck Protection Program Loan obligations.

## 2.    Existing Long-Term Municipal Bond Obligations

In November 2014, as part of the 2014 Chapter 11 Case, the Debtor's then outstanding Series 2007 Bonds were exchanged for 75% of the Series 2014A Bonds and Series 2014B Bonds and 25% of the Series 2014C Bonds.

The Series 2014A Bonds bear interest at rates from 5.875% to 6.70% depending on the maturity, with a final maturity date of January 1, 2049.  Interest is payable semiannually on each January 1 and July 1 commencing January 1, 2015.  The Series 2014A Bonds are subject to mandatory sinking fund redemptions annually beginning on January 1, 2019.

$23,842,500 of Series 2014B Bonds bear interest at 5.5% per annum with a final maturity date of July 1, 2020.  Interest is payable semiannually on each January 1 and July 1 commencing January 1, 2015.  The Series 2014B Bonds were initially subject to mandatory redemption on the first business day of each January, April, July and October from available Entrance Fees.  As of December 31, 2018, $6,104,913 of Series 2014B Bonds remained outstanding.  On July 1, 2019, the Debtor began transferring 1/12th of the amount outstanding (approximately $508,000 per month) to the UMB Series B Redemption Fund.  As of December 31, 2019, $3,048,000 of the outstanding balance has been transferred to UMB.  Redemptions began on February 24, 2020.  As of April 30, 2020, $2,018,000 of Series 2014B Bonds remained outstanding and an additional $508,000 had been transferred to UMB.  As of the Petition Date, $509,041 of Series 2014B Bonds was redeemed on July 1, 2020 and $1,508,685 of Series 2014B Bonds remained outstanding.

$59,537,660 of Series 2014C Bonds bear interest at a rate of 2.0% per annum.  Interest is payable semiannually on each January 1 and July 1, but only from Excess Cash (as defined in the 2014 Bond Documents) available.  If the Excess Cash is not sufficient to pay interest, the unpaid interest is added to the principal amount of the Series 2014C Bonds.  As of the Petition Date, accrued and unpaid interest on the Series 2014C Bonds was $8,327,701 through June 10, 2021.  The Series 2014C Bonds are subject to mandatory redemption from Excess Cash.

The Bond Claims are secured by valid, enforceable, duly perfected first priority liens on and security interests in the Prepetition Bond Collateral pursuant to the Bond Documents, subject only to the lien on the Debtor's real property securing the Debtor's obligations under that certain Payment in Lieu of Taxes Agreement, dated as of December 1, 2007, as amended pursuant to that certain First Amendment to Payment in Lieu of Taxes Agreement dated as of June 1, 2014 between the 2014 Issuer and the Debtor, and as ratified by the Debtor in connection with the issuance of the 2014 Bonds pursuant to that certain Ratification dated November 13, 2014.

### III.    THE CHAPTER 11 PLAN

**THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE, CLASSIFICATION, TREATMENT AND IMPLEMENTATION OF THE PLAN, AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, WHICH IS ATTACHED TO THIS DISCLOSURE STATEMENT AS <u>EXHIBIT A</u>.**

The Claims against the Debtor are divided into Classes according to their seniority and other criteria.  The Classes of Claims for the Debtor and the funds and other property to be distributed under the Plan are described more fully below.

**THE DEBTOR BELIEVES THAT THE PLAN AFFORDS CREDITORS THE POTENTIAL FOR THE GREATEST REALIZATION OF THE VALUE OF THE DEBTOR'S ASSETS.  ADDITIONALLY, THE DEBTOR BELIEVES THAT THE PLAN AVOIDS SIGNIFICANT HARDSHIP TO RESIDENTS THAT WOULD OTHERWISE OCCUR AS A RESULT OF A LIQUIDATION.**

### A.    Treatment of Claims and Interests Under the Plan.

#### 1.    Administrative and Priority Claims.

##### a.    <u>Administrative Expense Claims</u>.

Subject to the provisions of sections 328, 330(a), and 331 of the Bankruptcy Code and except to the extent that a Holder of an Allowed General Administrative Claim and the Debtor before the Effective Date or the Reorganized Debtor after the Effective Date agree to less favorable treatment, each Holder of an Allowed General Administrative Claim will be paid the full unpaid amount of such Allowed General Administrative Claim in Cash: (a) if such Allowed General Administrative Claim is based on liabilities that the Debtor incurred in the ordinary course of business after the Petition Date, in accordance with the terms and conditions of the particular transaction giving rise to such Allowed General Administrative Claim and without any further action by any Holder of such Allowed General Administrative Claim; (b) if such Allowed General Administrative Claim is due, on the Effective Date, or, if such Allowed General Administrative Claim is not due as of the Effective Date, on the date that such Allowed General Administrative Claim becomes due or as soon as reasonably practicable thereafter; (c) if a General Administrative Claim is not Allowed as of the Effective Date, on the date that is no later than thirty (30) days after the date on which an order allowing such General Administrative Claim becomes a Final Order of the Court or as soon as reasonably practicable thereafter; or (d) at such time and upon such terms as set forth in a Final Order of the Court.

##### b.    <u>Administrative Expense Claims Bar Date</u>.

To be eligible to receive Distributions under the Plan on account of an Administrative Expense Claim that is not otherwise Allowed by the Plan, a request for payment of an Administrative Expense Claim must have been or be filed with the Court on or before the Administrative Expense Claims Bar Date.  Any Administrative Expense Claim that is not asserted in accordance herewith shall be deemed disallowed under the Plan and shall be forever barred against the Debtor, the Debtor's Estate, or any of the Debtor's Assets or property, and the Holder

thereof shall be enjoined from commencing or continuing any action, employment of process or act to collect, offset, recoup or recover such Claim.

### 2. Accrued Professional Compensation Claims.

All Professionals seeking payment of Accrued Professional Compensation Claims shall (i) file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred in the Chapter 11 Case by the date that is forty-five (45) days after the Effective Date and (ii) be paid (a) the full unpaid amount as is Allowed by the Court within five (5) Business Days after the date that such Claim is Allowed by order of the Court, or (b) upon such other terms as may be mutually agreed upon between the Holder of such an Allowed Accrued Professional Compensation Claim and the Debtor. Any Accrued Professional Compensation Claim that is not asserted in accordance with Section 2.2 of the Plan shall be deemed disallowed under the Plan and shall be forever barred against the Debtor, the Debtor's Estate, or any of its Assets or property, and the Holder thereof shall be enjoined from commencing or continuing any action, employment of process or act to collect, offset, recoup or recover such Claim.

### 3. Priority Tax Claims.

Pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, unless otherwise agreed by a Holder of an Allowed Priority Tax Claim and the Debtor, each Holder of an Allowed Priority Tax Claim shall receive, in full satisfaction of its Priority Tax Claim, payment in full in Cash of the Allowed amount of the Priority Tax Claim on the later of the Effective Date or as soon as practicable after the date when such Claim becomes an Allowed Claim.

### 4. United States Trustee Statutory Fees.

The Debtor and the Reorganized Debtor, as applicable, will pay fees payable under 28 U.S.C § 1930(a), including fees, expenses, and applicable interest payable to the United States Trustee, for each quarter (including any fraction thereof) until the Chapter 11 Case is converted, dismissed, or closed, whichever occurs first.

### 5. Classification of Claims and Interests.

Except as set forth in the Plan, all Claims against and Interests in the Debtor are placed in a particular Class. The Debtor has not classified Administrative Expense Claims, Accrued Professional Compensation Claims, and Priority Tax Claims.

The following table classifies Claims against and Interests in the Debtor for all purposes, including voting, confirmation and Distribution pursuant hereto and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. The Plan deems a Claim or Interest to be classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class. A Claim or Interest is in a particular Class only to the extent that any such Claim or Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date. Each Class set forth below is treated hereunder as a distinct Class for voting and Distribution purposes.

Subject to all other applicable provisions of the Plan (including its Distribution provisions), classified Claims shall receive the treatment described in section 4 of the Plan. The Plan will not provide any Distributions on account of a Claim to the extent that such Claim has been disallowed, released, withdrawn, waived, or otherwise satisfied or paid as of the Effective Date, including, without limitation, payments by third parties.

The following table designates the Classes of Claims against and Interests in the Debtor and specifies which of those Classes are (i) Impaired or Unimpaired by the Plan, (ii) entitled to vote to accept the Plan in accordance with section 1126 of the Bankruptcy Code, (iii) deemed to reject the Plan, or (iv) deemed to accept the Plan.

| Class | Claims and Interests | Status | Entitled to Vote |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | No (Deemed to Accept) |
| 2 | Other Secured Claims | Unimpaired | No (Deemed to Accept) |
| 3 | Bond Claims | Impaired | Yes |
| 4 | General Unsecured Claims, including Rejection Damage and Bond Trustee Deficiency Claims | Impaired | Yes |
| 5 | Resident Refund Claims | Impaired | Yes |
| 6 | Intercompany Claims | Impaired | No (Deemed to Reject) |
| 7 | Interests in the Debtor | Unimpaired | No (Deemed to Accept) |

## 6.    Treatment of Claims and Interests.

### a.    Other Priority Claims (Class 1).

This Class consists of all Allowed Other Priority Claims against the Debtor that are specified as having priority in section 507(a) of the Bankruptcy Code, if any such Claims exist as of the Effective Date. Except to the extent that a Holder of an Allowed Other Priority Claim against the Debtor has agreed to a different treatment of such Claim, each such Holder shall receive, in full satisfaction of such Allowed Other Priority Claim, Cash in an amount equal to such Allowed Other Priority Claim, on or as soon as reasonably practicable after the later of (i) the Effective Date; (ii) the date the Other Priority Claim becomes an Allowed Claim; or (iii) the date for payment provided by any agreement or arrangement between the Debtor and the Holder of the Allowed Other Priority Claim against the Debtor.

### b.    Other Secured Claims (Class 2).

This Class consists of all Other Secured Claims against the Debtor. In full satisfaction of an Allowed Other Secured Claim, on the later of the Effective Date and the date on which the Other Secured Claim is Allowed, each Holder of an Allowed Other Secured Claim shall receive, at the sole and exclusive option of the Reorganized Debtor: (a) Cash equal to the amount of such Claim; or (b) treatment of such Allowed Other Secured Claim in any other manner that renders the Claim Unimpaired, including Reinstatement.

 

       c.        **Bond Claims (Class 3)**.

This Class consists of the Bond Claims against the Debtor.  The Bond Claims are Allowed and shall be treated as follows: (i) Bond Claims on account of the 2014 A Bonds are Allowed in the aggregate amount of $[●], (ii) Bond Claims on account of the 2014 B Bonds are Allowed in the aggregate amount of $[●], (iii) Bond Claims on account of the 2014 C Bonds are Allowed in the aggregate amount of $[●].  Unliquidated, accrued and unpaid fees and expenses of the 2014 Bond Trustee and its professionals incurred through the Petition Date and not paid during this Chapter 11 Case are also part of, and shall be added to, the aggregate amount of the Bond Claims.  Upon the terms and subject to the conditions set forth in the Plan, in full and final satisfaction, settlement, release, and discharge of the Bond Claims, on the Effective Date or as soon as reasonably practicable thereafter, each Holder of Bond Claims on account of the Series 2014A Bonds and Series 2014B Bonds shall exchange the then outstanding Series 2014A Bonds and Series 2014B Bonds for a pro rata share of the Series 2021B Bonds issued in the aggregate original principal amount of $127,327,200.  On the Effective Date or as soon as reasonably practicable thereafter, the Series 2014C Bonds will be cancelled in whole without any payment or consideration.  Any and all fees of the 2014 Bond Trustee and its professionals shall be paid, subject to the terms of the 2014 Bond Documents, from the existing debt service reserve fund for the Series 2014 Bonds and shall otherwise be treated as part of the Allowed Bond Claims and shall be paid in full on the Effective Date.  Accordingly, Class 3 Claims are Impaired.

       d.        **General Unsecured Claims (Class 4)**.

This Class consists of all General Unsecured Claims against the Debtor, including Rejection Damage Claims and Bondholder Deficiency Claims.  Except to the extent that a Holder of an Allowed General Unsecured Claim against the Debtor agrees to a different treatment of such Claim, on the Effective Date, the Debtor will pay an amount equal to fifteen (15) percent of the Allowed Amount of such Class 4 Claim, in each case subject to all defenses or disputes the Debtor may assert as to the validity or amount of such Claims.  The Bondholders will receive no distribution on account of their Bondholder Deficiency Claims but shall have the right to vote such claims.  Accordingly, Class 4 Claims are Impaired.

       e.        **Resident Refund Claims (Class 5)**.

This Class consists of all presently due and owing claims for refunds of entrance fees pursuant to Residency Agreements and applicable New York State law.  In full satisfaction of an Allowed Resident Refund Claim, on the later of the Effective Date and the date on which the Resident Refund Claim is Allowed, each Holder of an Allowed Resident Refund Claim shall receive payment in the full face amount of such Class 5 Claim but shall not receive interest thereon.  Accordingly, Class 5 Claims are Impaired.

       f.        **Intercompany Claims (Class 6)**.

This Class consists of all Intercompany Claims against the Debtor including Claims of the Member.  All Intercompany Claims shall be extinguished without distribution.

### g.    **Interests in the Debtor (Class 7)**.

This Class consists of Interests of the Debtor.  On the Effective Date, Interests of the Debtor shall be Reinstated, and the holder of such Interests shall retain such Interests.

### B.    **Cramdown.**

If all applicable requirements for confirmation of the Plan are met as set forth in section 1129(a) of the Bankruptcy Code except subsection (8) thereof, the Debtor may request that the Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code on the basis that the Plan is fair and equitable and does not discriminate unfairly with respect to each Class of Claims or Interests that is Impaired under, and has not accepted or is deemed to reject, the Plan.

### C.    **Means for Implementation of the Plan.**

### 1.    **Refinancing Transactions.**

On the Effective Date, the Debtor, the Reorganized Debtor or any other entities may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including: (a) the execution and delivery of appropriate agreements or other documents of refinancing, exit financing or reorganization containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Plan; (c) the filing of appropriate certificates of incorporation, merger, or consolidation with the appropriate governmental authorities under applicable law; and (d) all other actions that the Debtor or the Reorganized Debtor, as applicable, determines are necessary or appropriate.

The Confirmation Order shall and shall be deemed to, under both section 1123 and section 363 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan.

### 2.    **2021 Bond Documents.**

The Reorganized Debtor shall be authorized to enter into the 2021 Bond Documents on the Effective Date.  On the Effective Date, and following the consummation of the Refinancing Transaction, the 2021 Bond Documents to which the Reorganized Debtor will be a party shall constitute legal, valid, binding, and authorized obligations of the Reorganized Debtor, enforceable in accordance with their terms.  The financial accommodations to be extended under the 2021 Bond Documents are being extended and shall be deemed to have been extended in good faith and for legitimate business purposes and are reasonable and shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any other applicable non-bankruptcy law.  On the Effective Date, all of the Liens and security interests to be granted in accordance with the 2021 Bond Documents (a) shall be deemed to be granted, (b) shall be legal, binding, and enforceable

Liens on and security interests in the collateral granted thereunder in accordance with the terms of the 2021 Bond Documents, (c) shall be deemed automatically perfected on the Effective Date (without any further action being required by the Reorganized Debtor, the Trustee, or any of Holders of Series 2021 Bonds), having the priority set forth in the 2021 Bond Documents and subject only to such Liens and security interests as may be permitted under the 2021 Bond Documents, and (d) shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law.  The Reorganized Debtor, and the Entities granted such Liens and security interests are authorized to make all filings and recordings and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order, and any such filings, recordings, approvals, and consents shall not be required).  The Reorganized Debtor shall take such actions as reasonably requested by the 2021 Bond Trustee and consistent with the Plan and the Plan Support Agreement in connection with the Refinancing Transactions and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

On the Effective Date, the Reorganized Debtor shall cause the 2021 Issuer to issue the Series 2021 Bonds, the primary economic terms of which are described below.[7]

### 3.    Series 2021A Bonds.

| | |
|---|---|
| **Principal:** | $40,710,000.00, on the terms and conditions set forth in the 2021 Bond Documents. |
| **Rate of Interest and Payment Terms:** | Fixed rate of 9.0% per annum, payable semi-annually.  Principal on the Series 2021A Bonds will amortize commencing January 1, 2027 as set forth in the 2021 Bond Documents. |
| **Maturity Date:** | January 1, 2041 |
| **Call Protection:** | The Series 2021A Bonds will subject to optional redemption at par on and after October 1, 2031 (the "Par Call Date").  The Series 2021A Bonds shall also be subject to optional redemption on and after October 1, 2026 and prior to the Par Call Date, at a make-whole redemption price as set forth in the 2021 Bond Documents. |
| **Collateral:** | The Series 2021A Bonds will be secured by a first priority lien on all assets of Debtor, except the LSA, and shall have payment priority over |

---

[7]   The information set forth in the accompanying chart is solely for summary purposes.  To the extent there is any discrepancy between the information set forth in the chart and the 2021 Bond Documents, the 2021 Bond Documents, copies of which are attached hereto as Exhibit C, control.

the Series 2021B Bonds.

4.      **Series 2021B Bonds.**

**Principal:**

The Series 2014A Bonds and Series 2014B Bonds (in the current aggregate principal amount of $139,917,130) will be exchanged for a pro rata amount of the new Series 2021B Bonds in a principal amount of $127,327,200.

**Rate of Interest and Payment Terms:**

The Series 2021B Bonds will be subordinate in payment and security to the Series 2021A Bonds.  Interest on the Series 2021B Bonds will be reduced from the current fixed blended rate of 6.613% to a fixed rate of 5.0% per annum.  The Series 2021B Bonds will bear interest at the rate of (i) 5.00% per annum, provided that upon the earlier of (x) the incurrence of indebtedness by the Corporation, the Sponsor or any affiliate thereof for Phase II, (y) twenty years after the Effective Date and (z) the date on which the Corporation has 150 Days Cash on Hand in excess of the MLR Requirement (as defined below), the interest rate on the Series 2021B Bonds shall increase to 5.25% per annum.  Principal on the Series 2021B Bonds will amortize commencing January 1, 2042 as set forth in 2021 Bond Documents.

**Maturity Date:**

January 1, 2058

**Call Protection:**

The Series 2021B Bonds will not be subject to optional redemption prior to October 1, 2026.  The Series 2021B Bonds will be subject to optional redemption prior to the maturity at the following prices (as a percentage of the principal amount of the Series 2021B Bonds):

| Redemption Date | Redemption Price |
|---|---|
| October 1, 2026 – September 30, 2027 | 107% |
| October 1, 2027 – September 30, 2028 | 106 |
| October 1, 2028 – September 30, 2029 | 105 |
| October 1, 2029 – September 30, 2030 | 105 |
| October 1, 2030 – September 30, 2031 | 105 |
| October 1, 2031 – September 30, 2032 | 105 |
| October 1, 2032 – September 30, 2033 | 105 |
| October 1, 2033 – September 30, 2034 | 104 |
| October 1, 2034 – September 30, 2035 | 103 |
| October 1, 2035 – September 30, 2036 | 102 |
| October 1, 2036 – September 30, 2037 | 101 |
| October 1, 2037 and thereafter | 100 |

**Collateral:**

The Series 2021B Bonds will be secured by a first priority lien on all assets of the Debtor, except the LSA, and subject to the payment priority of the Series 2021A Bonds.

### 5.    Accrued Interest and Series 2014C Bonds

Past due and accrued interest on the Series 2014A Bonds and Series 2014B Bonds and the entirety of the Series 2014C Bonds will be extinguished.  The accreted value of the Series 2014C Bonds as of June 12, 2021 is $67,869,098.02.

### 6.    Member Contribution and Liquidity Support Agreement.

The Member and the Debtor executed an agreement evidencing the Member's obligation to provide the Member Contribution of $9 million to the Debtor, subject to satisfaction of certain conditions precedent, on June 14, 2021 (the "Contribution Agreement").  Approximately $3,600,000 of the Member Contribution will come from the proceeds of the closing of the sale of the real property located in the hamlet of Mount Sinai within the Town of Brookhaven in Suffolk County, New York (the "Proceeds"), which are currently held by the Member, subject to ACCHS or an affiliate obtaining the approval of DOH for the use of such proceeds (the "DOH Approval").

The Member Contribution shall be subject to the following conditions: (i) the Bankruptcy Court shall have entered an order confirming the Plan in a form reasonably acceptable to ACCHS as described in the Contribution Agreement; (ii) the order confirming the Plan shall not be subject to any stay or appeal; (iii) the Member Contribution is used by the Borrower to fund the balance of the MLRR or, once the MLRR is funded, other costs of the Restructuring that are not funded by the new money paid for Series 2021A Bonds, (iv) the Member Contribution, as a condition of the issuance of the New Money, is set forth in one or more of the documents evidencing the Series 2021 Bonds, all of which  have been duly adopted by the 2021 Issuer pursuant to a final Bond authorizing resolution (as may be amended form time to time); (v)  the DOH has granted the DOH Approval, provided that such condition shall only apply to the Proceeds; (vi) any and all other requisite state and local approvals, including, without limitation, approvals by the Charites Bureau of the New York State Attorney General, the DOH, and DFS, if necessary, have been granted by the applicable agency; and (vii) the documents evidencing the Borrower's and other parties' obligations under the Series 2021 Bonds, all of which have been duly adopted by the Issuer pursuant to a final Bond authorizing resolution (as may be amended form time to time), and the Plan provide that the Subvention Certificate evidencing the $3,000,000 subvention from ACCHS to the Borrower issued on March 31, 2004 shall survive the Restructuring, subordinate to all the Series 2021 Bonds.

The Member shall also provide liquidity support under the LSA for a 10-year period as provided in the LSA, which shall be reserved for making payments to keep the Borrower in regulatory compliance, including with respect to payments of unpaid entrance fee refunds and satisfaction of minimum liquid reserve requirements that may become due in the future.  The funds provided pursuant to the LSA shall not be subject to the liens of the 2021 Bond Trustee, and the LSA may not be amended without the consent of the 2021 Bond Trustee.  Funding of the LSA will come from the closing of the sale of substantially all of the assets of Amsterdam Nursing Home Corporation (1992).

7.      **Reserves**

Under New York law, CCRCs are required to maintain liquid assets supporting reserve funds once the community becomes operational.  The amount of the debt service reserve fund is required to be equal to the total of all principal and interest payments becoming due within the next 12 months under any long-term financing of the facility.  The amount of the operating reserve fund shall be equal to 35 percent of the sum of the projected operating expenses during the next 12 months, plus the projected aggregate of all taxes and insurance expenses related to capital assets due within the next 12 months, plus the projected debt interest payments due within the next 12 months, excluding the debt interest payments described in the description of the debt reserve fund above, plus the projected and/or actual refund expenses becoming due within the next 12 months. As a result of the restructuring, the Debtor will be in compliance with the minimum liquid operating reserve requirement and minimum liquid debt reserve requirement as set forth by New York State DFS Insurance Regulation 140.

8.      **No Further Corporate Action.**

The issuance of the Series 2021 Bonds for distribution under the Plan is authorized without the need for further corporate action, and all of the Series 2021 Bonds issued or issuable under the Plan shall be duly authorized and validly issued under the Plan.  The Reorganized Debtor shall cause to be delivered customary legal opinions and other documents in connection with the issuance of the Series 2021 Bonds, in form and substance acceptable to the Trustee, including, without limitation, (i) the Opinion of Bond Counsel, and (ii) a lender's title policy with respect to the real property securing the Reorganized Debtor's obligations under the Series 2021 Bond Documents, and the first mortgage position of the Trustee, subject to such exceptions as are reasonably acceptable to the Trustee.

9.      **Continued Corporate Existence.**

Except as otherwise provided in the Plan, the Debtor shall continue to exist as of the Effective Date as a separate corporate Entity, with all the powers of a corporation under the applicable law in the jurisdiction where the Debtor is incorporated or formed and under the certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be under the Plan and require no further action or approval.

10.     **Vesting of Assets in the Reorganized Debtor.**

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated therein, including the Liens and security interests granted under the 2014 Bond Documents which such Liens and security interests continue to secure the obligations related to the 2021 Bond Documents, on the Effective Date, all property in the Estate, all Causes of Action, and any property acquired by the Debtor under the Plan shall vest in the Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances.  On and after the Effective Date, except as otherwise provided in the Plan, the Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes

of Action without supervision or approval by the Court and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules.

### 11.    Cancellation of Agreements, Security Interests, and Other Interests.

On the Effective Date, except to the extent otherwise specifically provided in the Plan, including to the extent certain of the Original Bond Documents continue in existence pursuant to their amendment and restatement pursuant to the 2021 Bond Documents, all notes, instruments, certificates, and other documents evidencing the Bonds, shall be cancelled and the obligations of the Debtor or the Reorganized Debtor thereunder or in any way related thereto (including, without limitation, any guarantee obligations of any non-Debtor Affiliates with respect to the Bond Claims) shall be discharged and the agents and Trustee thereunder shall be automatically and fully discharged from all duties and obligations thereunder.  Except to the extent certain security interests and Liens continue in existence pursuant to the 2021 Bond Documents, all existing security interests and/or Liens and/or any other Secured Claims shall also be automatically released, discharged, terminated, and of no further force and effect as of the Effective Date. Notwithstanding the foregoing, following confirmation of the Plan or the occurrence of the Effective Date, to the extent that the Original Bond Documents do not otherwise remain in effect pursuant to the 2021 Bond Documents, any credit document or agreement that governs the rights of any Holder of a Bond Claim shall continue in effect for purposes of (1) allowing Holders of such Allowed Claims to receive distributions under the Plan; (2) allowing and preserving the rights of the agents or representative of Holders of such Claims to make distributions on account of such Allowed Claims, as provided in the Plan; (3) preserving all exculpations in favor of the Trustee; (4) allowing the Trustee to enforce any rights and obligations owed to it, solely by Holders of Series 2014 Bonds under the 2014 Bond Documents, the Plan or the Confirmation Order, including the ability of the 2014 Bond Trustee to be compensated for fees and reimbursed for expenses, including expenses of its professionals, to assert its charging lien, to enforce its indemnity and other rights and protections with respect to and pursuant to the 2014 Bond Documents; and (5) permitting the Trustee to appear and be heard in the Chapter 11 Case, or in any proceeding in the Court or any other court.

### 12.    Exemption from Registration Requirements; Trading of Securities.

The offering, issuance, and distribution of Series 2021 Bonds issued under the Plan shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act under section 3(a)(2) and 3(a)(4) of the Securities Act of 1933, as amended and under section 1145(a)(1) of the Bankruptcy Code.  Any and all Series 2021 Bonds issued under the Plan will be freely tradable under the Securities Act by the recipients thereof.

### 13.    Organizational Documents.

Subject to Section 6.1 of the Plan, the Reorganized Debtor shall enter into such agreements and amend its corporate governance documents to the extent necessary to implement the terms and provisions of the Plan.  Under section 1123(a)(6) of the Bankruptcy Code, the organizational documents of the Reorganized Debtor will prohibit the issuance of non-voting Interests.  After the Effective Date, if necessary, the Reorganized Debtor will amend and restate its organizational documents, and the Reorganized Debtor will file its respective certificates or articles of incorporation, bylaws, or such other applicable formation documents, and other constituent

documents as permitted by the laws of the state of incorporation and the organization documents of the Reorganized Debtor.

**14. Exemption from Certain Transfer Taxes and Recording Fees.**

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfer from the Debtor to the Reorganized Debtor or to any Entity under, in contemplation of, or in connection with the Plan or under: (1) the issuance, distribution, transfer, or exchange of any debt, securities, or other interest in the Debtor or the Reorganized Debtor; (2) the creation, modification, consolidation, or recording of any mortgage, deed of trust or other security interest, or the securing of additional indebtedness by such or other means; (3) the making, assignment, or recording of any lease or sublease; or (4) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles, or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

**15. Board and Officers of the Reorganized Debtor.**

As of the Effective Date, the members of the Board of Directors and officers of the Debtor as of the Petition Date shall remain in their current capacities as directors and officers of the Reorganized Debtor unless otherwise disclosed in the Plan Supplement or prior to the commencement of the Confirmation Hearing, in each case subject to the ordinary rights and powers of the Board of Directors to remove or replace the officers in accordance with the Reorganized Debtor's organizational documents and any applicable employment agreements that are assumed pursuant to the Plan. From and after the Effective Date, each officer of the Reorganized Debtor shall serve pursuant to the terms of the Reorganized Debtor's certificate of incorporation and bylaws or other formation and constituent documents, and applicable laws of the Reorganized Debtor's jurisdiction of formation.

**16. Directors and Officers Insurance Policies.**

Notwithstanding anything in the Plan to the contrary, the Reorganized Debtor shall be deemed to have assumed all of the Debtor's Directors and Officers ("D&O") Liability Insurance Policies under section 365(a) of the Bankruptcy Code effective as of the Effective Date. Entry of the Confirmation Order will constitute the Court's approval of the Reorganized Debtor's foregoing assumption of the unexpired D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtor under the Plan as to which no Proof of Claim need be filed.

### 17.    Other Insurance Policies.

On the Effective Date, the Debtor's Insurance Policies in existence as of the Effective Date shall be reinstated and continued in accordance with their terms and, to the extent applicable, shall be deemed assumed by the Reorganized Debtor under section 365 of the Bankruptcy Code and Section 7.1 of the Plan.  Nothing in the Plan shall affect, impair, or prejudice the rights of the insurance carriers, the insureds, or the Reorganized Debtor under the Insurance Policies in any manner, and such insurance carriers, the insureds, and Reorganized Debtor shall retain all rights and defenses under such Insurance Policies.  The Insurance Policies shall apply to and be enforceable by and against the insureds and the Reorganized Debtor in the same manner and according to the same terms and practices applicable to the Debtor, as existed prior to the Effective Date.  Following the Effective Date, the Debtor's Insurance Policies shall comply with all applicable covenants set forth in the 2021 Bond Documents.

### 18.    Preservation of Rights of Action.

In accordance with section 1123(b) of the Bankruptcy Code but subject to the releases set forth in Section 9 of the Plan, including but not limited to the release of all Causes of Action against the Trustee and the Consenting Holders, all Causes of Action that the Debtor may hold against any Entity shall vest in the Reorganized Debtor on the Effective Date.  Thereafter, the Reorganized Debtor shall have the exclusive right, authority, and discretion to determine, initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, whether arising before or after the Petition Date, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Court.  **Subject to the releases set forth in Section 9 of the Plan, no Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any specific Cause of Action as any indication that the Debtor or Reorganized Debtor, as applicable, will not pursue any and all available Causes of Action. The Debtor or Reorganized Debtor, as applicable, expressly reserves all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan, and, therefore, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise) or laches, shall apply to any Cause of Action upon, after, or as a consequence of the confirmation of the Plan or the occurrence of the Effective Date**.

### 19.    Corporate Action.

Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by Holders of Claims or Interests, directors, managers, or officers of the Debtor, the Reorganized Debtor, or any other Entity, including: (1) assumption of Executory Contracts; (2) selection of the directors, managers, and officers for the Reorganized Debtor; (3) the execution of and entry into the 2021 Bond Documents; (4) the issuance and distribution of the Series 2021 Bonds as provided in the Plan; and (5) all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the transactions contemplated by the Plan (whether to occur before, on, or after the Effective Date).  All matters provided for in the Plan involving the company structure of the Reorganized Debtor and any company action required by the Debtor or Reorganized Debtor, as applicable, in connection therewith shall be deemed to have

occurred on and shall be in effect as of the Effective Date without any requirement of further action by the security holders, directors, managers, authorized persons, or officers of the Debtor or Reorganized Debtor, as applicable.

On or prior to the Effective Date, the appropriate officers, directors, managers, or authorized persons of the Debtor or Reorganized Debtor, as applicable (including any president, vice-president, chief executive officer, treasurer, general counsel, or chief financial officer thereof), shall be authorized and directed to issue, execute, and deliver the agreements, documents, securities, certificates of incorporation, certificates of formation, bylaws, operating agreements, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Debtor or the Reorganized Debtor, as applicable, including (1) the 2021 Bond Documents, (2) the Series 2021 Bonds and (3) any and all other agreements, documents, securities, and instruments relating to the foregoing. The authorizations and approvals contemplated by the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

### 20.    Effectuating Documents; Further Transactions.

Prior to, on, and after the Effective Date, the Debtor and Reorganized Debtor and the directors, managers, officers, authorized persons, and members of the boards of directors or managers and directors thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and provisions of the Plan, the 2021 Bond Documents, the Series 2021 Bonds and any other securities issued under the Plan in the name of and on behalf of the Reorganized Debtor, without the need for any approvals, authorizations, actions, or consents except for those expressly required under the Plan. All counterparts to any documents described in this paragraph are authorized to and may execute any such documents as may be required or provided by such documents without further order of the Court.

### D.    Assumption of Executory Contracts and Unexpired Leases.

### 1.    Assumption of Executory Contracts.

Except as otherwise provided in the Plan or in a motion filed by the Debtor before the Effective Date, each of the Executory Contracts of the Debtor, shall be deemed assumed as of the Effective Date, without the need for any further notice to or action, order, or approval of the Court, pursuant to section 365 of the Bankruptcy Code. All existing Residency Agreements shall be assumed. The Confirmation Order may constitute an order of the Court approving the assumption of each of the Executory Contracts, all pursuant to sections 365(a) and 1123 of the Bankruptcy Code and effective on the occurrence of the Effective Date.

### 2.    Inclusiveness.

Except as otherwise provided in the Plan or agreed to by the Debtor and the applicable counterparty, each Executory Contract shall include any and all modifications, amendments, supplements, restatements or other agreements made directly or indirectly by any agreement, instrument or other document that in any manner affects such Executory Contract.

31

3.    **Cure of Defaults.**

The Debtor or the Reorganized Debtor, as applicable, shall pay Cures, if any, on the Effective Date or as soon as reasonably practicable thereafter, with the amount and timing of payment of any such Cure dictated by the Debtor's ordinary course of business.

4.    **Indemnification.**

On and as of the Effective Date, the Indemnification Provisions will be assumed and irrevocable and will survive the effectiveness of the Plan, and the Reorganized Debtor's governance documents will provide for the indemnification, defense, reimbursement, exculpation, and/or limitation of liability of and advancement of fees and expenses to the Debtor's and the Reorganized Debtor's current and former directors, officers, employees, and agents to the fullest extent permitted by law and at least to the same extent as the certificate of incorporation, bylaws, or similar organizational documents of the Debtor as of the Petition Date, against any claims or Causes of Action whether direct or derivative, liquidated or unliquidated, fixed, or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted. The Reorganized Debtor shall not amend and/or restate its certificate of incorporation, bylaws, or similar organizational document before or after the Effective Date to terminate or materially adversely affect (1) the Reorganized Debtor's obligations referred to in the immediately preceding sentence or (2) the rights of such managers, directors, officers, employees, or agents referred to in the immediately preceding sentence. Notwithstanding anything to the contrary in the Plan, the Reorganized Debtor shall not be required to indemnify the Debtor's managers, directors, officers, or employees for any claims or Causes of Action for which indemnification is barred under applicable law, the Debtor's organizational documents, or applicable agreements governing the Debtor's indemnification obligations.

5.    **Full Release and Satisfaction.**

Assumption of any Executory Contract pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy related defaults, arising under any assumed Executory Contract at any time before the effective date of the assumption.

6.    **Reservation of Rights.**

Nothing contained in the Plan or the Plan Supplement shall constitute an admission by the Debtor or the Reorganized Debtor that any such contract or lease is in fact an Executory Contract or that the Debtor or the Reorganized Debtor has any liability thereunder.

7.    **Nonoccurrence of Effective Date.**

In the event that the Effective Date does not occur, the Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting unexpired leases under section 365(d)(4) of the Bankruptcy Code, unless such deadline(s) have expired.

### E.    Conditions Precedent to Confirmation and the Effective Date.

### 1.    Conditions Precedent to Confirmation.

The Debtor shall not submit the Confirmation Order for consideration by the Court until each of the following conditions precedent have been satisfied or waived pursuant to the provisions of the Plan:

      **a.**    The proposed Confirmation Order shall be in form and substance reasonably satisfactory in all respects to the Debtor, the Trustee, the Member and the Consenting Holders; and

      **b.**    The Plan and the Plan Supplement, including any schedules, documents, supplements and exhibits thereto shall be in form and substance reasonably acceptable to the Debtor, the Trustee and the Consenting Holders, on the terms contemplated by the Plan Term Sheet.

### 2.    Conditions Precedent to the Effective Date.

The Effective Date shall not occur until each of the following conditions precedent have been satisfied or waived pursuant to the provisions of the Plan:

      **a.**    The Court shall have entered the Confirmation Order, in form and substance reasonably satisfactory to the Debtor, the Trustee, the Member and the Consenting Holders, and such Confirmation Order shall not be subject to any stay or an unresolved request for revocation under section 1144 of the Bankruptcy Code;

      **b.**    The Plan Support Agreement shall not have been terminated, and remains in full force and effect;

      **c.**    On the occurrence of the Effective Date, the conditions to effectiveness of the 2021 Bond Documents shall have been satisfied or waived by the 2021 Bond Trustee and the Consenting Holders, and the Refinancing Transaction shall have closed pursuant to the terms of the Plan Support Agreement;

      **d.**    The Effective Date shall be no later than September 8, 2021.

      **e.**    All actions, documents, certificates, opinions and agreements necessary to implement the Plan, including, without limitation, 2021 Bond Documents, shall have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental units in accordance with applicable laws; and

      **f.**    All requisite governmental authorities and third parties shall have approved or consented, to the extent required, to all actions,

documents, certificates, and agreements necessary to implement the Plan.

### 3. Waiver of Conditions.

The conditions to confirmation and consummation of the Plan set forth therein may be waived in writing at any time by the Debtor, with the written consent of the Trustee, without notice to any other parties in interest or the Court and without a hearing.

### 4. Effect of Failure of Conditions.

If consummation of the Plan does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any claims by or Claims against the Debtor; (2) prejudice in any manner the rights of the Debtor, any Holders of Claims or Interests or any other Person; or (3) constitute an admission, acknowledgment, offer or undertaking by the Debtor, any Holders of Claims or Interests or any other Person in any respect.

### F. Effect of Confirmation.

### 1. General.

Under section 1123 of the Bankruptcy Code, and in consideration for the classification, distributions, releases and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved under the Plan. The entry of the Confirmation Order shall constitute the Court's approval of the compromise or settlement of all such Claims, Interests and controversies, as well as a finding by the Court that any such compromise or settlement is in the best interests of the Debtor, its Estate, and any Holders of Claims and Interests and is fair, equitable and reasonable. Notwithstanding anything contained in the Plan to the contrary, the allowance, classification and treatment of all Allowed Claims and Interests and their respective distributions (if any) and treatments hereunder, takes into account the relative priority and rights of the Claims and the Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code or otherwise. As of the Effective Date, any and all contractual, legal and equitable subordination rights, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code or otherwise, relating to the allowance, classification and treatment of all Allowed Claims and Interests and their respective distributions (if any) and treatments hereunder, are settled, compromised, terminated and released pursuant hereto; *provided, however*, that nothing contained in the Plan shall preclude any Person or Entity from exercising their rights under and consistent with the terms of the Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with the Plan including but not limited to the 2021 Bond Documents.. Notwithstanding the foregoing, any subordinated debt expressly provided for in the Plan or the 2021 Bond Documents shall remain subordinated to the extent provided for in such documents.

### 2. Releases by the Debtor.

Pursuant to section 1123(b) of the Bankruptcy Code, notwithstanding anything contained in the Plan to the contrary, for good and valuable consideration, the adequacy of which is hereby confirmed, including the consummation of the transactions contemplated by the Plan, on and after the Effective Date, each Released Party shall be deemed to be conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Debtor, the Reorganized Debtor, and the Estate, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing entities, from any and all claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of any of the Debtor, the Reorganized Debtor, or the Estate, as applicable, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, tort, contract, or otherwise, that the Debtor, the Reorganized Debtor, or the Estate would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, the Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtor (including the capital structure, management, ownership, or operation thereof), the purchase, sale, or rescission of the purchase or sale of any security of the Debtor or the Reorganized Debtor, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between the Debtor and any Released Party, the Series 2014 Bonds, the assertion or enforcement of rights and remedies against the Debtor, the Debtor's in- or out-of-court restructuring efforts, any Avoidance Actions, intercompany transactions between the Debtor and any non-Debtor, the Chapter 11 Case, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Plan Support Agreement, the Disclosure Statement, the Refinancing Transaction, the Plan (including, for the avoidance of doubt, the Plan Supplement), the Cash Collateral Order, or any other restructuring transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement, the Plan Support Agreement, the Plan (including for the avoidance of doubt the plan supplement), or the 2021 Bond Documents, before or during the filing of the Chapter 11 Case, the filing of the Chapter 11 Case, the pursuit of Confirmation of the Plan, the pursuit of consummation of this Plan, the administration and implementation of this Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes actual fraud, willful misconduct, or gross negligence as determined by a Final Order of the Bankruptcy Court. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Refinancing Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the 2021 Bond Documents, the LSA, the Member Contribution Agreement or any Claim or obligation arising under the Plan.

The foregoing release shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person and the Confirmation Order will permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action or liabilities released under the foregoing release. Notwithstanding the foregoing, nothing in section 9.2 of the Plan shall or shall be deemed to prohibit the Debtor or the Reorganized Debtor from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, Causes of Action or liabilities they may have against any Person that is based upon an alleged breach of a confidentiality or non-compete obligation owed to the Debtor or the Reorganized Debtor, unless otherwise expressly provided for in the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, under Bankruptcy Rule 9019, of foregoing debtor release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the foregoing release is: (i) in exchange for the good and valuable consideration provided by the Released Parties including, without limitation, the Released Parties' contributions to facilitating the restructuring and implementing the Plan; (ii) a good faith settlement and compromise of the Claims released by the debtor's release; (iii) in the best interest of the Debtor and its Estate; (iv) fair, equitable and reasonable; (v) given and made after due notice and opportunity for hearing; and (vi) a bar to the Debtor, the Reorganized Debtor, or the Debtor's Estate asserting any Claim or Cause of Action released pursuant to the debtor's release.

### 3. Releases by Holders of Claims.

**ON AND AFTER THE EFFECTIVE DATE, EXCEPT (I) FOR THE RIGHT TO ENFORCE THE PLAN OR ANY RIGHT OR OBLIGATION ARISING UNDER THE PLAN SUPPLEMENT THAT REMAINS IN EFFECT OR BECOMES EFFECTIVE AFTER THE EFFECTIVE DATE OR (II) AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR CONFIRMATION ORDER, INCLUDING THE 2021 BOND DOCUMENTS, IN EXCHANGE FOR GOOD AND VALUABLE CONSIDERATION, INCLUDING THE OBLIGATIONS OF THE DEBTOR UNDER THE PLAN AND THE CONTRIBUTIONS OF THE RELEASED PARTIES TO FACILITATE AND IMPLEMENT THE PLAN, TO THE FULLEST EXTENT PERMISSIBLE UNDER APPLICABLE LAW, EACH RELEASED PARTY WILL BE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER RELEASED AND DISCHARGED BY EACH RELEASING PARTY FROM ANY AND ALL CLAIMS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, REMEDIES, AND LIABILITIES WHATSOEVER, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING OR HEREINAFTER ARISING, IN LAW, EQUITY, TORT, CONTRACT, OR OTHERWISE, INCLUDING ANY DERIVATIVE CLAIMS ASSERTED ON BEHALF OF THE DEBTOR, THAT SUCH ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT (WHETHER INDIVIDUALLY OR COLLECTIVELY), BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE PURCHASE, SALE, OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITY OF THE DEBTOR OR THE**

REORGANIZED DEBTOR, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN THE DEBTOR AND ANY RELEASED PARTY, THE SERIES 2014 BONDS, THE ASSERTION OR ENFORCEMENT OF RIGHTS AND REMEDIES AGAINST THE DEBTOR, THE DEBTOR'S IN- OR OUT-OF-COURT RESTRUCTURING EFFORTS, ANY AVOIDANCE ACTIONS, INTERCOMPANY TRANSACTIONS BETWEEN THE DEBTOR AND ANY NON-DEBTOR, THE CHAPTER 11 CASE, THE FORMULATION, PREPARATION, DISSEMINATION, NEGOTIATION, FILING, OR CONSUMMATION OF THE PLAN SUPPORT AGREEMENT, THIS DISCLOSURE STATEMENT, THE REFINANCING TRANSACTION, THE PLAN (INCLUDING, FOR THE AVOIDANCE OF DOUBT, THE PLAN SUPPLEMENT), THE CASH COLLATERAL ORDER, OR ANY OTHER RESTRUCTURING TRANSACTION, CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT (INCLUDING ANY LEGAL OPINION REQUESTED BY ANY ENTITY REGARDING ANY TRANSACTION, CONTRACT, INSTRUMENT, DOCUMENT OR OTHER AGREEMENT CONTEMPLATED BY THE PLAN OR THE RELIANCE BY ANY RELEASED PARTY ON THE PLAN OR THE CONFIRMATION ORDER IN LIEU OF SUCH LEGAL OPINION) CREATED OR ENTERED INTO IN CONNECTION WITH THE DISCLOSURE STATEMENT, THE PLAN SUPPORT AGREEMENT, THE PLAN (INCLUDING FOR THE AVOIDANCE OF DOUBT THE PLAN SUPPLEMENT), OR 2021 BOND DOCUMENTS, THE LSA OR THE MEMBER CONTRIBUTION AGREEMENT, BEFORE OR DURING THE FILING OF THE CHAPTER 11 CASE, THE FILING OF THE CHAPTER 11 CASE, THE PURSUIT OF CONFIRMATION OF THE PLAN, THE PURSUIT OF CONSUMMATION OF THE PLAN, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN, INCLUDING THE ISSUANCE OR DISTRIBUTION OF SECURITIES PURSUANT TO THE PLAN, OR THE DISTRIBUTION OF PROPERTY UNDER THE PLAN OR ANY OTHER RELATED AGREEMENT, OR UPON ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE, OTHER THAN CLAIMS OR LIABILITIES ARISING OUT OF OR RELATING TO ANY ACT OR OMISSION OF A RELEASED PARTY OTHER THAN THE DEBTOR THAT CONSTITUTES ACTUAL FRAUD, WILLFUL MISCONDUCT, OR GROSS NEGLIGENCE AS DETERMINED BY A FINAL ORDER OF THE BANKRUPTCY COURT.  NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE RELEASES SET FORTH ABOVE DO NOT RELEASE ANY POST EFFECTIVE DATE OBLIGATIONS OF ANY PARTY OR ENTITY UNDER THE PLAN, THE CONFIRMATION ORDER, ANY REFINANCING TRANSACTION, OR ANY DOCUMENT, INSTRUMENT, OR AGREEMENT (INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN, INCLUDING THE 2021 BOND DOCUMENTS, OR ANY CLAIM OR OBLIGATION ARISING UNDER THE PLAN.

ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE THIRD-PARTY RELEASES, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED HEREIN, AND, FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT

**THE THIRD PARTY RELEASES ARE:  (A) CONSENSUAL; (B) ESSENTIAL TO THE CONFIRMATION OF THE PLAN; (C) GIVEN IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASED PARTIES; (D) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE THIRD-PARTY RELEASES; (E) IN THE BEST INTERESTS OF THE DEBTOR AND ITS ESTATE; (F) FAIR, EQUITABLE, AND REASONABLE; (G) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (H) A BAR TO ANY OF THE RELEASING PARTIES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE THIRD-PARTY RELEASES.**

4.    **Exculpation.**

Except as otherwise specifically provided in the Plan or the Confirmation Order, to the maximum extent permitted by applicable law, no Exculpated Party will have or incur liability for, and each Exculpated Party will be released and exculpated from, any Claim, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, remedy, loss and liability for any Claim in connection with or arising out of this Chapter 11 Case, the formulation, preparation, dissemination, negotiation, Filing, or termination of the Plan Support Agreement and related prepetition transactions, this Disclosure Statement, the Plan, the Plan Supplement, or any Refinancing Transaction, contract, instrument, release or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into before or during this Chapter 11 Case, any preference, fraudulent transfer, or other avoidance claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the Filing of the Chapter 11 Case, the solicitation of votes for or the pursuit of confirmation of the Plan, the administration, funding, consummation, or distribution of property under of the Plan or any related agreement, the occurrence of the Effective Date, the issuance of securities under or in connection with the Plan, or the transactions in furtherance of any of the foregoing, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, except for (a) the liability of any entity that would otherwise result from the failure to perform or pay any obligation or liability under the Plan or any contract, instrument, release or other agreement or document to be entered into or delivered in connection with the Plan including the 2021 Bond Documents, the LSA and the Member Contribution Agreement; or (b) claims related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

The Exculpated Parties and other parties set forth above have, and upon confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

### 5.    Discharge of Claims and Causes of Action.

To the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code, except as otherwise expressly provided by the Plan or the Confirmation Order, effective as of the Effective Date, all consideration distributed under the Plan shall be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims and Causes of Action of any kind or nature whatsoever against the Debtor or any of its Assets or properties, including any interest accrued on such Claims or Interests from and after the Petition Date, and regardless of whether any property shall have been abandoned by order of the Court, distributed or retained under the Plan on account of such Claims, Interests or Causes of Action. Except as otherwise expressly provided by the Plan or the Confirmation Order, upon the Effective Date, the Debtor and its Estate shall be deemed discharged and released under and to the fullest extent provided under sections 524 and 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code from any and all Claims of any kind or nature whatsoever, including, but not limited to, demands and liabilities that arose before the Confirmation Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code.  Such discharge shall void any judgment obtained against the Debtor or the Reorganized Debtor at any time, to the extent that such judgment relates to a discharged Claim.

### 6.    Injunction.

**EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, INCLUDING BUT NOT LIMITED TO ANY RIGHT ARISING UNDER OR RELATED TO THE 2021 BOND DOCUMENTS, THE LSA OR THE MEMBER CONTRIBUTION AGREEMENT FROM AND AFTER THE EFFECTIVE DATE, ALL PERSONS AND ENTITIES WHO HAVE HELD, HOLD, OR MAY HOLD CLAIMS OR INTERESTS THAT HAVE BEEN RELEASED, DISCHARGED, OR ARE SUBJECT TO EXCULPATION WILL BE, TO THE FULLEST EXTENT PROVIDED UNDER SECTION 524 AND OTHER APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE, PERMANENTLY ENJOINED FROM (I) COMMENCING OR CONTINUING, IN ANY MANNER OR IN ANY PLACE, ANY SUIT, ACTION OR OTHER PROCEEDING; (II) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING IN ANY MANNER ANY JUDGMENT, AWARD, DECREE, OR ORDER; (III) CREATING, PERFECTING, OR ENFORCING ANY LIEN OR ENCUMBRANCE; (IV) ASSERTING A SETOFF, RIGHT OF SUBROGATION, OR RECOUPMENT OF ANY KIND UNLESS SUCH HOLDER HAS FILED A MOTION REQUESTING THE RIGHT TO PERFORM SUCH SETOFF ON OR BEFORE THE EFFECTIVE DATE, AND NOTWITHSTANDING AN INDICATION OF A CLAIM OR INTEREST OR OTHERWISE THAT SUCH HOLDER HAS, OR INTENDS TO PRESERVE ANY RIGHT OF SETOFF PURSUANT TO APPLICABLE LAW OR OTHERWISE; OR (V) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND,  IN EACH OF (I) – (V) ON ACCOUNT OF OR WITH RESPECT TO ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, EQUITY INTEREST, OR REMEDY RELEASED OR TO BE RELEASED, SETTLED OR TO BE SETTLED OR DISCHARGED OR TO BE DISCHARGED UNDER THE PLAN OR THE CONFIRMATION ORDER AGAINST ANY PERSON OR ENTITY SO RELEASED OR**

**DISCHARGED (OR THE PROPERTY OR ESTATE OF ANY PERSON OR ENTITY SO RELEASED, DISCHARGED). ALL INJUNCTIONS OR STAYS PROVIDED FOR IN THE CHAPTER 11 CASE UNDER SECTION 105 OR SECTION 362 OF THE BANKRUPTCY CODE, OR OTHERWISE, AND IN EXISTENCE ON THE CONFIRMATION DATE, SHALL REMAIN IN FULL FORCE AND EFFECT UNTIL THE EFFECTIVE DATE.**

7. **Binding Nature of Plan.**

**ON THE EFFECTIVE DATE, AND EFFECTIVE AS OF THE EFFECTIVE DATE, THE PLAN SHALL BIND, AND SHALL BE DEEMED BINDING UPON, THE DEBTOR, THE REORGANIZED DEBTOR, ANY AND ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTOR, ALL PERSONS AND ENTITIES THAT ARE PARTIES TO OR ARE SUBJECT TO THE SETTLEMENTS, COMPROMISES, RELEASES, DISCHARGES, AND INJUNCTIONS DESCRIBED IN THE PLAN, EACH PERSON ACQUIRING PROPERTY UNDER THE PLAN, ANY AND ALL NON-DEBTOR PARTIES TO EXECUTORY CONTRACTS WITH THE DEBTOR AND THE RESPECTIVE SUCCESSORS AND ASSIGNS OF EACH OF THE FOREGOING, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, AND NOTWITHSTANDING WHETHER OR NOT SUCH PERSON OR ENTITY (I) WILL RECEIVE OR RETAIN ANY PROPERTY, OR INTEREST IN PROPERTY, UNDER THE PLAN, (II) HAS FILED A PROOF OF CLAIM OR INTEREST IN THE CHAPTER 11 CASE OR (III) FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN, AFFIRMATIVELY VOTED TO REJECT THE PLAN OR IS CONCLUSIVELY PRESUMED TO REJECT THE PLAN.**

8. **Protection Against Discriminatory Treatment.**

To the extent provided by section 525 of the Bankruptcy Code and the Supremacy Clause of the United States Constitution, all Persons and Entities, including Governmental Units, shall not discriminate against the Reorganized Debtor or deny, revoke, suspend or refuse to renew a license, permit, charter, franchise or other similar grant to, condition such a grant to, discriminate with respect to such a grant, against the Reorganized Debtor, or another Person or Entity with whom the Reorganized Debtor has been associated, solely because the Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Case (or during the Chapter 11 Case but before the Debtor is granted or denied a discharge) or has not paid a debt that is dischargeable in the Chapter 11 Case.

9. **Preservation of Privilege and Defenses.**

No action taken by the Debtor or Reorganized Debtor in connection with the Plan shall be (or be deemed to be) a waiver of any privilege or immunity of the Debtor or Reorganized Debtor, as applicable, including any attorney-client privilege or work-product privilege attaching to any documents or communications (whether written or oral).

### 10. Injunction Against Interference with Plan.

Upon the Court's entry of the Confirmation Order, all Holders of Claims and Interests, the Debtor, and other parties in interest, along with their respective present or former employees, agents, officers, directors, or principals, shall be enjoined from taking any actions to interfere with the Debtor's, the Reorganized Debtor's and their respective affiliates', employees', advisors', officers' and directors', and agents' implementation or consummation of the Plan.

### 11. Release of Liens.

Except as otherwise provided in the Plan, the Confirmation Order, the 2021 Bond Documents, including to the extent the 2021 Bond Documents amend or restate the 2014 Bond Documents, or in any contract, instrument, release or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with, and conditioned upon, the applicable Distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Estate shall be fully released. Except as otherwise provided in the Plan, the Confirmation Order, the 2021 Bond Documents, including to the extent the 2021 Bond Documents amend or restate the 2014 Bond Documents, all mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Debtor's Estate shall be fully released on the Effective Date without any further action of any party, including, but not limited to, further order of the Court or filing updated schedules or statements typically filed pursuant to the Uniform Commercial Code.

### G. Modification, Revocation or Withdrawal of the Plan.

### 1. Modification and Amendments.

The Plan or any exhibits thereto may be amended, modified, or supplemented by the Debtor with the consent of the Trustee in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law without additional disclosure pursuant to section 1125 of the Bankruptcy Code. In addition, after the Confirmation Date, the Debtor or the Reorganized Debtor may institute proceedings in the Court to remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes and effects of the Plan.

### 2. Effect of Confirmation on Modifications.

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

### 3. Revocation or Withdrawal of the Plan.

The Debtor reserves the right to, consistent with its fiduciary duties, revoke or withdraw the Plan before the Effective Date. If the Debtor revokes or withdraws the Plan, or if the Confirmation Date does not occur, then: (a) the Plan shall be null and void in all respects; (b) any

settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts effected by the Plan and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (c) nothing contained in the Plan shall: (i) constitute a waiver or release of any Claims or Interests; (ii) prejudice in any manner the rights of the Debtor or any other Person; or (iii) constitute an admission, acknowledgement, offer or undertaking of any sort by the Debtor or any other Person.

**H.      Retention of Jurisdiction.**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Court shall retain jurisdiction over all matters arising out of, or related to, the Chapter 11 Case and the Plan, including all rights and obligations arising under the 2021 Bond Documents, the LSA, the Member Contribution Agreement and the Subvention Certificate including, but not limited to, jurisdiction to:

**a.**      allow, disallow, determine, liquidate, classify, estimate or establish the priority, secured or unsecured status or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Expense Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount or allowance of Claims;

**b.**      decide and resolve all matters related to the granting and denying, in whole or in part, of any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

**c.**      resolve any matters related to:  (i) the assumption or rejection of any Executory Contract to which the Debtor is party or with respect to which the Debtor may be liable in any manner and to hear, determine and, if necessary, liquidate, any Claims arising therefrom, and cure Claims, pursuant to section 365 of the Bankruptcy Code or any other matter related to such Executory Contract; (ii) any potential contractual obligation under any Executory Contract that is assumed; and (iii) any dispute regarding whether a contract or lease is or was executory or expired;

**d.**      ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

**e.**      adjudicate, decide or resolve any matters, and grant or deny any applications involving the Debtor that may be pending on the Effective Date;

**f.**      adjudicate, decide or resolve any matter involving the Reorganized Debtor;

**g.**    adjudicate, decide or resolve any and all matters related to section 1141 of the Bankruptcy Code;

**h.**    issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Person with consummation or enforcement of the Plan;

**i.**    resolve any cases, controversies, suits, disputes or Causes of Action with respect to the discharge, releases, injunctions, exculpations, indemnifications and other provisions contained in the Plan and enter such orders as may be necessary or appropriate to implement such releases, injunctions and other provisions;

**j.**    enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

**k.**    resolve any cases, controversies, suits, disputes or Causes of Action that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, any transactions or payments contemplated thereby, or any contract, instrument, release, indenture or other agreement or document relating to any of the foregoing;

**l.**    adjudicate any and all disputes arising from or relating to Distributions under the Plan;

**m.**    consider any modifications of the Plan, cure any defect or omission or reconcile any inconsistency in any Court order, including the Confirmation Order;

**n.**    hear and determine all disputes involving the existence, nature or scope of the Debtor's discharge;

**o.**    enforce all orders previously entered by the Court;

**p.**    hear any other matter not inconsistent with the Bankruptcy Code; and

**q.**    enter a final decree closing the Chapter 11 Case.

**I.**    **Miscellaneous Provisions.**

**1.**    **Section 1125(e) Good Faith Compliance.**

As of and subject to the occurrence of the Confirmation Date, the Debtor and its Related Persons shall be deemed to have solicited acceptances of the Plan in good faith and in compliance

with the applicable provisions of the Bankruptcy Code and any applicable non-bankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation.

### 2.        Substantial Consummation.

On the Effective Date, the Plan shall be deemed to be substantially consummated within the meaning set forth in section 1101 and pursuant to section 1127(b) of the Bankruptcy Code.

### 3.        Closing of the Chapter 11 Case.

The Reorganized Debtor shall, promptly after the full administration of the Chapter 11 Case, but by no later than 30 days after the Effective Date, file with the Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Court to close the Chapter 11 Case.

### 4.        Plan Supplement.

Any exhibits or schedules not filed with the Plan may be contained in the Plan Supplement, if any, and the Debtor hereby reserves the right to file such exhibits or schedules as a Plan Supplement.

### 5.        Further Assurances.

The Debtor or the Reorganized Debtor may file with the Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtor, the Reorganized Debtor and all Holders of Claims receiving Distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

### 6.        Exhibits Incorporated.

All exhibits to the Plan, including the Plan Supplement, are incorporated into and are part of the Plan as if fully set forth therein.

### 7.        Inconsistency.

In the event of any inconsistency among the Plan, the Disclosure Statement and any exhibit to the Disclosure Statement, the provisions of the Plan shall govern.

### 8.        No Admissions.

If the Effective Date does not occur, the Plan shall be null and void in all respects, and nothing contained in the Plan shall (a) constitute a waiver or release of any Claims by or against, or any Interests in, the Debtor, (b) prejudice in any manner the rights of the Debtor or any other party in interest, or (c) constitute an admission of any sort by the Debtor or other party in interest.

### 9.      Reservation of Rights.

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Court shall enter the Confirmation Order and the Effective Date has occurred.  None of the Plan, any statement or provision contained in the Plan or any action taken or not taken by the Debtor with respect to the Plan, the Disclosure Statement or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of the Debtor with respect to the Holders of Claims or Interests before the Effective Date.

### 10.      Successors and Assigns.

The rights, benefits and obligations of any Person named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign, affiliate, officer, director, manager, agent, representative, attorney, beneficiaries or guardian, if any, of each Person.

### 11.      Entire Agreement.

On the Effective Date, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

### 12.      Notices.

All notices, requests, and demands to or upon the Debtor in the Chapter 11 Case shall be in writing and, unless otherwise provided in the Plan, shall be deemed to have been duly given or made when actually delivered or, if by facsimile transmission, when received and telephonically confirmed to the below recipients:

<div align="center">

AMSTERDAM HOUSE CONTINUING CARE
RETIREMENT COMMUNITY, INC.
Attention: President and CEO
300 E. Overlook
Port Washington, New York 11050
Telephone: (516) 472-6620
Facsimile: (516) 472-6690
E-mail: jdavis@amsterdamnh.org

with copies to:

SIDLEY AUSTIN LLP
Attention:  Thomas R. Califano
William E. Curtin
787 Seventh Avenue
New York, New York 10019
Telephone:  (212) 839-5300
Facsimile:  (212) 839-5599
E-mail:  tom.califano@sidley.com

</div>

wcurtin@sidley.com

- and -

SIDLEY AUSTIN LLP
Attention:  Jackson T. Garvey
One South Dearborn
Chicago, IL 60603
Telephone:  (312) 853-7000
Facsimile:  (212) 853-7036
E-mail:  jgarvey@sidley.com

All notices and requests to Persons holding any Claim or Interest in any Class shall be sent to them at their last known address or to the last known address of their attorney of record in the Chapter 11 Case.  Any such Holder of a Claim or Interest may designate in writing any other address for purposes of this section, which designation will be effective upon receipt by the Debtor.

### 13.    Severability.

If, prior to the entry of the Confirmation Order, any term or provision of the Plan is held by the Court to be invalid, void or unenforceable, the Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

### 14.    Governing Law.

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflicts of laws, shall govern the rights, obligations, construction, and implementation of the Plan and the transactions consummated or to be consummated in connection therewith.

### 15.    Request for Confirmation.

The Debtor requests entry of the Confirmation Order under section 1129(a) of the Bankruptcy Code and, to the extent necessary, section 1129(b) of the Bankruptcy Code.

## IV.    RISK FACTORS IN CONNECTION WITH THE PLAN

The Holders of Bond Claims against the Debtor should read and carefully consider the following risk factors, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith), before deciding whether to vote to accept or reject the

46

Plan. These risk factors should not, however, be regarded as constituting the only risks associated with the Plan and its implementation.

### A.    Bankruptcy Considerations.

Although the Debtor believes the Plan will satisfy all requirements necessary for confirmation by the Court, there can be no assurance that the Court will confirm the Plan as proposed. Moreover, there can be no assurance that modifications of the Plan will not be required for confirmation or that such modifications would not necessitate the re-solicitation of votes.

In addition, the occurrence of the Effective Date is conditioned on the satisfaction (or waiver) of the conditions precedent set forth in section 8 of the Plan, and there can be no assurance that such conditions will be satisfied or waived. In the event the conditions precedent described in section 8 of the Plan have not been satisfied, or waived (to the extent possible) by the Debtor or applicable parties (as provided for in the Plan) as of the Effective Date, then the Confirmation Order will be vacated, no Distributions will be made pursuant to the Plan, and the Debtor and all Holders of Claims and Interests will be restored to the status quo ante as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred.

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtor believes that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because each Class of Claims and Interests encompass Claims or Interests, as applicable, that are substantially similar to the other Claims and Interests in each such Class. Nevertheless, there can be no assurance that the Court will reach the same conclusion.

### B.    Risks Related to the Debtor's Business and Industry

**1.    Even if the Plan is confirmed, the extent of the Debtor's remaining indebtedness may impair its financial condition and the Debtor's ability to grow and compete.**

As of the date hereof, the Debtor's total secured debt is approximately $212,158,000. Although the Debtor anticipates that the Plan will significantly decrease the annual debt service requirements of the Debtor and, over time, increase its liquidity, it still will have a significant level of debt upon consummation of the Plan. The Debtor's debt has important consequences for its financial condition, including:

> i.    making the Debtor vulnerable to general adverse economic, competitive and industry conditions;

> ii.    limiting the Debtor's ability to obtain additional financing to support its operations and make capital improvements, if necessary;

> iii.    requiring a substantial portion of the Debtor's cash flow from operations for the payment of principal and interest on its debt and reducing its ability to use its cash flow to fund working capital,

capital expenditures, execution of its business strategy, acquisitions, operations and general corporate requirements; and

iv.     limiting the Debtor's ability to receive trade credit from its vendors or otherwise placing it at a competitive disadvantage to other less leveraged competitors.

**2.      Servicing the Debtor's debt will require a significant amount of cash, and its ability to generate sufficient cash depends upon many factors, some of which are beyond its control.**

The Debtor's ability to make payments on and refinance its debt, fund planned capital expenditures and execute its business strategy depends on its ability to generate cash flow in the future. To some extent, this is subject to general economic, financial, competitive and other factors that are beyond the Debtor's control. Even if the Plan is consummated, there can be no assurance that the Debtor's business will continue to generate cash flows at or above current levels or that it will be able to meet its cash needs. If the Debtor is unable to service its debt or experiences a significant reduction in its liquidity, the Debtor could be forced to reduce or delay planned capital expenditures and other initiatives, sell assets, restructure or refinance its debt or seek additional equity capital, and the Debtor may be unable to take any of these actions on satisfactory terms or in a timely manner, or at all. Further, any of these actions may not be sufficient to allow the Debtor to service its debt obligations or may have a materially adverse effect on its results of operations and financial condition. The Debtor's failure to generate sufficient operating cash flows to pay its debts or refinance its indebtedness could have a material adverse effect on its results of operations and financial condition. If the Debtor cannot make scheduled payments on its debt, it would be in default, and as a result, holders of such debt could declare all outstanding principal and interest to be due and payable and the Debtor's existing and future lenders could, under certain circumstances, terminate their commitments to lend it money and foreclose against the assets securing its borrowings.

**3.      The Debtor may fail to maintain turnover or occupancy.**

The economic feasibility of The Harborside, including its refund obligations, depends upon the ability of The Harborside to attract new residents and to maintain substantial occupancy of its facility.

If the Debtor does not achieve the required levels of occupancy for The Harborside, the revenues anticipated by The Harborside from Monthly Service Fees and other charges could be adversely affected. Additionally, if a substantial number of residents live beyond the life expectancies anticipated by the Debtor, new residents will be admitted at a slower rate and the receipt of additional, potentially higher Entrance Fees will be curtailed with a consequent impairment of The Harborside's cash flow. Even if the anticipated attrition levels are realized and maintained, no assurance can be given that remarketing of vacated units will take place as quickly as assumed by the Debtor.

**4.      The Debtor may be faced with competition from other similar facilities.**

The Debtor faces competition from similar facilities operating in or near its market area, from other residential facilities for older adults and from existing facilities offering custodial, intermediate and skilled nursing care.  The Debtor may face additional competition in the future as a result of the construction of new, or the renovation or expansion of existing, housing and nursing care facilities for elderly persons in the area served by The Harborside as well as in the areas surrounding the area served by The Harborside.

**5.      The Plan and the related transactions, which contemplate transactions that will modify the Debtor's capital structure, are based in large part upon assumptions and analyses developed by it.  If these assumptions and analyses prove to be incorrect, the Debtor's Plan may be unsuccessful in its execution of the restructuring and it may be unable to continue as a going concern.**

The Plan and the transactions related thereto, which contemplate transactions that will affect the Debtor's capital structure, are premised upon assumptions and analyses of the Debtor that are based upon the Debtor's experience and perception of historical trends, current conditions and expected future developments, as well as other factors that it considers appropriate under the circumstances.  Whether actual future results and developments will be consistent with the Debtor's expectations and assumptions depend on a number of factors.

In addition, the Plan relies upon financial forecasts, including with respect to revenue growth, improved earnings before interest, taxes, depreciation and amortization, improved interest margins, and growth in cash flow.  Financial forecasts are necessarily speculative, and it is likely that one or more of the assumptions and estimates that are the basis of these financial forecasts will not be accurate.  The Debtor's actual financial condition and results of operations may differ, perhaps materially, from what it anticipated.  Consequently, there can be no assurance that the results or developments contemplated by the Plan will occur or, even if they do occur, that they will have the anticipated effects on the Debtor's business or operations.  The failure of any such results or developments to materialize as anticipated could materially adversely affect the successful execution of the transactions contemplated by the Plan.

**6.      Uncertainties related to the Debtor's business may impact its ability to attract new residents.**

The Debtor's success depends on its ability to consistently, accurately and effectively provide affordable living accommodations and related healthcare and support services to seniors.  Should seniors perceive that the uncertainties related to the Debtor's business have adversely affected its services, there will be a decrease in new residents attracted to The Harborside.

**7.      Uncertainties related to the Debtor's business may create a distraction for or cause a loss of personnel and may otherwise adversely affect its ability to attract new personnel.**

The market for qualified personnel is competitive and the Debtor's future success will depend upon, among other factors, its ability to attract and retain key personnel and to pay those

personnel market wages. In addition, uncertainties about the future prospects and viability of its business is impacting and is likely to continue to impact the Debtor's ability to attract and retain key personnel, and is a distraction for existing personnel. If the Debtor loses the services of key personnel, if one or more of them decides to join a competitor or otherwise compete with it or if personnel continue to be distracted due to the uncertainties about the future prospects and viability of its business, the Debtor may not be able to effectively implement its business strategy and its business could suffer. The loss of the services of any of the Debtor's other key management personnel or the failure to attract and retain personnel could have a material adverse effect on its results of operations and financial condition due to disruptions in its leadership and the continuity of its business relationships.

8.      **Third-party reimbursement may be reduced or eliminated.**

The health care industry, in general, is subject to regulation by a number of governmental agencies, including those which administer the Medicare reimbursement program, and other federal, state and local governmental agencies. As a result, the Debtor is sensitive to legislative and regulatory changes in such programs and is affected by reductions in governmental spending for such programs. Congress has in the past enacted a number of provisions which affect health care providers, and additional legislative changes can be expected. Previous legislative actions have included limitation of payments to nursing homes under the Medicare program.

Future legislation, regulation or actions by the federal government are expected to continue the trend toward more restrictive limitations on reimbursement for long-term care services. At present, no determination can be made concerning whether, or in what form, such legislation would be introduced and enacted into law. Similarly, the impact of future cost control programs and future regulations upon the Debtor's financial performance cannot be determined at this time.

The Debtor may receive reimbursement from non-governmental third-party payors, such as commercial insurers, employers under self-insurance programs, health maintenance organizations, and preferred provider organizations. Most of these programs make payments at rates which are less than actual charges. Accordingly, there can be no assurance that payments made under such programs will be adequate to cover actual costs incurred.

9.      **The income of the elderly may diminish.**

A large percentage of the monthly income of the residents of The Harborside is fixed income derived from pensions and social security or income from investments. If, due to inflation or otherwise, substantial increases in monthly fees are required to cover increases in operating costs, wages, benefits and other expenses, residents may have difficulty paying such monthly fees. Furthermore, investment income of the residents may be adversely affected by declines in the stock market and sustained historically low market interest rates, also resulting in payment difficulties.

10.     **Continuing Long-Term Uncertainties Regarding COVID-19 Pandemic As Any Resurgence May Undermine the Debtor's Business.**

In the last several months, COVID-19 infection rates in the United States have stabilized or continued to drop and most states, including New York, have streamlined the vaccination process. While federal guidance is softening regarding masks and other COVID-19 precautions,

there is still the risk of a potential resurgence or the emergence and impact of different COVID variants, the effects of which the Debtor cannot thoroughly predict at this time.

From an operational perspective, the Debtor is focused on providing the safest possible environment for its Residents and employees.  Although the Debtor is continuing to implement appropriate safety measures, as a provider of healthcare services, it is and continues to be exposed to the health and economic effects of COVID-19, many of which may have and will continue to have a material adverse impact on the Company's employees, as well as its business operations and financial condition.  Future COVID-19 issues could 1) diminish the public's trust in healthcare facilities, especially healthcare facilities, such as the Debtor, that cater to vulnerable populations and 2) result in reduced employee morale, labor unrest, work stoppages or other workforce disruptions.  Both of these could have an adverse effect on the Debtor's business operations and financial condition.

## 11.    Other Possible Risk Factors.

The occurrence of any of the following events, or other unanticipated events, could adversely affect the financial condition or results of operations of the Debtor:

    i.     reinstatement of or establishment of mandatory governmental wage, rent or price controls;

    ii.     adoption of federal, state or local legislation or regulations having an adverse effect on the future operating or financial performance of the Debtor;

    iii.     events adversely affecting the operation of The Harborside, including enactment of legislation imposing ceilings on increases in health care charges, changes in Medicare or comparable regulations or attempts by third-party payors administering health care cost reimbursement plans to control or restrict the operations of certain health care facilities;

    iv.     a decline in the population, a change in the age composition of the population or a decline in the economic conditions of the Debtor's market area;

    v.     developments or events affecting the federal or state exemption of the Debtor's income from taxation;

    vi.     suspension or revocation of or failure to renew any license, certificate or approval to operate The Harborside, or any portion thereof, or any restriction on new admissions to licensed beds;

    vii.     changes in key management personnel;

    viii.     reductions in utilization of continuing care retirement and assisted living facilities as a result of preventive medicine, improved

occupational health and safety, development and utilization of medical and scientific research and technological advances and other developments;

ix.     changes in reimbursement procedures or in contracts under public or private insurance programs;

x.      increased costs of attracting and retaining, or decreased availability of a sufficient number of, health professionals, including trained nurses vital to The Harborside;

xi.     increases in costs, including costs associated with, among other things, salaries, wages and fringe benefits, supplies, technology and equipment, insurance, energy and other utilities, the attraction and retention of nurses and other personnel, compliance with or violation of environmental laws and regulations, and other costs that could result in a sizable increase in expenditures without a corresponding increase in revenues;

xii.    inability of the Debtor to obtain future governmental approvals to undertake additional projects necessary to remain competitive as to rates, charges and the quality and scope of care or any limitation on the availability of tax-exempt or other financing for future projects; and

xiii.   the occurrence of natural disasters, including floods, hurricanes, tornadoes and earthquakes, could damage The Harborside, interrupt utility service or otherwise impair the operations of the Debtor and the generation of revenues from The Harborside.  The Harborside is required to be covered by general property insurance in amounts which management of the Debtor considers to be sufficient to provide for the replacement of such facility in the event of a natural disaster.

## C.     Additional Factors

### 1.      No Duty to Update Disclosures.

The Debtor has no duty to update the information contained in this Disclosure Statement as of the date hereof, unless otherwise specified herein, or unless the Debtor is required to do so pursuant to an order of the Court.  Delivery of the Disclosure Statement after the date hereof does not imply that the information contained herein has remained unchanged.

### 2.      Representations Outside this Disclosure Statement.

This Disclosure Statement contains representations concerning or related to the Debtor and the Plan that are subject to approval by the Court.  Please be advised that any representations or inducements outside this Disclosure Statement and any related documents which are intended to

secure your acceptance or rejection of the Plan should not be relied upon by Holders of Claims or Interests that are entitled to vote to accept or reject the Plan.

### 3. No Admission.

The information and representations contained herein shall not be construed to constitute an admission of, or be deemed evidence of, any legal effect of the Plan on the Debtor or Holders of Claims and Interests.

### 4. Tax and Other Related Considerations.

A discussion of potential tax consequences of the Plan is provided in section VII hereof; however, the content of this Disclosure Statement is not intended and should not be construed as tax, legal, business or other professional advice. Holders of Claims and/or Interests should seek advice from their own independent tax, legal or other professional advisors based on their own individual circumstances.

## V. PLAN CONFIRMATION AND CONSUMMATION

### A. The Confirmation Hearing.

Bankruptcy Code section 1128(a) requires the Court, after appropriate notice, to hold a Confirmation Hearing. On, or as promptly as practicable after the filing of the Plan and this Disclosure Statement, the Debtor will request, pursuant to the requirements of the Bankruptcy Code and the Bankruptcy Rules, that the Court schedule the Confirmation Hearing. Notice of the Confirmation Hearing (the "Confirmation Hearing Notice") will be provided to all known Creditors or their representatives. The Confirmation Hearing may be adjourned from time to time by the Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any subsequent adjourned Confirmation Hearing.

Pursuant to Bankruptcy Code section 1128(b), any party in interest may object to confirmation of a plan of reorganization or liquidation. Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules, must set forth the name of the objector, the nature and amount of Claims or Interests held or asserted by the objector against the Debtor, the basis for the objection and the specific grounds of the objection, and must be filed with the Court, together with proof of service thereof, and served upon: (i) counsel for the Debtor, Sidley Austin LLP, 787 Seventh Avenue, New York, New York 10019, Attn: Thomas R. Califano (thomas.califano@dlapiper.com) and William E. Curtin (wcurtin@sidley.com), and Sidley Austin LLP, One South Dearborn Street, Suite 900, Chicago, Illinois 60603, Attn: Jackson T. Garvey (jgarvey@sidley.com); (ii) counsel for UMB Bank, N.A., Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., One Financial Center, Boston, Massachusetts 02111, Attn: Daniel Bleck (dbleck@mintz.com); (iii) the Office of the United States Trustee for the Eastern District of New York (Central Islip Division), Alfonse M. D'Amato Federal Courthouse, 560 Federal Plaza, Central Islip, New York 11722; and (iv) such other parties as the Court may order, so as to be actually received no later than the date and time designated in the Confirmation Hearing Notice.

Bankruptcy Rule 9014 governs objections to confirmation of the Plan. **UNLESS AN OBJECTION TO CONFIRMATION OF THE PLAN IS TIMELY SERVED UPON THE**

PARTIES LISTED ABOVE AND FILED WITH THE COURT, IT MAY NOT BE
CONSIDERED BY THE COURT IN DETERMINING CONFIRMATION OF THE PLAN.

### B.      Plan Confirmation Requirements Under the Bankruptcy Code.

In order for the Plan to be confirmed, the Bankruptcy Code requires that the Court
determine that the Plan complies with the technical requirements of chapter 11 of the Bankruptcy
Code and that the disclosures concerning the Plan have been adequate and have included
information concerning all payments made or promised in connection with the Plan and the
Chapter 11 Case.  The Bankruptcy Code also requires that: (1) the Plan be accepted by the requisite
votes of Creditors except to the extent that confirmation despite dissent is available under
Bankruptcy Code section 1129(b); (2) the Plan is feasible (that is, there is a reasonable probability
that the Debtor will be able to perform its obligations under the Plan without needing further
financial reorganization not contemplated by the Plan); and (3) the Plan is in the "best interests"
of all Creditors (that is, Creditors will receive at least as much under the Plan as they would receive
in a hypothetical liquidation case under chapter 7 of the Bankruptcy Code).  To confirm the Plan,
the Court must find that all of the above conditions are met, unless the applicable provisions of
Bankruptcy Code section 1129(b) are employed to confirm the Plan, subject to satisfying certain
conditions, over the dissent or deemed rejections of Classes of Claims.

### 1.      Best Interests of Creditors.

The Bankruptcy Code requires that, with respect to an impaired class of claims or interests,
each holder of an impaired claim or interest in such class either (i) accepts the plan or (ii) receives
or retains under the plan property of a value, as of the effective date of the plan, that is not less
than the amount (value) such holder would receive or retain if the debtor was liquidated under
chapter 7 of the Bankruptcy Code on the Effective Date.

The Debtor, with the assistance of its professionals, has prepared the Liquidation Analysis
attached hereto as **Exhibit E**.  The Liquidation Analysis is based upon a hypothetical liquidation
in a chapter 7 case.  In preparing the Liquidation Analysis, the Debtor has taken into account the
nature, status and underlying value of its Assets, the ultimate realizable value of its Assets, and the
extent to which such Assets are subject to liens and security interests.  In addition, the Liquidation
Analysis also reflects the required time and resources necessary to effectuate an orderly wind down
of The Harborside, which provides critical care to residents and must comply with numerous
federal and state regulations.

Based upon the Liquidation Analysis, the Debtor believes that liquidation under chapter 7
would result in smaller distributions, if any, being made to Creditors than those provided for in the
Plan because of: (a) the likelihood that the Debtor's Assets would have to be sold or otherwise
disposed of in an orderly fashion; (b) additional administrative expenses attendant to the
appointment of a trustee and the trustee's employment of attorneys and other professionals; and
(c) additional expenses and Claims, some of which would be entitled to priority, which would be
generated during the liquidation and from the rejection of leases and other executory contracts in
connection with a cessation of the Debtor's operations.  In the opinion of the Debtor, the recoveries
projected to be available in a chapter 7 liquidation are not likely to afford the Holders of Claims
as great a realization potential as afforded to them under the Plan.

Accordingly, the Debtor believes that in a chapter 7 liquidation, Holders of Claims would receive less than such Holders would receive under the Plan.  There can be no assurance, however, as to values that would actually be realized in a chapter 7 liquidation, nor can there be any assurance that a Court would accept the Debtor's conclusions or concur with such assumptions in making its determinations under section 1129(a)(7) of the Bankruptcy Code.

### 2.    Feasibility of the Plan.

Pursuant to section 1129(a)(11) of the Bankruptcy Code, a debtor must demonstrate that confirmation of a plan is not likely to be followed by the liquidation or need for further financial reorganization of the debtor or its successor under the plan, unless such liquidation or reorganization is proposed under the plan.

In order to establish the feasibility of the Plan for purposes of section 1129(a)(11) of the Bankruptcy Code, the Debtor and its management team and advisors, have developed the Financial Projections attached hereto as **Exhibit D**.  The Financial Projections set forth the projected financial performance of the Reorganized Debtor over a defined period of time based upon a number of assumptions and factors.  The Financial Projections are unaudited.  Impaired creditors and other interested parties should review Section VI of this Disclosure Statement for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtor.

The Debtor anticipates that the Financial Projections will show that the Reorganized Debtor will have a viable operation following the Chapter 11 Case and that confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization.

### 3.    Acceptance by Impaired Classes.

The Bankruptcy Code requires, as a condition to confirmation, that, except as described below, each class of claims or equity interests that is impaired under a plan, accept the plan.  A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required.  As a general matter under the Bankruptcy Code, a class is "impaired," unless the plan:  (a) leaves unaltered the legal, equitable and contractual rights to which the claim or the equity interest entitles the holder of such claim or equity interest; (b) cures any default and reinstates the original terms of such claim or equity interest; or (c) provides that, on the consummation date, the holder of such claim or equity interest receives cash equal to the allowed amount of that claim or, with respect to any equity interest, any fixed liquidation preference to which the holder of such equity interest is entitled to any fixed price at which the debtor may redeem the security.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the plan.  Thus, a class of claims will have voted to accept the plan only if two-thirds (2/3) in amount and a majority in number actually voting cast their ballots in favor of acceptance.  A vote may be disregarded if the Court determines, after notice and a hearing, that acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

Any Class of Claims that is not occupied as of the commencement of the Confirmation Hearing by an Allowed Claim or a Claim temporarily Allowed under Bankruptcy Rule 3018 shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.  If no votes to accept or reject the Plan are received with respect to a Class whose votes have been solicited under the Plan (other than a Class that is deemed eliminated under the Plan), such Class shall be deemed to have voted to accept the Plan.

### 4.        Additional Requirements for Nonconsensual Confirmation.

The Bankruptcy Code permits confirmation of a plan even if it is not accepted by all impaired classes, as long as: (a) the plan otherwise satisfies the requirements for confirmation; (b) at least one impaired class of claims has accepted it without taking into consideration the votes of any insiders in such class; and (c) the plan is "fair and equitable" and does not "discriminate unfairly" as to any impaired class that has not accepted the plan.  These so called "cramdown" provisions are set forth in section 1129(b) of the Bankruptcy Code.

### 5.        No Unfair Discrimination.

The "no unfair discrimination" test requires that the plan not provide for unfair treatment with respect to classes of claims or interests that are of equal priority, but are receiving different treatment under the plan.

### 6.        Fair and Equitable.

The fair and equitable requirement applies to classes of claims of different priority and status, such as secured versus unsecured.  The plan satisfies the fair and equitable requirement if no class of claims receives more than 100% of the allowed amount of the claims in such class. Further, if a class of claims is considered a dissenting class ("Dissenting Class"), i.e., a Class of Claims that is deemed to reject the Plan because the required majorities in amount and number of votes is not received from the Class, the following requirements apply:

### a.        Class of Secured Claims.

Each holder of an impaired secured claim either: (i) retains its liens on the subject property, to the extent of the allowed amount of its secured claim and receives deferred cash payments having a value, as of the effective date of the plan, of at least the allowed amount of such claim; (ii) has the right to credit bid the amount of its claim if its property is sold and retains its liens on the proceeds of the sale (or if sold, on the proceeds thereof); or (iii) receives the "indubitable equivalent" of its allowed secured claim.

### b.        Class of Unsecured Creditors.

Either (i) each holder of an impaired unsecured claim receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the holders of claims and interests that are junior to the claims of the Dissenting Class will not receive any property under the plan.

c.    **Class of Interests.**

Either (i) each interest holder will receive or retain under the plan property of a value equal to the greater of (a) the fixed liquidation preference or redemption price, if any, of such stock and (b) the value of the stock, or (ii) the holders of interests that are junior to the interests of the Dissenting Class will not receive any property under the plan.

The Debtor believes the Plan does not "discriminate unfairly" and will satisfy the "fair and equitable" requirement notwithstanding that certain Classes of Interests are deemed to reject the Plan because no Class that is junior to such Class will receive or retain any property on account of the Claims and Interests in such Class and the Plan does not provide for unfair treatment with respect to Classes of Claims or Interests that are of equal priority.

## VI.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtor believes the Plan is in the best interests of its Creditors and should accordingly be accepted and confirmed.  If the Plan as proposed, however, is not confirmed, the following alternatives may be available to the Debtor: (i) a liquidation of the Debtor's Assets pursuant to chapter 7 of the Bankruptcy Code; or (ii) an alternative plan of reorganization or liquidation may be proposed and confirmed.

### A.    Chapter 7 Liquidation.

If a plan pursuant to chapter 11 of the Bankruptcy Code is not confirmed by the Court, the Debtor's Chapter 11 Case may be converted to a liquidation case under chapter 7 of the Bankruptcy Code, in which a trustee would be elected or appointed, pursuant to applicable provisions of chapter 7 of the Bankruptcy Code, to liquidate the Assets of the Debtor for distribution in accordance with the priorities established by the Bankruptcy Code.  The Debtor believes that such a liquidation would result in smaller distributions being made to the Debtor's Creditors than those provided for in the Plan because: (a) the likelihood that other Assets of the Debtor would have to be sold or otherwise disposed of in an orderly fashion; (b) additional administrative expenses attendant to the appointment of a trustee and the trustee's employment of attorneys and other professionals; and (c) additional expenses and Claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of leases and other executory contracts in connection with a cessation of the Debtor's operations.  The Debtor has found that confirmation of the Plan will provide each Holder of an Allowed Claim with a recovery that is not less than such Holder would receive pursuant to liquidation of the Debtor under chapter 7 of the Bankruptcy Code.

### B.    Alternative Plan Pursuant to Chapter 11 of the Bankruptcy Code.

If the Plan is not confirmed, the Debtor may propose a different plan, which might involve an alternative means for the reorganization or liquidation of the Debtor's Assets.  However, the Debtor believes that the terms of the Plan provide for an orderly and efficient restructuring of the Debtor's obligations and will result in the realization of the most value for Holders of Claims against the Debtor's Estate.

## VII.    CERTAIN FEDERAL TAX MATTERS RELATING TO THE PLAN

### A.    Introduction

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtor and to certain U.S. Holders, as defined below, (which, solely for purposes of this discussion, means the beneficial owners for U.S. federal income tax purposes) of Claims.  This summary is based on the IRC, the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial decisions and published administrative rules, and pronouncements of the Internal Revenue Service (the "IRS"), all as in effect on the date hereof. Changes in the rules or new interpretations of the rules may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below.  Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below.  The Debtor has not requested, and does not intend to request, any ruling or determination from the IRS or any other taxing authority with respect to the tax consequences discussed herein, and the discussion below is not binding upon the IRS or the courts.  No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This summary does not address foreign, state, local, gift or estate tax consequences of the Plan, nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to a holder in light of its individual circumstances or to a holder that may be subject to special tax rules (such as persons who are related to the Debtor within the meaning of the IRC, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax-exempt organizations, pass through entities, beneficial owners of pass-through entities, trusts, governmental authorities or agencies, dealers and traders in securities, subchapter S corporations, persons who hold Claims as part of a straddle, hedge, conversion transaction, or other integrated investment, persons using a mark-to-market method of accounting, non-U.S. Holders, and holders of Claims who are themselves in bankruptcy).  This summary assumes that the various debt and other arrangements to which any the Debtor is a party will be respected for U.S. federal income tax purposes in accordance with their form, and that the Claims constitute interests in the Debtor "solely as a creditor" for purposes of section 897 of the IRC.  This summary does not discuss differences in tax consequences to holders of Claims that act or receive consideration in a capacity other than any other holder of a Claim of the same Class or Classes, and the tax consequences for such holders may differ materially from that described below.  This summary does not address the U.S. federal income tax consequences to holders (a) whose Claims are Unimpaired or otherwise entitled to payment in full in Cash under the Plan, or (b) that are deemed to reject the Plan.

For purposes of this discussion, a U.S. Holder ("U.S. Holder") is a holder of a Claim or Interest that is: (a) an individual citizen or resident of the United States for U.S. federal income tax purposes; (b) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the U.S., any state thereof or the District of Columbia; (c) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (d) a trust (i) if a court within the U.S. is able to exercise primary jurisdiction over the trust's administration and one or more "United States persons" (within the

meaning of section 7701(a)(30) of the IRC) have authority to control all substantial decisions of the trust, or (ii) that has a valid election in effect under applicable Treasury Regulations to be treated as a "United States person" (within the meaning of section 7701(a)(30) of the IRC).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a holder of a Claim, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partner (or other beneficial owner) and the entity. Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are holders of Claims should consult their tax advisors regarding the U.S. federal income tax consequences of the Plan.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR INTEREST. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR TAX ADVISORS AS TO THE FEDERAL, STATE, LOCAL AND NON-U.S. INCOME, ESTATE, AND OTHER TAX CONSEQUENCES OF THE PLAN.**

### B.    U.S. Federal Income Tax Consequences to the Debtor.

Generally, when a debtor discharges its debt obligation for an amount less than the adjusted issue price of the debt obligation, the debtor must include such difference in its gross income as cancellation of indebtedness ("COD") income. Due to its status as a not-for-profit corporation generally exempt from U.S. federal income tax pursuant to section 501(a) of the IRC, however, the Debtor does not expect that the Plan will result in any significant federal income tax consequences to it.

Although the Debtor does not expect that the implementation of the Plan would adversely affect its tax-exempt status, and does not believe that any COD income triggered by the Plan would be treated as "unrelated business taxable income" ("UBTI") that is taxable to the Debtor, if the Debtor's tax-exempt status were adversely affected, or if any COD income would be treated as UBTI, the Debtor may become subject to tax on its income. Even if any COD income triggered by the Plan were treated as UBTI, it is expected that the Debtor would qualify for a bankruptcy exclusion rule pursuant to which the Debtor would not recognize such COD income so long as the discharge were granted by the Bankruptcy Court or occurred pursuant to a plan of reorganization approved by the Bankruptcy Court. In such case, however, the Debtor would generally be required to reduce certain income tax attributes otherwise available and of value to the Debtor by the amount of the COD income. Tax attributes subject to reduction include: (a) net operating losses ("NOLs") and NOL carryforwards; (b) credit carryforwards, including the general business credit and the minimum tax credit; (c) capital losses and capital loss carryforwards; (d) the tax basis of the Debtor's depreciable and nondepreciable assets, but not in an amount greater than the excess of the aggregate tax bases of the property held by the debtor immediately after the discharge over the aggregate of the Debtor's liabilities immediately after the discharge; and (e) foreign tax credit carryforwards.

### C.    U.S. Federal Income Tax Consequences to Holders of Claims.

#### 1.    Holders of Bond Claims (Class 3).

Pursuant to the Plan, the Holders of Series 2014A Bonds and Series 2014B Bonds will exchange such bonds for Series 2021B Bonds (each, a "<u>Bond Exchange</u>"). The tax consequences of the Bond Exchange to a particular holder will vary depending on each holder's circumstances. Accordingly, each holder should consult with its tax advisors as to any potential tax consequences to such holder, including as to (i) whether the Bond Exchange could result in a taxable disposition to a particular holder, and (ii) the treatment and tax consequences of the Series 2021B Bonds received by a holder in exchange for its allocable share of accrued and unpaid interest on its Series 2014A Bonds and Series 2014B Bonds.

The entirety of the Series 2014C Bonds will be extinguished and holders of Series 2014C Bonds will receive nothing in exchange for their Claims. As a result, U.S. Holders of Series 2014C Bonds will generally recognize a loss in an amount equal the Holder's adjusted tax basis, if any, in its Claim, except to the extent such U.S. Holder previously claimed a loss with respect to such Claim under its regular method of accounting.

#### 2.    Holders of General Unsecured Claims (Class 4)

As part of the Plan, a U.S. Holder of a General Unsecured Claim will receive a cash payment equal to fifteen (15) percent of the Allowed Amount of such General Unsecured Claim, in each case subject to all defenses or disputes the Debtor may assert as to the validity or amount of such Claim.

The precise U.S. federal income tax consequences for a Holder of a General Unsecured Claim will depend, in part, upon the Holder's method of accounting (cash or accrual) and whether its Claim is a capital asset or item of property in the hands of the holder.

To the extent that a U.S. Holder does not have any basis in its General Unsecured Claim for U.S. federal income tax purposes (e.g., such U.S. Holder does not hold its General Unsecured Claim as a capital asset or as an item of property), then such U.S. Holder is generally expected to recognize income equal to the amount received for such Claim. Such income is further expected to be classified as ordinary in nature.

On the other hand, for a U.S. Holder that holds its General Unsecured Claim as a capital asset or as an item of property, such U.S. Holder would generally be expected to realize gain or loss in an amount equal to the difference between (a) the amount received for such Claim and (b) the adjusted tax basis in its General Unsecured Claim, determined immediately prior to the Effective Date. The character of such gain or loss will depend on certain factors that are specific to the U.S. Holder of a General Unsecured Claim.

Holders of General Unsecured Claims should consult their tax advisors with respect to the U.S. federal income tax consequences to them of the Plan.

### 3.    Holders of Resident Refund Claims (Class 5)

As part of the Plan, a U.S. Holder of a Resident Refund Claim will receive the full face amount of the Holder's Entrance Fee but will not receive interest thereon.  The tax consequences to a U.S. Holder of a Resident Refund Claim depend upon circumstances specific to such holder, including whether the Resident Refund Claim arises out of a "continuing-care contract" as defined in section 7872(h) of the IRC and whether such U.S. Holder deducted any portion of his or her Entrance Fee at the time the Entrance Fee was paid. To the extent any such deductions were taken, a U.S. Holder may be required to recognize income upon receipt of the payment of the Resident Refund Claim.

Holders of Resident Refund Claims should consult their tax advisors with respect to the U.S. federal income tax consequences to them of the Plan.

### D.    U.S. Tax Consequences of Ownership of the Series 2021 Bonds

The federal income tax consequences of holding the Series 2021 Bonds will depend on the terms, structure and composition of the Series 2021 Bonds.

As a condition precedent to the Effective Date, the Series 2021B Bonds Trustee will receive a satisfactory opinion of bond counsel that the interest on the Series 2021B Bonds will be excluded from gross income for federal income tax purposes and will not be an item of tax preference for purposes of the federal alternative minimum tax imposed on individuals. Notwithstanding this opinion, ownership of the Series 2021 Bonds may result in additional federal and state tax consequences to the U.S. Holders of the Series 2021 Bonds.

The opinion of bond counsel is based on current legal authority, may cover matters not directly addressed by such authorities, and represents bond counsel's judgment as to the proper treatment of the Series 2021 Bonds.  It is not binding on the IRS or the courts.  Furthermore, bond counsel cannot give, and will not give, any opinion or assurance about the further activities of the Debtor, or about the effect of future changes to the IRC, the applicable regulations promulgated thereunder, or the interpretation or enforcement thereof by the IRS. The Debtor, however, has agreed to act in a manner so as to maintain the exclusion from gross income of the interest on the Series 2021B Bonds.

### E.    Information Reporting and Backup Withholding

The Debtor will comply with all applicable reporting requirements of the IRC.  In general, information reporting requirements may apply to distributions or payments made to a holder of a Claim under the Plan. Additionally, under the backup withholding rules, a holder of a Claim may be subject to backup withholding with respect to distributions or payments made pursuant to the Plan unless, in the case of a U.S. Holder, such U.S. Holder provides a properly executed IRS Form W-9. Backup withholding is not an additional tax but is, instead, an advance payment that may entitle the holder to a refund from the IRS to the extent it results in an overpayment of tax, provided that the required information is provided to the IRS.

In addition, from an information reporting perspective, the Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of

transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the holders' tax returns.

**THE UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX.  THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF UNITED STATES FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM OR INTEREST IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM UNDER THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, NON-US, OR OTHER TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

## VIII.   RECOMMENDATION AND CONCLUSION

The Debtor believes the Plan is in the best interests of its Estate, Creditors and other interested parties and urge the Holders of Impaired Claims entitled to vote to accept the Plan and to evidence such acceptance by properly voting and timely returning their ballots.

Dated:    06/14/2021

Respectfully submitted,

AMSTERDAM HOUSE CONTINUING CARE
RETIREMENT COMMUNITY, INC.

By: _____
Name: James Davis
Title: President and Chief Executive Officer

*Signature Page to Disclosure Statement*

## Exhibit A

**Plan of Reorganization**

**(Filed concurrently)**

**<u>Exhibit B</u>**

**Plan Support Agreement**

**(Filed as Exhibit M to the First Day Declaration)**

**<u>Exhibit C</u>**

**2021 Bond Documents**

**(To Follow)**

**<u>Exhibit D</u>**

**Financial Projections**

**(To Follow)**

**<u>Exhibit E</u>**

**Liquidation Analysis**

**(To Follow)**

**<u>Exhibit F</u>**

**Form of Opinion of Bond Counsel**

**(To Follow)**